**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION**

| | |
|---|---|
| **METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC.,** | ) )  ) |
| **Plaintiff,** | ) ) |
| **v.** | ) **Civil Action No. 12-cv-954-AW** |
| | ) |
| **AMERICAN HOME REALTY NETWORK, INC.** | ) ) ) ) ) |
| **Defendants,** | ) ) |
| **AMERICAN HOME REALTY NETWORK, INC.,** | ) ) |
| **Counterclaimant,** | ) ) |
| **v.** | ) ) |
| **METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC.,** | ) ) ) |
| **and** | ) ) |
| **NATIONAL ASSOCIATION OF REALTORS,** | ) ) ) |
| **and** | ) ) |
| **DOEs Nos. 1 – 25,** | ) ) |
| **Counterclaim Defendants.** | ) ) ) |

**<u>FIRST AMENDED COUNTERCLAIM</u>**

Counterclaimant, AMERICAN HOME REALTY NETWORK, INC., (hereinafter, "Counterclaimant" or "AHRN") by its counsel hereby files this First Amended Counterclaim pursuant to Fed. R. Civ. P. 15(a)(1)(B), and complains of counterclaim defendants METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC. AND NATIONAL ASSOCIATION OF REALTORS and DOES Nos. 1-25 (collectively "Counterclaim Defendants," or "Defendants") as follows:

1.      Counterclaimant, AMERICAN HOME REALTY NETWORK, INC. ("AHRN") is a corporation organized under the laws of the State of Delaware with its principal place of business at 222 7th Street, 2nd Floor, San Francisco, California.

2.      Counterclaim Defendant, METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC. ("MRIS") is a corporation organized under the laws of the State of Delaware with its principal place of business at 9707 Key West Avenue, Suite 200, Rockville, Maryland.  MRIS, the largest Multiple Listing Service ("MLS") in the United States, began this case with copyright infringement, Lanham Act, and state law tortious conversion and unjust enrichment claims against AHRN.

3.      Counterclaim Defendant, NATIONAL ASSOCIATION OF REALTORS, ("NAR"), is a trade association organized under the laws of Illinois with its principal place of business at 430 North Michigan Avenue, Chicago, Illinois 60611.  NAR establishes and enforces policies and professional standards for its over one million individual member brokers and their affiliated agents and sales associates ("Realtors"), and 1,600 local and state member

boards, which control approximately 80 percent of the roughly 1,000 MLSs in the United States.   NAR's member brokers compete with one another in local brokerage referral services markets to represent consumers in connection with real estate transactions.   NAR has encouraged, and has voted to fund, sham and overreaching copyright infringement claims by MRIS and other MLSs.

4.      Counterclaim Defendants DOEs Nos. 1-25 are thought to be brokers and/or MLSs and their principals, who are part of the NAR orchestrated conspiracy against AHRN to suppress competition in the real estate industry for their mutual benefit.   The true names and capacities of the Defendants named herein as Does Nos. 1-25 are unknown to Counterclaimant, who therefore sues them under these fictitious names.   AHRN will amend this counterclaim to add their true names and capacities when they become known. On information and belief, during the course of the conspiracy, each of the Doe Defendants was and continues to be an agent and principal of each of the other Defendants; and each was, and is, acting in the course and scope of his authority.

5.      At this time, AHRN does not name Regional Multiple Listing Service of Minnesota, Inc. (hereinafter, "Northstar" or "RMLS") as a party, although it notes that Northstar is the plaintiff in *Regional Multiple Listing Service of Minnesota, Inc., d/b/a NorthstarMLS v. American Home Realty Network, Inc.*, 0:12cv965 (D. Minn.) filed on May 18, 2012.   As more facts are learned in discovery, if appropriate, AHRN will add Northstar as one of its Doe Defendants.

## A.      COUNTERCLAIM PLAINTIFF AHRN

6.      Counterclaim Plaintiff AHRN is a five year-old San Francisco real estate brokerage referral services and technology startup that provides information to home buyers and sellers, identifying the real estate agents best suited to assist them in purchasing or selling properties in their local market on a nationwide basis.  AHRN owns NeighborCity®, an online residential real estate service and operates a website, www.neighborcity.com. Www.neighborcity.com allows consumers to search for homes for sale and obtain recommendations for the local real estate agents best suited to assist them with their purchase, as evaluated by its proprietary AgentMatch® software system, utilizing the available universe of listing and transactional data.  This transformative use of real estate data creates highly targeted recommendations of the real estate agents most likely to connect buyers and sellers in closing sales, an innovation formerly unavailable to the public.

7.      AHRN has developed a real estate search engine that searches the Internet for data on real estate listings, including "for sale" listings, "for sale by owner" listings, foreclosures, transaction records and real estate agents. AHRN's program also applies its proprietary algorithms to identify, rate and rank buy- and sell-side agents most suitable to represent potential buyers and sellers in proposed transactions and then monitors the customer's satisfaction with those introductions by obtaining related quantitative and qualitative data in the form of customer feedback through its analysis of transactional results.

8.      Unlike other web sites where realtors pay to be ranked as "featured

agents," AHRN's does not sell advertising, sponsorships or accept any payments related to its real estate agent ratings and rankings.  Instead AHRN applies the same scoring heuristics and algorithms to every active real estate agent in the country.

9.     The NeighborCity web site makes the residential real estate market more transparent by giving home buyers and sellers the information they need to make intelligent real estate decisions, especially when hiring a real estate agent and broker.  Once a property is identified, AHRN's online services qualify and introduce homebuyers and sellers to relevantly experienced and vetted real estate agents who are available to represent them exclusively.

10.    Consumers can use neighborcity.com to search for properties in their desired location.  When a consumer clicks on a particular property, AHRN's algorithm identifies local real estate agents who are determined by the algorithm to be most effective at representing that buyer in the purchase of that property, as well as the most effective agents to represent the sale of that buyer's existing property.

11.    To efficiently match consumers with real estate agents, AHRN uses information about the property and then matches it against each agent's particular sales and listing history, analyzing each agent's professional performance from the homeowner's perspective, relative to other competing agents who assist in the listing, purchase and sale of comparable properties at about the same point in time, while making certain assumptions about the best interest of the homeowner or prospective homeowner, e.g. sellers want to sell

their home for the highest price possible and in the least amount of time, while most buyers want the best suited home for their individual needs, at the lowest possible price.

12.     AHRN also tracks each agent's effectiveness by identifying such information as the percentage of homes listed for sale that result in a sale, the difference between a property's asking price and the price for which it actually sold, the price per square foot, the days on market and days to sale, as well as other performance indicators relative to comparable listings and recent transactions. All of these various data points or "performance attributes" for each agent are compared relative to their peers (or direct competitors) through the dynamic and automated formation of a peer-index unique to each particular real estate agent, thus allowing a consumer to understand how well an agent has performed in the past relative to the universe of agents that could potentially serve them.  All of this information provides consumers with critical performance indicators, not otherwise available, to effectively select a representative for purchasing or selling a home.

13.     Consumers in the residential real estate market have responded positively to the increased access to information about properties and real estate agents that AHRN provides.   As a result, AHRN has grown significantly in the last year in terms of revenues, transactions referred and full-time employees.


**B.     NATURE OF THE ACTION**

14.     AHRN brings this action against the Counterclaim Defendants'

concerted anti-competitive conduct that includes: (a) an MRIS-instigated Multiple Listing Service ("MLS") industry-wide adoption of a sham copyright registration "Program" of purported database compilation copyrights, the technology and copyrights of which belong to others; (b) sham claims of copyrights in unregistered and uncopyrightable textual elements and photographs in the MLSs' databases; (c) threatened and actual enforcement of the sham copyright "Program" against innovators like AHRN; and (d) MRIS and NAR and other MLSs' adoption of pseudo-regulatory rules limiting their respective members' ability to share public domain listing data with innovative brokers like AHRN, Redfin and others that provide real estate agent ratings and rankings and/or exclusively provide client referrals, as a group boycott of such innovators.

15.     AHRN competes with both NAR's member MLSs, such as MRIS and Northstar, and the MLSs' brokers.  As to MRIS, both AHRN and MRIS provide real estate listings to the public (a service) but each is compensated for this service in different ways.  MRIS receives subscription fees and AHRN receives a percentage of the broker's commission if the broker accepts an AHRN client-referral and a deal resulting from the referral results in a closed transaction.  MRIS has alleged that AHRN's website diverts traffic from its (and its brokers') website(s) and deprives MRIS of exclusive control over its listings, simply by virtue of its existence.  MRIS has power in this market as it controls and regulates dissemination of the listing information within its service area and virtually all brokers doing business in the service area join.

16.     The MLSs' brokers compete with AHRN over who controls referrals

to agents to close transactions.  The listing brokers would prefer to generate traffic directly to their own websites, thereby making client referrals without the assistance of AHRN.  That allows them to charge their agents a referral fee in addition to their standard commission. The listing agent and broker both want to receive all of the customer inquiries made on the Internet via the major real estate portals and websites, so that they earn a commission on both the buy and sell side of each transaction, as opposed to just the sell-side commission which is typically half of the total commission paid in a transaction.  AHRN makes referrals to agents determined to be the best suited by its AgentMatch® algorithm, which agent is typically not an agent of the listing broker and therefore an independent representative.  The MLSs' and MRIS's control over listing information and the restrictive manner in which it is licensed, published, used and disseminated, helps their large broker members who control a disproportionate share of the available inventory get a significantly higher share of commissions for both sides of a transaction.  AHRN and other innovative brokers can break this pattern by making referrals to agents outside the listing brokerage.

17.     NAR's, MRIS's, and Northstar's adoption of the sham copyright Program, enforcement activity and rules constitute violations of the federal antitrust and federal and state unfair competition laws.

18.     NAR, MRIS, Northstar, other MLSs and their industry consulting firms, and allied law firms, under cover of the "Program," have made false statements: (a) publicly disparaging AHRN with accusations of "theft," "piracy" and similar terms; and (b) misrepresenting in their applications to register with

the United States Copyright Office that their compilation copyrights covering their databases are "unpublished," when in fact their databases are published through wide dissemination to subscribers and licensees for purposes including display to the public. Such misrepresentations to the Copyright Office were made in order to obtain lower copyright registration fees than would have applied to compilation copyrights for published databases.

19.    NAR's, MRIS's, Northstar's and others' false statements violate federal and state unfair competition laws.

20.    MRIS's lawsuit against AHRN in this Court, and Northstar's lawsuit against AHRN in Minnesota are in furtherance of NAR's efforts to drive AHRN out of business and eliminate AHRN as a competitor in the market for real estate broker services.  AHRN seeks damages and injunctive relief to bar Defendants' unlawful predatory conduct and to prevent harm to consumers in the market for residential real estate brokerage referral services.

21.    Defendant MRIS is a regional MLS operating in Maryland, Virginia, Washington, D.C. and parts of Pennsylvania, Delaware and West Virginia.  *See* Complaint, ¶ 13.  NAR, MRIS and its member-brokers, and other MLSs have taken notice of AHRN's success and have banded together at the behest of, with encouragement by, and with the promise of financial support, from NAR. In collaboration with NAR and other MLSs, MRIS wrongfully seeks to stop AHRN from listing property for sale on its neighborcity.com website before it becomes a larger threat to NAR's and other MLSs' interests in preserving their rigid hold on property listing information and

directing consumers to large brokers who thus capture commissions from both sides of residential real estate transactions.

22.     As NAR, the MLSs, and their member-brokers have done before when innovative businesses attempt to enter the real estate market, Defendants seek to prevent competition by maintaining an iron grip on real estate data that is critical to consumers.  In furtherance of that anti-competitive goal, Defendants have agreed not to license to AHRN any allegedly copyrighted material from their respective websites with the intent of "[t]hrowing a world of hurt" on AHRN and destroying its business.

23.     Defendants' exclusionary practices continue a pattern in the real estate industry in which traditional brokerages have undertaken various measures to suppress competition whenever challenged by an innovative business model.  Such conduct has prompted lawsuits by the Department of Justice ("DOJ") and investigations by the Federal Trade Commission ("FTC"), all seeking to promote access to property information for new entrants to the real estate industry who challenge the traditional broker model.  Defendants' conduct is simply another strategy by powerful real estate brokers to suppress information from which they derive value, to the detriment of consumers. Absent this court's intervention, Defendants' illegal conduct will continue unabated.

### C.     JURISDICTION AND VENUE

24.     This First Amended Counterclaim is filed under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and Section 4 of the Clayton Act, 15 U.S.C. § 15, to prevent and restrain violations by Defendants of Section

43(a) of the Lanham Act, 15 U.S.C. §1125(a), and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1332, 1337(a), and 1367.

25.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the counterclaims occurred, and the Defendants are subject to personal jurisdiction, in this district.

26.     This Court has personal jurisdiction over MRIS, a Delaware corporation, because it maintains its principal place of business at 9707 Key West Avenue, Suite 200, Rockville, Maryland.

27.     This Court has personal jurisdiction over NAR, a trade association organized under the laws of Illinois, with offices at 500 New Jersey Avenue, NW, Washington, DC 20001-2020 because it regularly transacts business in Maryland and under the Maryland long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1) and § 6-103(b)(4) by virtue of its conspiracy to restrain trade and monopolize with, among others, MRIS.

28.     This Court has personal jurisdiction over Doe Defendants under the Maryland long-arm statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1) and § 6-103(b)(4) by virtue of their conspiracy to restrain trade and monopolize with NAR and MRIS.

29.     Defendants are engaged in interstate commerce.  MRIS, and Does Nos. 1- 25 broker, market and sell real estate throughout the United States. NAR has members nationwide to whom it provides information and assistance

and against whom it enforces its policies and standards. Defendants' activity represents a regular, continuous and substantial flow of interstate commerce and therefore their wrongful activities have a substantial adverse effect on interstate commerce in the United States.

### D. PRINCIPLES OF COPYRIGHT LAW

30.     The origin of the copyright laws, Article 1, Section 8, clause 8 of the U.S. Constitution, confers power to Congress: "[t]o promote the progress of science and useful arts, by securing for limited times to authors and inventors the exclusive right to their respective writings and discoveries."  The Supreme Court has held that: "[f]or a particular work to be classified under the head[ing] of writings of authors,… originality is required."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 346 (U.S. 1991) (internal punctuation omitted) *quoting The Trade-Mark Cases*, 100 U.S. 82, 94 (1879).

31.     Section 101 of the Copyright Act of 1976, 17 U.S.C. §101, defines a "compilation" for purposes of a compilation copyright as:

> a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a  whole constitutes an original work of authorship.

32.     Section 103(b) of the Act further provides:

> The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. *The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.*

(Emphasis added).

- 12 -

33.     In 1987, the Copyright Office of the Library of Congress issued

Circular 65 titled "Copyright Registration for Automated Databases," which states

the following:

> Databases may be considered copyrightable as a form of
> compilation, which is defined in the law as a work "formed by the
> collection and assembling of preexisting materials or of data that
> are selected, coordinated, or arranged in such a way that the
> resulting work as a whole constitutes an original work of
> authorship."

Circ. 65 at 3.

34.     Circular 65 (at 3) also specifies what compilation copyrights do not

protect:

> Copyright protection is not available for:
>
> - ideas, methods, systems, concepts, and layouts;
> - individual words and short phrases, individual unadorned
>   facts; and,
> - the selection and ordering of data in a database where the
>   collection and arrangement of the material is a mechanical
>   task only, and represents no original authorship; e.g., merely
>   transferring data from hard copy to computer storage.

35.     The 1991 Supreme Court decision in the *Feist* case, as the MRIS

and Regional MLS cases here, involved alleged infringement of compilation

copyrights, which implicate the "bedrock principle of copyright that mandates the

law's seemingly disparate treatment of facts and factual compilations.  No one

may claim originality as to facts … because facts do not owe their origin to an act

of authorship."  499 U.S. at 347.

36.     *Feist* involved a request to license a telephone directory in which

Rural Telephone Service claimed copyright.  That request to license was refused,

and as here, the refusal by Rural Telephone Service was "motivated by an

unlawful purpose to extend its monopoly in telephone service to a monopoly in yellow pages advertising." *Feist, supra,* at 343, *quoting Rural Telephone Service Co. v. Feist Publications, Inc.*, 737 F. Supp. 610, 622 (Kan. 1990).

37.    The Supreme Court in *Feist* noted "that there can be no valid copyright in facts is universally understood," *id* at 344.

> Many compilations consist of nothing but raw data *i.e.,* wholly factual information, not accompanied by any original written expression. On what basis may one claim a copyright in such a work?  Common sense tells us that 100 uncopyrightable facts do not magically change their status when gathered in one place….

*Id.* at 345.

## E.    FACTUAL STATEMENT

### *National Association of Realtors*

38.    Upon information and belief, NAR is a trade association that establishes and enforces policies and professional standards for its over one million individual member real estate brokers and their affiliated agents and sales associates ("Realtors"), and 1,600 local and state member boards of realtors.  NAR's member brokers compete with one another in local brokerage referral services markets to represent consumers in connection with real estate transactions.

39.    NAR's policies govern the conduct of its members in all fifty states, including all Realtors and all of NAR's member boards.   Upon information and belief, NAR's member boards control approximately eighty percent of the approximately 1,000 MLSs in the United States.

40.     NAR promulgates rules governing the conduct of MLSs and requires its member boards to adopt these rules.   Among the Rules it has adopted are rules that prohibit, or strongly discourage, MLSs from licensing their listing databases to member brokers, like Houston Association of Realtors, and third parties, like AHRN, Redfin, and agentaquarium.com from (1) ranking or otherwise evaluating agents; (2) "prohibiting use of the licensed data to sell referrals."   http://www.realtor.org/articles/syndication-success-a-look-at-the-legal-considerations-of-effective-listing-data-licensing;" and (3) using the MLS licensed data for unauthorized purposes.

41.     Each year, NAR holds an Annual Meeting.  In 2011, it was held in Anaheim, California in November and a Mid-Year Meeting was also held in Washington, D.C., at which NAR's member MLSs and brokers convened to discuss matters of industry concern.   At the November 2011 Annual Meeting, NAR led discussions about AHRN, and at the May 2012 Mid Year Meeting in Washington, DC, the litigation by MRIS and Northstar against AHRN were discussed by the NAR Board.

42.     In 2005, the United States Department of Justice brought suit against NAR for violating Section 1 of the Sherman Act, in promulgating and enforcing rules on its members that discriminated against and excluded Internet-based real estate brokers in order to maintain NAR-supported brokers' real estate sales commissions at inflated values.   *U.S. v. NAR*, Civil Action No. 05C-5140 (E.D. Ill. September 8, 2005) ("DOJ Complaint") [D.E. 25-3]. The complaint in that case demonstrates that the public interest lies with

competition, noting that "[b]y virtue of industry-wide participation and control over a critically important input, MLS joint ventures have market power in almost every relevant market."  *Id.*, ¶23.  The Division recognized that brokers with innovative, Internet-based business models present a competitive challenge to brokers who provide listings to their customers only by traditional methods.  *Id.*, ¶ 29.

43.    The government sought to enjoin NAR "from maintaining or enforcing a policy that restrains competition from brokers who use   the Internet  to  more efficiently and cost effectively serve home sellers and buyers, and from adopting other related anti-competitive rules."  D O J   Complaint [D.E. 25-3] at ¶ 1.

44.    On November 18, 2008, the Department of Justice entered a consent decree with the NAR, settling the Complaint with a Final Judgment by imposing certain prohibitions on the real estate industry.  *See* DOJ Consent Decree [D.E. 25-4].   NAR accepted prohibitions imposed upon it against promulgating and enforcing any rule that *inter alia*:

- Prohibits, restricts, or impedes, a web-based broker from providing to its customers all of the listing information that is permitted under traditional methods: mail, fax, etc.;  *see* Consent Decree at 5; (Prohibition A);

- Unreasonably disadvantages or unreasonably discriminates against a web-based broker who provides to its customers all of the listing information that is permitted under traditional methods: mail, fax, etc., *id.* (Prohibition B)

- Prohibits, restricts, or impedes the referral of customers whose identities are obtained from a website by a web-based broker to any other person, or establishes the price of any such referral, *id.,* (Prohibition C);

- Imposes fees or costs upon any broker who operates a website or upon any person operating a website for a broker that exceed the reasonably estimated actual costs incurred by a Member board in providing listing

information to the broker, *id*., (Prohibition D).

*Multiple Listing Services*

45.     Defendant MRIS, Northstar, and, upon information and belief, one or more of the Doe Defendants are Multiple Listing Services.  MLSs are entities to which virtually all real estate brokerages belong and pay periodic dues.  In exchange for these dues, MLSs provide member brokerages access to an electronic database of supply, pricing, and property--characteristics information relating to past and current real-estate listings in the MLSs' respective Service Areas.

46.     Upon information and belief, MRIS serves brokers in Maryland, Virginia, Washington, D.C. and parts of Pennsylvania, Delaware and West Virginia.  *See* Complaint, ¶ 13.  MRIS claims 85% of listed properties—as measured by dollar volume of closed transactions—in its service area. Northstar serves brokers in Minnesota, and the Doe Defendant MLSs serve brokers in their respective Service Areas.  Defendant MLSs (including one or more of the Doe Defendants) are thus market-wide joint ventures of supposed competitors that possess substantial market power, and to compete successfully, a brokerage referral services must be an a member of these MLSs.

47.     MRIS's database (and other MLSs' databases) allows MLS members to communicate information among themselves, information such as descriptions of listed properties for sale and offers to compensate other members if these other members locate buyers for the listing agent or broker.

These databases also allow members representing buyers to search the listed properties to match buyers' needs.

48.    By providing an efficient means of exchanging information on real estate listings, MLSs are intended to benefit real-estate buyers and sellers and, in turn, buyers of real-estate brokerage referral services in the MLS Service Areas.  And since virtually all for-sale properties in a MLS's Service Area are listed with the MLS, buyers' agents must use MLS when assisting buyers in making a purchasing decision in order to inform them of the availability of real estate on the market, each property's characteristics, and its seller's asking price.

49.    The MLSs' dominant roles make access to the MLS databases— and therefore MLS membership—critically important for any brokerage referral services seeking to serve clients efficiently in an MLS Service Area.  Indeed, access to the MRIS, Northstar and other MLS databases is critical to brokers' success in their respective Service Areas, as for the most part the MLSs are the only providers of this service in their respective Service Areas.   Therefore, brokerages seeking to meaningfully provide real-estate-brokerage referral services in an MLS Service Area must be MLS members.   "Particularly in an area served by only one MLS, access to MLS resources may be critical for a brokerage referral service to successfully participate in the real estate market." *Robertson v. Sea Pines Real Estate Cos.,* 679 F.3d 278, 282 (4th Cir. 2012). *See also* DOJ Complaint [D.E. 25-3] at 7, ¶ 22. ("The vast majority of brokers believe that they must participate in the MLS operating in their local market in

order to adequately serve their customers and compete with other brokers.  As a result few brokers would withdraw from MLS participation even if the fees or other costs associated with that participation substantially increased").

50.     Defendants and brokers — through their various employees' participation on the NAR and MLS Boards of Trustees and by using the MLSs as conduits — have created rules that govern MLS members' conduct and business practices and have set standards for admitting new members.  Through these rules, Defendants and other MLSs have profited by illegally inhibiting competition over the method by which they provide real-estate-brokerage referral services to customers (i.e., property sellers) in the MLS Service Areas and have illegally stabilized and inflated the prices that these customers pay for real estate-brokerage referral services and limited consumer options.

51.     As technology has changed in the last 100 years, MLSs' methods of dissemination of information to customers have similarly changed.  "From the 1920s, when MLSs first became prevalent, brokers allowed customers to view a printed 'MLS book.'  Later, the availability of copy machines allowed brokers to reproduce pages from the MLS book and deliver the pages with responsive listings to customers by hand or mail.  The advent of facsimile transmission — and, later, electronic mail — further quickened the process of delivering MLS listings to customers."  DOJ Complaint [D.E. 25-3] at 7, ¶24.

52.     The relevant market in this action consists of residential real estate brokerage referral services in the markets in which Defendants operate (the "Relevant Markets").  MLSs are local cooperatives run by local broker-members,

usually affiliated with the National Association of Realtors ("NAR"), who pool and disseminate information on homes available for sale in their regions.  Each MLS combines its members' data and then makes it available to all of its member-brokers, which enables more efficient exchange of information among brokers.  According to an April 2007 Joint Report  by the Federal Trade Commission and the  U.S.  Department  of  Justice  entitled  "Competition  in  the  Real  Estate Brokerage referral services Industry," MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS and brokers must have access  to  their  local  multiple  listing  service  (MLS)  to  compete  effectively.  Because brokers usually set the rules for each others' participation in the MLS, it is  possible  for  one  dominant  group  of  brokers  to  establish  rules  that  disfavor other brokers who compete in a manner they dislike.

53.    The August 27, 2009 Final Judgment upon consent in *United States v. Consolidated Listing Service, Inc.*, Case No. 2:08-CV-01786-SB (D.S.C.), stated that the defendant MLS "shall not adopt, maintain, or enforce any Rule, *or enter into or enforce any agreement or practice*, that directly or indirectly . . . discriminates against or disadvantages any Member or Licensee based on the Member's or Licensee's office location, pricing or commission rates, *business model*, contractual forms or types used, or services or activities the Member or Licensee performs or does not perform for any home buyer or home seller[.]" (emphasis supplied).    *See* 2:080-CV-01786-SB (D.S.C.) DOJ Consent Decree at 5.

54.     Other courts have similarly found that anti-competitive MLS rules are unreasonable, "[w]hen broker participation in the [MLS] is high, the service itself is economically successful and competition from other listing services is lacking, rules which invite the unjustified exclusion of any broker should be found unreasonable." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1374 (5th Cir. 1980). Defendants' conduct is the old guard real estate industry's next effort to stifle competition.

*MRIS's "Program" to Combine and Conspire<br>In Restraint of Trade and Defraud the Copyright Office*

55.     In 2005, David Charron, President and CEO of MRIS; Erik M. Feig, MRIS General Counsel; and J.T. Westermeier, outside counsel to MRIS, listed as a Partner at DLA Piper Rudnick Gray Cary (in 2006 version), jointly wrote a two part "Guidance Paper," issued in several versions including with the title "Strengthening the Foundation: The Real Estate Listing Content Copyright FAQ and An Updated Program to administer and Enhance the Value of Real Estate Listing Content," Version 2.0 (April, 2006), inviting the MLS industry to join "The Program."  Guidance Paper, part 1, attached as Exhibit A, Guidance Paper, part 2, *see* [D.E. 25-11].

56.     The object of The Program was first and foremost to defeat "the emergence of several high profile initiatives proclaiming 'new' and 'improved' alternative business models that they propose will dramatically change the real estate industry."  *Id.*, part 1, at 1 (Exhibit A).

57.     The authors conducted a comprehensive publicity campaign to

attract other MLSs to join The Program.  Versions of the Guidance Paper were featured in RealtyTimes and Real Trends, distributed at "MLS Topics in the Tropics", a conference sponsored by The Realtor® Association of Greater Fort Lauderdale February 22 - 4, 2005, at Ft. Lauderdale, Florida, the Realty Alliance annual meeting in Sacramento, California on March 30, 2005, and presented to the San Francisco Association of Realtors on June 3, 2005.  *Id.*, part 2, at 17 fns.

58.     The Guidance Paper proposed that the MLSs industry defeat the new alternative business model entrants in the real estate brokerage referral services business by subverting the copyright process by claiming the existence of, and encouraging the enforcement of copyright in unregistered and uncopyrightable listing data consisting of facts assembled in compilation copyrights, in disregard of the Supreme Court's holding in *Feist* that "100 uncopyrightable facts do not magically change their status when gathered in one place."  *See* 499 U.S. at 345.

59.     The Program urged the MLS industry to play a semantic game with new market entrants, the Copyright Office and the public whereby the MLS industry would stop referring to "listing data" and call the data "listing content, Guidance Paper at 8," in order to "help dismantle the argument that listings are a compilation of public material and should be in the public domain noting; 'While listing content may not, on the surface, have the degree of creativity we associate with a song or a story or other types of so-called 'creative' works, there should be little question that listing content is protectable by copyrights.'"  *Id.*, part 1, at 9.

- 22 -

60.    The Program also urged "[m]aking each property listing a joint work owned by the broker and the MLS for copyright purposes.  This joint work is created by merging each listing broker's and MLS's respective copyright contributions into a merged, unitary property listing with co - ownership of the respective copyrights.  Joint ownership is a key building block of the Program." *Id.*, part 2, at 18.

61.    The Program also devised: (a) the mashing of non-copyrightable listing data from different sources, after renaming it listing "content" in the MLSs database and (b) for the MLSs to register such listing content under compilation copyright procedures for automated databases, claiming the registrations would cover both "the compilation and collection of content in the database, but extend to the jointly owned copyrighted content in each individual listing."  *Id.*, part 2, at 19.

62.    One purpose of the Program was for the MLSs to create enforcement programs, send cease-and-desist letters and litigate against the new business model brokers.

63.    The Program's other purpose was a "practical strategy" to evade the Copyright Office's fee structure for individual copyright and published database copyright registrations.  From the Guidance Paper:

> Given the number of listings in a typical MLS database and the number of updates occurring on a daily basis, as a practical matter registering the claims of copyright ownership in each individual listing with the U.S. Copyright Office is impractical and not cost effective.  What we contend is needed is a practical strategy that protects the copyrights in each individual property listing as well as the compilation and collection of property listings contained in the MLS database.

*Id.*, part 2, at 22.

64.    The MRIS Guidance Paper's recommendations that the MLS industry register copyrights covering listing databases as "unpublished" compilations instead of published compilations saves the MLS industry and deprives the Copyright Office of trillions of dollars per year in registration fees because of the difference in fees between quarterly and daily registration.

65.    The MRIS Guidance Paper's recommendation that the MLS forego registration of listing photographs in group registration copyrights and instead claim the photographs as individually covered by the registration of the listing database compilation save the MLS industry and deprives the Copyright Office of 100s of billions of dollars annually.

66.    Absent the MLSs' huge savings by following MRIS's recommended sham registration Program, the MLS industry could not afford to maintain professed copyright protection in its listing databases and could not use the claims of copyright infringement to control competitors use of public domain listing data.

67.    The MLS industry adopted the Program under the auspices of, and with the encouragement and guidance of NAR.  On September 27, 2010, at an NAR meeting in Chicago, one session featured a discussion that included:

> MLS' [sic] debate the merits of consolidation, revenue streams, *data ownership and their 'true role'* ● Real estate brokers struggle to survive on narrow margins ● Realtors struggle to earn U.S. median income ● *Everybody wants realty data for free* ● Innovators want no barriers to innovation ● Thought leaders want their views adopted ● New business models and technologies continue to disrupt (Freemium) ● RETS is not all it could be[.]

(*emphasis added*) Travis Wright, <u>RESO REDUX</u>, at ¶16, (Oct. 4, 2010), http://www.slideshare.net/maxandriley/reso-redux-by-travis-wright. Wright is the Executive Director of RESO, the Real Estate Standard Setting Organization ("RESO"), formerly part of NAR.

68.   This coded discussion description is a clear signal to drive disruptive innovators out of business with the "true role" of the MLS copyright Program.

69.   NAR held its annual meeting in Anaheim, California from November 11 to 14, 2011. On information and belief, the NAR annual meeting featured discussions of the perceived threat AHRN poses to the industry and what the industry could do to shut down AHRN.  Further, NAR, at a time yet unknown advised its members to follow MRIS's recommended sham compilation copyright registration process, whether the facts warranted it or not. NAR instructed its member MLSs, "In Space 6: Derivative Work or Compilation, the application should state that the materials included in this compilation are preexisting materials and the information in this section should also make it clear that these materials were "selected" and "arranged," in order to assure that the compilation receives copyright protection."   <u>MLS Copyright Compilation Registration,</u>   http://www.realtor.org/law-and-ethics/mls-copyright-compilation-registration.   This NAR publication also provides "MLS Registration Tips" as follows;

- "MLS compilations are largely collections of factual information regarding the properties listed for sale by members.  According to the Copyright Act, the copyrightable interest in factual compilation is in the author's original "selection, arrangement and coordination"

of that information.  These should be treated as special words to be used whenever describing the compilation and MLS's role in creating the compilation in any description of the compilation.

• MLS compilations always contain public domain information (facts) or materials that were previously published about the subject properties filed with the service.  Keeping this in mind when reviewing the suggested language in the instructions for completing section 6(a) and (b) should make your choices obvious.

• The deposit requirement can be met by producing printouts for fifty different properties showing the fields of information collected with regard to properties.  This shows your selection of which facts to collect and how those facts have been arranged and coordinated with each other, thus demonstrating the MLS's creativity in creating the MLS compilation" http://www.realtor.org:8119/sites/default/files/applications-and-forms/2006/mls-registration-tips-2006.doc.

70.    Beginning in November, 2011, just before the Anaheim meeting, AHRN began to receive what would become, after the Anaheim meeting, a torrent of cease-and-desist letters from brokers and MLSs.  Substantially similar cease and desist letters in form and content, 32 in all, have continued into 2012 and uniformly allege copyright infringement and threaten legal action.

71.    Eleven (11) additional letters are from brokers objecting to AHRN's referral program; and three (3) letters involve complaints to governmental agencies related to either alleged copyright infringement and/or licensing violations.

72.    On November 15, 2011, the morning after the Anaheim NAR meeting closed, AHRN received one of these cease-and-desist letters from an attorney for Northstar in Minnesota.  Three days later, on November 18, 2011, AHRN received a cease-and-desist letter from MRIS, as well as phone calls and email inquiries from various MLSs and their hired consultants that stated they

were in attendance and/or hosted various sessions conducted at the NAR 2011 annual meeting.

73.    On December 22, 2011, AHRN was copied on an email from John Mosey of the Northstar to his attorney Mitchell Skinner, in which Mosey complained of a sense that after "dropping C&D's [Cease-and-Desist Letters] on the head of the bad fellow," i.e. Jonathan Cardella, AHRN's CEO, nothing had changed, and he called for following up the "full force and fury" of the cease-and-desist letters with:

- "Collective action;"
- Imparting a "world of hurt" on Cardella;
- Using copyright litigation as the means to do that;
- Sharing the cost of litigation among the MLSs;
- "Connecting the dots between all of the MLSs;"
- "Sending a message that our copyrights are enforceable and we are serious about punishing anyone who doesn't take us seriously."

*See* Mosey email [D.E. 25-9].

74.    On information and belief, MRIS's Complaint filed on March 19, 2012, and another filed on April 18, 2012, by Northstar in Minnesota, *Regional Multiple Listing Service of Minnesota, Inc., d/b/a NorthstarMLS v. American Home Realty Network, Inc.*, 0:12cv965 (D. Minn.) are the direct and concerted action discussed and sought by the concerted action at the Anaheim NAR Annual Meeting.

75.    These actions by brokers and multiple listing services immediately followed AHRN's roll-out of updated professional profile pages for 850,000 agents, in March of 2012.  Those profile feature agent performance scores and ranking metrics based on their transaction and listing histories.

Redfin, which in 2011, launched a similar feature internally referred to as "Scouting Report," and other companies that introduced similar real estate agent profile pages were forced to discontinue publication of those pages under pressure from MRIS and other MLSs within days after their respective launches.

*Groups, Consultants, Law Firms*

76.    The real estate industry, in general, and the MLS sector of the industry, in particular, has a number of groups, consultants and law firms which broadcast, amplify, and offer the means to achieve and implement, the industry's anticompetitive goals, including, but not limited to:

- Real Trends, whose founder Steve Murray is an early and enthusiastic supporter of the MRIS/Charron/Feig/Westermeier promotion of the "Program;"

- The Cove Group, a group of 20 MLS CEOs, to which John Mosey, CEO of Northstar belongs and touts as its "sole purpose is to share ideas and experience with the goal of effecting positive change and helping brokers improve their profitability;"

- Clareity Consulting, real estate information technology consultants, whose founder Gregg Larson has long time ties to NAR.

- Larson/Sobotka PLLC, a law firm, and Larson/Sobotka Business Advisors LLC, a consulting firm, which also, on information and belief, created, own or sponsor the Council of Multiple Listing Services ("CMLS").  CMLS meetings, through presentations of its partners, such as on September 26, 2012 at a "Legal Counsel Seminar in Boston, advance the MRIS/Charron/Feig/Westermeier Program;

  - CMLS is described by John Mosey as "where all things MLS are front-and-center and where collective action is marshaled whenever some issue or event affects the industry;"

Industry Visionary, Interview of John Mosey http://www.frogpond.com/John-Mosey-FP4-196;

- o Brian Larson gave "a crash course in copyright fundamentals and ownership, including what elements are protectable, how to protect elements within a compilation, not just the compilation, registration issues, and copyright registration rule changes. This will also include a discussion of current MLS industry piracy litigation;"

CMLS Legal Counsel Seminar (Sept. 26, 2012) http://www.cmls2012.com/legal-seminar/;

- o Marc Manos of Nexsen | Pruet, addressed "business models for MLSs to collaborate with each other in enforcing intellectual property rights, protecting the attorney client privilege when having discussions with other industry participants, communication among competitors and industry participants, and avoiding antitrust claims."

*Id.*

## Group Boycott

77.    In response to the sudden flood of cease-and-desist letters after the Anaheim NAR Annual Meeting, AHRN responded to each letter with an offer to negotiate a license for the use of the brokers' or multiple listing services' website.   In each case, AHRN's overture to license was rebuffed out of hand without negotiations. Each rejection used the same format and essentially the same language.

78.    In the instances in which AHRN was able to reach agreement or had negotiations with real estate brokers over referral agreements with AHRN and AHRN's use of listings information, the brokers repudiated such agreements starting in January, 2012.   Upon information and belief, this repudiation was in response to pressure from the MLSs.

79.    Each letter to AHRN from the CEO, Vice President or general counsel of a broker states in remarkably similar language essentially that:

It has come to my attention that American Home Realty Network, Inc. d/b/a    NeighborCity ("NeighborCity") has been soliciting or may intend in the future to solicit agents of Reese & Nichols to ask them to execute referral agreements that purport to bind Reece & Nichols.

Please be advised that Reece & Nichols has no interest in entering into any referral or other agreements with NeighborCity, and Reece & Nichols….

Accordingly, to the extent any agent has executed an agreement with NeighborCity that purports to bind Reece & Nichols that agreement is void and of no legal effect. Alternatively, Reece & Nichols hereby terminates any such agreement.

80.    AHRN has received nearly identical "it-has-come-to-my-attention" broker letters intending to stop solicitations of referral agreements by AHRN and repudiating referral agreements with AHRN from brokers in Louisville, Kentucky; Fort Mitchell, Kentucky; Winston Salem, North Carolina; Edina, Minnesota; Lancaster, Pennsylvania; and Severna Park, Maryland.

81.    The NAR held its Midyear Meeting in Washington D.C. between May 14 and 19, 2012.  On information and belief, NAR's Board voted on Saturday, May 19, 2012 to fund the instant MRIS lawsuit and Minnesota Northstar lawsuit against AHRN.

82.    NAR has no direct stake in the substance of MRIS's and Northstar's litigation against AHRN.  NAR, however, seeks to fund the litigations for its own financial gain.

83.    On information and belief, the cease-and-desist letters, as well as the refusal and repudiation letters related to broker or agent referrals were coordinated by discussions and agreements among NAR, MLSs and brokers.

84.    At its May Mid-Year Meeting in Washington, D.C., the NAR

Board of Directors approved new rules to further exclude competitors like AHRN

from using MLS data on its websites and in its applications:

> [A]pproved a set of comprehensive amendments to NAR's Internet Data Exchange (IDX) policy and MLS rules to clarify that "participant websites" are those in which MLS participants have actual and apparent control of the sites.  … Control means participants can add, delete, modify, or update their information, and a reasonable consumer would recognize the information as the participant's.
>
> Separately, the board acknowledged the growing complexity of MLS technology issues by creating an MLS Technology and Emerging Issues Subcommittee, which will anticipate and analyze MLS technology issues.
>
> Approved $161,667 in legal assistance for seven cases, involving … 4) challenging misappropriation of MLS data by a third-party Web site….

*See,*   http://www.realtor.org/governance/board-of-directors/report-from-the-may-

19-board-of-directors-meeting.

85.    According to the Berkshire MLS's Legal Update from NAR 2012

mid-year meeting, NAR General Counsel:

> "[NAR General Counsel] Lauri [Laurene K.] Janik advised local MLSs "to send Cease and Desist letters if data has been taken, and to save any correspondence received or found from them purporting to be speaking on behalf of our members without authorization.  We are doing so on behalf of the Berkshire MLS. NAR also asked us to tell our members to be patient while lawsuits are fought on behalf of all...[sic]. I also spoke with Realtor.com and will file a request that they place special tracking on our data to stop the theft if found."

Sandy Carroll, Legal Update from NAR Midyear Meeting, Report of Recent Actions by Board and NAR Report (Jun 6, 2012) http://www.berkshirerealtors.org/archive_news_event.taf?ID=704.

*Sham Litigation*

86.    Real estate listing information is an amalgam of facts: location of the listed residential real estate, the date it was built, number of bedrooms, asking price, days on market, name and affiliation of listing agent and other facts.

87.    MRIS, Northstar, and other MLSs' compilation copyrights obtained pursuant to The Program promoted by MRIS and NAR are invalid because they violate 17 U.S.C. § 103(b), *Feist* and Circular 65.

88.    On information and belief, the MRIS, Northstar and other MLS listing databases are based on third party-created software layouts in templates of fields and field descriptors into which brokers or their assistants insert individual numbers, words and short phrases, individual unadorned facts they have obtained from prospective sellers of residential real estate.  Indeed, MRIS and Northstar, and as much as half the real estate industry, use the same MLS Matrix database software by CoreLogic, *see*, http://www.northstarmls.com/content/northstarmls-matrix;   and   *see   also*, http://www.mris.com/mris-products/core-products-services/matrix/.    According   to CoreLogic, "Matrix is an enterprise-class MLS system that provides real estate brokers and agents with a flexible, high-performance platform for managing real estate listings."

> The professional real estate tools that make up the MLS are Matrix and Keystone. Keystone is the tool used to enter listing information, Matrix is where you will search, save, print and email listings.

MRIS Keystone User Manual, at p.3,

www.mris.com/_res/downloads/KeystoneUserManual.pdf.

89.     The selection, coordination and arrangement of data in MLS listing databases are standard in the MLS industry, dating back to paper MLS book days.  The collection and arrangement of the material in MLS listing databases is only a mechanical task of data entry, representing no original authorship, and merely transfers data from such sellers that were previously maintained in hard copy to computer storage.

90.     If authorship is involved, it would be involve the creativity of CoreLogic not the MLSs.   CoreLogic's 10K filed with the Securities and Exchange Commission for the year ending December 31, 2011, claims that it has 27 issued patents, 67 pending patent applications and 115 copyrights.  10K at 11.

91.     The MLS industry previously referred to the listing information contained in hard copy listing books as "listing data."  This is the data that the MRIS Guidance Paper's Project recommends referring to as "listing content," a recommendation that MLSs have adopted in their dealings with the Copyright Office.  The selection, coordination and arrangement of the compilations of listing data do not meet the minimum Constitutional level of creativity required for the registration of compilation copyrights.

92.  "CoreLogic enters licensing agreements with its customers granting a license to use [its] products and services, including its software and databases." *Id.* at 12.   The presumably nonexclusive licenses would necessarily include CoreLogic's software patents and copyrights, whether registered or not, covering the Matrix database software's coordination and arrangement of data.   MRIS

cannot claim compilation copyrights in the compilation of data inserted into preset data fields created by others.

93.     Listing data in the MRIS, Northstar and other MLS listing databases include layouts for fields in a process that includes entry of data into webpage or software data fields or containers into which brokers or their assistants insert standard photos of generic front views of houses and key rooms, such as living rooms, kitchens and bedroom(s), usually taken by photographers unidentified in compilation copyright registrations.     *See,* Northstar MLS, Core Services, *http://www.northstarmls.com/content/core-services* ("Add/Edit     System-Click the Add/Edit tab in Matrix to add new listings, edit current listings, change a listing's status, add photos….").

94.     The photographs in MLS listing databases are not necessarily selected, arranged or coordinated in any way that is unique or creative and their addition to other listing data does not change the lack of copyrightability of the compilations in the MLSs' listing databases.  Indeed, the exterior front photo of any property is required for each listing and is typically has to be in the first position in the order of photos, by default in most MLS systems.

95.     MRIS has not attached the listings database, or the submissions of portions thereof to the Copyright Office, to its complaint or motion for preliminary injunctions.

96.     MRIS has not registered copyrights covering either the individual textual listing elements or photographs in its listing database.  Northstar has not registered individual textual listing elements in its listing database and has

registered only 50 sample photographs out of thousands of photographs in its listing database.

97.     Nevertheless, MRIS' and Northstar's copyright infringement complaints against AHRN, and other MLS's cease-and-desist letters to AHRN, bootstrap the presumption of validity of the compilation copyright of the database as a whole, to attach uncopyrightable facts in their listing databases.   MLSs falsely maintain that the underlying facts are copyrighted merely because their compilation copyright registrations are for databases they falsely claim are unpublished.

98.     Indeed, as to MRIS, it does not even own or validly "license," let alone register, copyrights in any the listing data.   MRIS's Subscription Agreement provides that:

> Title to the information supplied by the Subscriber such as listing information shall remain with Subscriber's undersigned Principal Broker Subscriber.   All listing information submitted by MRIS® Subscriber to MRIS® for inclusion in the MRIS® System shall be owned by MRIS® Principal Broker Subscriber.

MRIS Subscriber and Access Agreement [D.E. 29-1] at ¶ 4.5.

99.     MRIS also claims copyrights in photographs of listed residential real estate included in its database and displayed on its homesdatabase.com web site of real estate listings.   MRIS's Terms of Use for uploading photographs purports that the act of hitting the "enter" key on a computer to upload the photographs to MRIS's database for display on its website assigns the unregistered photographs to MRIS.   This does not meet the standard of 17 U.S.C. §204(a), which requires a signed writing from the assignor of a copyright.

100.   On information and belief, NAR has conducted no, or insufficient, due diligence on the merits of MRIS's copyright claims to fund such litigation.   Nonetheless, NAR's payment or offer of payment for or financial contribution to MRIS and Northstar's litigation is an endorsement by NAR of the merits of their respective claims.

101.   Defendants and Does Nos. 1-25 have conspired to adopt the MRIS Guidance Paper's Program to register hundreds of thousands of invalid compilation copyrights; threaten to and actually enforce such invalid compilation copyrights; threaten to and actually seek enforcement of individually uncopyrightable and unregisterable listing data and generic photographs in sham litigation against AHRN to raise its barriers to entry to the market for residential real estate broker services in the United States. Defendants have used the threats of such sham litigation, and/or withholding of listing data under the guise of compilation copyright registrations, against others, including, but not limited to, Redfin, Trulia, AgentAquarium.com and others who have withdrawn from the market real estate broker referral services, particularly services that evaluate and rank real estate brokers or publish buy-side agent recommendations next to listing information.  In fact, while still in business, on information and belief, the Houston Association of Realtors has also been pressured into dropping its agent rating system. *See*, Andrea V. Brambila, <u>Google Ventures backing agent matching site</u>, inmanNEWS (Nov. 14, 2012), http://www.inman.com/news/2012/11/14/google-ventures-backing-agent-matching-site.

*NAR Anticompetitive Rules*

102.   NAR has adopted policies and rules that adopt the anticompetitive premise and goals of the MRIS Guidance Paper's "Program."   Such rules were designed to make it more difficult for MLSs to share listing data with third parties.

> In November 2009, NAR adopted the revision to its MLS Policy Statement 7.58, which, among other things, prevents brokers from using their MLSs' IDX data feeds "for any purpose other than display on their websites."   The revision provided that the policy "does not require Participants to prevent indexing of IDX listings by recognized search engines."   The revision allowed Google and its competitors (the "recognized search engines") to index brokers' IDX sites. It even permitted brokers to encourage search engines to do so. NAR staff later clarified "recognized search engines" by saying that it means sites that consumers would recognize as general search engines.

7DS Associates, <u>On Franchise IDX, Industry Rules, and Complaints</u> (May 20, 2011), http://7dsassociates.com/2011/05/franchise-idx-industry-rules-complaints/

103.   A February 9, 2010, post by on Larson/Sobotka PLLC and Larson/Sobotka Business Advisors LLC's web blog cites another such NAR rule in NAR's Statement of MLS Policy 7.85, and appears similarly intended:

> Use of listings and listing information by MLSs for purposes other than the defined purposes of MLS requires participants' consent. Such consent cannot be required as a condition of obtaining or maintaining MLS participatory rights. MLSs may presume such consent provided that listing brokers are given adequate prior notice of any intended use unrelated to the defined purpose of MLS, and given the opportunity to affirmatively withhold consent for that use.

Brian N. Larson, <u>Brokers' rights to control uses of their data and the RPR license agreement</u>, MLS Tesseract, (Feb. 9, 2010), http://www.mlstesseract.com/search/label/Listing%20syndication; and *See* NAR Handbook on Multiple Listing Policy [HMLP], 2010 ed., at 28;

- 37 -

104.   In August 2011, NAR issued a report of its The Internet Data Exchange Presidential Advisory Group ("IDX PAG") to review several IDX-related issues and concerns, and to develop recommendations for consideration by the NAR Leadership Team which admitted the anticompetitive nature of Policy 7.85. It offered the following as the rule's rationale:

> The PAG felt that allowing the "franchisor display" provision to remain in place would inevitably require further expansion of IDX display rights to like organizations (e.g. real estate brokerage referral services networks, regional brokerage referral services firms) and potentially others whose interests are not aligned with those of the REALTOR organization, MLSs, or MLS participants, and over whom MLSs would have little or no control with respect to unanticipated and unauthorized repurposing of participants' listings.

Report and Recommendations of the Internet Data Exchange Presidential Advisory Group (August 2011), http://www.councilofmls.com/wp-content/uploads/2011/10/IDX-PAGReport-cdn-11-v-2-4.pdf, See Exhibit B hereto.

105.   NAR offers informal interpretations of its rules according to Robert Hahn, Managing Partner of 7DS Associates and a frequent speaker at industry events, including Inman Connect, RETechSouth, and NAR Annual Convention;

> I received a couple of emails from sources within the MLS industry that came from NAR's General Counsel's office.
>
> NAR's interpretation is that the new "opt-in" rule should be interpreted in light of MLS Policy Statement 7.85, which requires participant consent "for any use of their listings that are not part of the defined purpose of MLS". The practical effect is that the franchisors are treated like any third party publisher site, such as Zillow. Under this interpretation, the MLS must provide a franchise-by-franchise opt-in methodology, and cannot go with the blanket all-franchises opt-in.
>
> The email goes on to make clear that NAR does not expect the MLSs to have to make extensive changes to their systems or

undertake expensive modifications. The belief within NAR is that very few brokers will actually opt-in….

Interestingly enough, the email makes clear that the franchisor must get permission not only from all of the brokers in order to display their listings, but must get permission from a local franchisee who is a participant of the MLS. So in theory, if there is only one Century 21 broker in a given MLS, that broker can block Century 21 corporate from putting any IDX listings on its website, *even if every other broker has opted-in.* That makes the burden for the franchisors higher than if they were just a third-party publisher.

7DS Associates, *supra.*

106.   The 7DS Associates web posting concludes on its own that NAR's anticompetitive intent is correct interpretation of the motive behind the NAR rules.

The NAR emails are revealing in one respect. It appears that the understanding of the NAR staff, which includes the General Counsel's office, is that the Board of Directors vote was motivated in huge part by the desire of brokers to "take back control" of listings. I think this is right, at least in part, but only in part.

I think the real motivation wasn't simply to "take back control" of listings, but to prevent *further loss of control* over listings.

*Id.* (emphasis added).

*Anti-Competitive Effects*

107.   MLSs have market power. The vast majority of brokers believe that  they must participate in the MLS operating in their local market in order to adequately serve their customers and compete with other brokers.  See, *e.g.,* DOJ Complaint [D.E. 25-3] at 7.  As a result, few brokers would withdraw from MLS participation, even if the fees or other costs associated with that participation substantially increased.

108.   By virtue of industry-wide participation and control over a critically

important input, MLS joint ventures have market power in every relevant real estate market.

109.    Defendants' coordinated: (a) cease-and-desist letters to AHRN, (b) refusal-to-deal letters to AHRN; (c) repudiation-of-agreement letters to AHRN, (d) sham lawsuits against AHRN and (e) agreement or offer to pay for or contribute to the costs of litigation against AHRN by MLSs and real estate brokers, was intended to and did have anti-competitive effects on AHRN in the market for real estate brokerage referral services.    Anti-competitive effects include the elimination of price competition and price maintenance on brokerage referral services above market levels nationwide, impeding and blocking market entry by AHRN and other innovative providers of broker analyses and impeding and blocking innovation in real estate brokerage referral services.

110.  Defendants' activities, and the violations alleged in this First Amended Counterclaim, affect home buyers and sellers located throughout the United States.

*False and Misleading Statements*

111.    MRIS, with the active support, encouragement, endorsement and financial assistance of NAR has made and is making numerous false and misleading statements in its Guidance Paper, in presentations of its Guidance Paper, in other presentations, on its website and elsewhere, including but not limited to, the following:

> (a) Stating the MRIS Guidance Paper's copyright "Program" is in
> accordance with the law;

(b) Stating the validity of MRIS's compilation copyrights registered under the strategy and process of MRIS's Guidance Paper's "Program," when in actuality any copyright would be the property of CoreLogic, Inc.;

(c) Stating the validity of MRIS's claims of unregistered individual copyrights covering textual elements and photographs in the CoreLogic database;

(d) Stating MRIS acquires valid copyrights to photos and real estate listings from its members through a "click wrap," "Terms of Use" ("ToU") assignment by the member's or assistant's uploading of photos into MRIS's database for display on its website;

(e) Including false and misleading copyright notices on photos on MRIS's homesdatabase.com website and third party websites to which it syndicates the listing data;

(f) Falsely and misleadingly informing its members that uncopyrightable real estate listing information can be treated as copyrightable musical lyrics by treating real estate listing data as "content."

112. NAR has republished or encouraged its members to republish MRIS's false and misleading statements on its web site. In presentations to NAR's MLS members and their broker members, and based on NAR's endorsement of MIRS's false and misleading statements, NAR has itself, and has encouraged others to, refer to AHRN as "stealing" information, as a "thief" or

of "theft," as a "pirate," "pirating" or of "piracy."   E.g., NAR-member, Berkshire County Board of Realtors' website accused Neighbor City of "taken [sic] our MLS listing data without license, authorization or agreement (we call that stolen in these parts) and are rating agents.… Termed: Data pirates of the year."  Carroll, *supra.*

113.   MRIS's and NAR's false and misleading statements and misrepresentations are material because they are likely to influence other MLSs, including Northstar and others, and their member brokers not to deal with AHRN and refuse to license their listing data and photographs to AHRN and others, including MLS's, their broker members and their actual and potential competitors;

114.   MRIS's and NAR's false and misleading statements and misrepresentations have actually deceived a substantial portion of their MLS affiliates, their broker members and their actual and potential competitor audiences.

115.   AHRN and other actual and potential competitors have been and are likely to be further injured by MRIS's and NAR's false and misleading statements and misrepresentations.   MRIS's and NAR's activities interfere directly with AHRN's ability to make referrals and to collect payment for the referrals it makes to NAR member brokers and agents.

116.   MRIS and NAR have placed their false and misleading statements and misrepresentations in interstate commerce by publishing them on their web sites, sending emails to their members, repeating the false and misleading

statements and misrepresentations at conferences MLS and broker conferences around the country, which in turn have resulted in further publications of MRIS's and NAR's false and misleading statements and misrepresentations by the industry echo chamber of consulting firms and law firms.

117.   AHRN's NeighborCity.com web site has seen substantial decreases in traffic; decreases in acceptance of referrals by brokers and agents, and increases in the repudiations of existing referral agreements and obligations to pay AHRN fees due under those agreements in markets where MRIS's and NAR's false and misleading statements and misrepresentations have had their greatest prominence.

118.   MRIS's and NAR's false and misleading statements and misrepresentations have lessened AHRN's goodwill associated with its NeighborCity.com web site, its trademark and services.

### F.   CAUSES OF ACTION

Counterclaimant AHRN asserts the following claims:

### COUNT I

### Lanham Act §43(a)
(Against NAR and MRIS)

119.   Counterclaimant AHRN hereby incorporates paragraphs 1- 118 by reference as if fully set forth herein.

120.   NAR and MRIS  have  made false or misleading statements and misrepresentations of fact in commercial advertising or promotion that misrepresent the nature, characteristics, and qualities of AHRN's services and commercial  activities and MRIS's rights and services.

121.    NAR's and MRIS's misrepresentations are material in that they have deceived, or are likely to deceive, MLS's brokers and home buyers in whether to deal or contract with AHRN.

122.    NAR's and MRIS's misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience.

123.    The defendants placed the false or misleading statements in interstate commerce of the United States.

124.    AHRN has been, or is likely to be, injured as a result of defendants' misrepresentations by directly diverting customers by AHRN to MRIS and other MLSs and by lessening of goodwill associated with AHRN's services.

## COUNT II

### Maryland Unfair Competition
(Against NAR and MRIS)

125.    Counterclaimant AHRN hereby incorporates paragraphs 1-124 by reference as if fully set forth herein.

126.    NAR's and MRIS's false statements, group boycott, and litigation activities constitute unfair competition.

127.    NAR's and MRIS's unfair competition includes fraud, deceit and trickery.

128.    NAR's and MRIS's unfair competition has damaged, threatens further damage and jeopardizes AHRN's business.

## COUNT III

### Unfair Competition, Cal. Bus. & Prof Code §17200 et seq.
(Against All Defendants)

129.    Counterclaimant AHRN hereby incorporates paragraphs 1-128 by reference as if fully set forth herein.

130.    Defendants have engaged in unlawful business acts or practices, as alleged herein, all in an effort to gain unfair competitive advantage over AHRN.

131.    These unlawful business acts or practices were committed pursuant to business activity related to group boycott and sham litigation against AHRN.

132.    The acts and conduct of Defendants constitute fraudulent, unlawful, and unfair competition as defined by Cal. Bus. & Prof. Code §§ 17200, *et seq.*

133.    Defendants' conduct constitutes violations of numerous state and federal statutes and codes, including but not limited to, violation of section 43(a) of the Lanham Act, 15 U.S.C. §1125(a) and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §1.

134.    Defendants have improperly and unlawfully taken commercial advantage of AHRN's investment in its NeighborCity.com site, technology and business model.  In light of Defendants' conduct, it would be inequitable to allow Defendants to retain the benefit of the funds obtained through the unauthorized and unlawful false and misleading statements, group boycott and sham litigation.

135. Defendants' unfair business practices have unjustly minimized AHRN's competitive advantages and have caused, and are causing, AHRN to

suffer damages.  As a result of such unfair competition, AHRN has also suffered irreparable injury and, unless Defendants are enjoined from such unfair competition, will continue to suffer irreparable injury, for which AHRN has no adequate remedy at law.

136.  Defendants should be compelled to disgorge and/or restore any and all revenues earnings, profits, compensation, and benefits they may have obtained in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*, including but not limited to, returning any revenue earned from the unlawful and unfair disparagement of AHRN and should be enjoined from further unlawful, unfair and deceptive business practices.

**COUNT IV**

**Sherman Act §1**
(Against All Defendants)

137.  Counterclaimant AHRN hereby incorporates paragraphs 1-136 by reference as if fully set forth herein.

138.  At least by their agreements beginning in Anaheim, California in November 2011, Defendants NAR, MRIS, unnamed defendant Northstar, their respective member brokers, and certain Doe Defendants (collectively, the "Conspirators") made a conscious commitment to a common scheme designed to achieve an unlawful objective that constitutes a contract combination or conspiracy (the "Conspiracy").

139.  However, the Conspiracy had its origins much earlier and dates at least to 2005, when MRIS and its principals and agents developed the Guidance Paper's Program for the MLSs consisting of sham copyright registrations and

wrongful enforcement of these alleged copyrights in the "content" of property listings.  The purpose of the Program is to stifle and eliminate competition in the industry and to limit public access to what should be publically available data on residential properties for sale nationwide, including their asking price.   The Conspiracy is also manifested in the adoption by MLSs of pseudo-regulatory rules limiting their members' ability to share public domain listing data with innovative brokers like AHRN, Redfin, Agentaquarium.com and others. The Conspiracy continues to this day and comprises separate economic and legal entities.

140.   One unlawful objective of the Conspiracy was, and continues to be, to impose unreasonable restraints of trade in individual state and local real estate markets served by MLSs and in the national real estate market, including, but not limited to Maryland, Virginia, the District of Columbia and parts of Pennsylvania, West Virginia and Delaware, Minnesota and other states ("Relevant Markets") from which AHRN has received cease-and- desist and other letters complaining about and disrupting AHRN's referral program.   The Conspirators have market power in the Relevant Markets by virtue of the MLSs' dominant position in their respective service areas.  The vast majority of brokers believe that they must participate in the MLS operating in their local market to adequately serve their customers and compete with other brokers.

141.   A specific unlawful objective of the Conspiracy was, and continues to be, to inhibit competition between and among member real estate brokers of MLSs and AHRN.   This objective is manifested in the conduct of the

Conspirators to interfere with and attempt to shut down AHRN's agent ranking and matching program, its referral service and similar innovative programs developed by other real estate brokers and entities.  These innovative programs are perceived as a threat to the traditional practices in the industry in which large brokers are positioned to receive commissions from both sides of a real estate transaction rather than opening up competition for the buy-side commissions. The innovative programs of AHRN, and other brokers and entities, feared by the Conspirators, serve the pro-competition, pro-consumer objective that consumers receive relevant and timely information on the record and availability of buy-side agents in their local areas to assist them in finding, negotiating and closing real estate transactions.

142. Another specific unlawful objective of the Conspiracy was, and continues to be, generally to inhibit innovation in the delivery of information to, and for the benefit of, buyers and sellers of residential real estate, i.e. consumers of real estate brokerage referral services.  Such information better positions consumers in finding their best deals in the market and strengthens their position in negotiating real estate purchase deals particularly when assisted by able buy-side real estate brokers and agents that independently and exclusively represented their interests.

143.  Another specific and unlawful objective of the Conspiracy was, and continues to be, to illegally raise entry barriers for potential innovative competitors such as AHRN, and eventually drive AHRN and others out of, the Relevant Markets.  In furtherance of this objective, the Conspirators have

agreed, and implemented restrictive rules and policies, (a) not to license to AHRN allegedly copyrighted property listing data, which is properly in the public domain and uncopyrightable, (b) to interfere with AHRN's referral agreements with agents and brokers, and (c) to threaten and commence sham copyright infringement legal actions against AHRN.   These actions were taken by the Conspirators with full knowledge that AHRN's legitimate access to and use of such property listing data and AHRN's referral network are necessary to AHRN's success and viability as a provider of information to consumers and referrals to brokers and agents.

144. The Conspiracy's intended effects of creating barriers to entry by innovative brokers, reducing competition among brokers and limiting consumer information has and will continue to illegally stabilize and inflate real estate broker commissions, reduce consumer options for real estate brokerage referral services, and restrict the dissemination of timely real estate listing information on the internet, thereby limiting potential resale values, and generally restrict competition in the Relevant Markets.

145.   The Conspirators' collective action among actual and potential competitors deprived the marketplace of independent centers of decision-making.

146.   The anti-competitive acts of the Conspiracy have directly harmed competition and have injured AHRN's sales and goodwill in an amount to be determined.

**COUNT V**

**Sherman Act §2**
(Against MRIS)

147.   Counterclaimant AHRN hereby incorporates paragraphs 1-146 by reference as if fully set forth herein.

148.   At least by 2005, MRIS and its large broker subscribers had an intent and scheme to monopolize the market for real estate brokerage referral services in the MRIS service area of Maryland, Virginia, Washington, D.C. and parts of Pennsylvania, Delaware and West Virginia.

149.   MRIS has market power through its dominant shares of 100% of the MLS services to its member brokers and its member brokers' dominant share of 85% of listed properties—as measured by dollar volume of closed transactions—in MRIS's service area.  The property listing information in MRIS's Database is an essential facility controlled by MRIS and required by brokers operating in MRIS's service area to effectively serve their clients and to compete with other brokers.  *See, e.g.,* DOJ Complaint [D.E. 25-3] at 7.

150.   MRIS has engaged in exclusionary conduct for itself, MRIS and other Defendants through MRIS's dissemination, promotion, and implementation of MRIS's Guidance Paper's "Program" and its rules governing its member brokers, its litigation against AHRN and its refusal to deal with AHRN, and others.  MRIS has effectively denied the essential facility to AHRN and other innovative brokers who compete with MRIS's broker subscribers.  MRIS can effectively provide the essential facility to AHRN and other innovative brokers by relaxing its

stranglehold on property listing data and ceasing its anti-competitive conduct against AHRN and other innovative brokers.

151.   MRIS's anti-competitive acts have directly harmed competition and have injured AHRN's sales and goodwill in an amount to be determined.

## COUNT VI

### Copyright Misuse
(Against MRIS)

152.   Counterclaimant AHRN hereby incorporates paragraphs 1-151 by reference as if fully set forth herein.

153.   Defendant MRIS is using its purported copyrights in a manner that violates the public policy embodied in the grant of a copyright.

154.   Defendant MRIS has  and continues  to illegally expand the scope of the limited rights conferred by the copyright grant.

155.   MRIS's illegal expansion of the scope of its copyright has and will continue to injure AHRN in lost sales and goodwill.

## COUNT VII

### Barratry, Md. Code Ann., Bus. Occ. & Prof., § 10-604(a)(1)
(Against NAR)

156.   Counterclaimant AHRN hereby incorporates paragraphs 1-155 by reference as if fully set forth herein.

157.   NAR has no interest in an existing relationship or interest in MRIS or Northstar's copyrights.

158.   NAR has solicited MRIS, Northstar and others, respectively, to sue AHRN or to retain lawyers to represent MRIS, Northstar or others in a lawsuit at NAR's expense, in whole or in part.

159.   NAR's solicitation, payment of or contribution to MRIS, Northstar and others has injured AHRN in its business and property.

## PRAYER FOR RELIEF

WHEREFORE counterclaimant prays for judgment against counterclaim defendants as follows:

A.   Award of compensatory damages in an amount to be determined;

B.   Award of lost profits or an adequate license or royalty fee in an amount to be determined;

C.   Award of declaratory relief;

D.   Award of treble, punitive or exemplary damages in an amount to be determined;

E.   Award of reasonable attorneys' fees;

F.   Order of preliminary and permanent injunctive relief, including but not limited to:

(a)   Enjoin NAR and MRIS from taking any actions to implement their plan to exclude AHRN from the market for Internet-based services to real estate brokers and buyers and sellers of residential real estate.

(b)   Enjoin NAR and MRIS from participating in any way in the conspiracy against AHRN to restrain trade and engaging in the

exclusionary conduct alleged herein.

G.    Grant of such other and further relief as the court deems just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, Counterclaimant AHRN hereby demands a trial by jury on all issues in its First Amended Counterclaim triable of right to a jury.

Respectfully submitted,

FARKAS+TOIKKA, LLP

_____/S/ Richard S. Toikka_____
Richard S. Toikka, Fed Bar No.13543
L. Peter Farkas (pro hac vice)
1101 30th Street, NW, Suite 500
Washington, DC 20007
202-337-7200 (phone)
202-337-7808 (fax)
rst@farkastoikka.com (email)
lpf@farkastoikka.com (email)


Of Counsel:

Christopher R. Miller (pro hac vice)
Chief Legal Officer and General
Counsel
American Home Realty Network, Inc.
222 7th Street, 2nd Floor
San Francisco, California  94103
800-357-3321 (phone)
C.Miller@NeighborCity.com (email)


*Counsel for Defendant and
Counterclaimant
American Home Realty Network, Inc.*

**CERTIFICATE OF SERVICE**

I, Richard S. Toikka, herby certify that on this the 26th day of November, 2012, a copy of the foregoing First Amended Counterclaim and Jury Demand was served by electronic means using the Court's CM/ECF system upon:

      Matthew Krueger (Bar No. 28386)
      mkrueger@sidley.com
      SIDLEY AUSTIN LLP
      1501 K Street, N.W.
      Washington, D.C. 20005
      (202) 736-8000

      Jack R. Bierig
      jbierig@sidley.com
      Tacy F. Flint
      tflint@sidley.com
      SIDLEY AUSTIN LLP
      One S. Dearborn Street
      Chicago, IL 60603
      (312) 853-7000

      *CounselCounsel for Counterclaim-Defendant*
      *National Association of Realtors®*


      John T. Westermeier, Esquire
      Margaret A. Esquenet, Esquire
      FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, L.L.P.
      901 New York Avenue, NW
      Washington, DC 20001-4413

      *Counsel for Plaintiff and Counterclaim Defendant*
      *Metropolitan Regional Information Systems, Inc.*


                    */S/ Richard S. Toikka*
                     Richard S. Toikka