**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

METROPOLITAN REGIONAL                 *
INFORMATION SYSTEMS, INC.,            *
   Plaintiff,                         *
                           *
       v.                               *
                           *
AMERICAN HOME REALTY NETWORK,         *
INC., *et al.*,                       *
   Defendants.                        *
                           *     Civil Action No. 12-cv-00954-AW
and                                   *
                           *
AMERICAN HOME REALTY NETWORK,         *
INC.,                                 *
   Counterclaim-Plaintiff,            *
                           *
       v.                               *
                           *
METROPOLITAN REGIONAL                 *
INFORMATION SYSTEMS, INC., *et al.*,  *
   Counterclaim-Defendants.           *
                           *
*****************************************************************************

## MEMORANDUM OPINION

Plaintiff Metropolitan Regional Information Systems, Inc. ("MRIS") filed suit against

Defendants American Home Realty Network ("AHRN") and AHRN CEO Jonathan Cardella on

March 28, 2012, alleging copyright infringement, violations of the Lanham Act, and tortious

conversion and unjust enrichment.  Doc. No. 1.  MRIS's claims are based on AHRN's alleged

reproduction of real estate listing content from the MRIS Database onto AHRN's website,

Neighborcity.com.

On August 24, 2012, the Court granted Cardella's Motion to Dismiss, denied AHRN's

Motion to Dismiss, and granted MRIS's Motion for a Preliminary Injunction.  Doc. Nos. 34–35.

Specifically, the Court ordered that "Defendant AHRN and all persons acting under its direction,

control or authority are hereby enjoined from unauthorized copying, reproduction, public display, or public distribution of copyrighted content from the MRIS Database, and from preparing derivative works based upon the copyrighted content from the MRIS Database." Doc. No. 35.  The Court subsequently granted-in-part AHRN's Motion to Clarify, Reconsider, or Suspend the Preliminary Injunction Order, and modified the Order as follows: "AHRN and all persons acting under its direction, control or authority are hereby preliminarily enjoined from unauthorized copying, reproduction, public display, or public distribution of MRIS's copyrighted *photographs* and from preparing derivative works based upon MRIS's copyrighted *photographs*." Doc. No. 65 (emphasis added).

On September 24, 2012, AHRN filed its Answer to MRIS's Complaint as well as Counterclaims against MRIS, National Association of Realtors ("NAR"), and Does #1–25.  Doc. No. 46.  After MRIS and NAR separately moved to dismiss AHRN's Counterclaims, Doc. Nos. 62–63, AHRN filed First Amended Counterclaims on November 26, 2012, Doc. No. 68.[1]  On December 13, 2012, MRIS moved to dismiss or summarily adjudicate AHRN's First Amended Counterclaims.  Doc. No. 76.  NAR moved to dismiss the First Amended Counterclaims on December 21, 2012.  Doc. No. 81.  AHRN subsequently moved to strike the Declaration of MRIS CEO David Charron from MRIS's Motion and for other miscellaneous relief.  Doc. No. 83.  MRIS also filed a Motion for Leave to File a Surreply to AHRN's Motion to Strike.  Doc. No. 95.  On May 3, 2013, the Court ordered the parties to appear for a hearing on the pending motions on May 29.  Six days before the hearing, AHRN filed a Motion for Leave to file Second Amended Counterclaims and a Motion to Seal attachments thereto.  Doc. Nos. 128, 132.

---

[1] AHRN was permitted to amend its counterclaims once as a matter of course pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.  Accordingly, on May 3, 2013, MRIS and NAR's original Motions to Dismiss were denied as moot.  *See* Doc. No. 124.

The Court has reviewed the First Amended Counterclaims and motion papers, and has carefully considered the arguments of counsel at the May 29 hearing.  For the reasons articulated below, MRIS's Motion to Dismiss or Summarily Adjudicate and NAR's Motion to Dismiss AHRN's First Amended Counterclaims will be GRANTED-IN-PART and DENIED-IN-PART. Counts I, V, VI, and VII will be dismissed with prejudice, while Counts II, III, and IV will be dismissed without prejudice.  AHRN will be granted fourteen days to file second amended counterclaims with respect to Counts II, III, and IV.  The remaining motions will be DENIED as moot.[2]

## I.     FACTUAL BACKGROUND

The following facts are taken from AHRN's First Amended Counterclaims.  The Court also incorporates by reference the factual background from its August 24, 2012 and November 13, 2012 Memorandum Opinions.

AHRN is a five-year old San Francisco-based real estate brokerage referral services and technology company.  AHRN, through its website Neighborcity.com and its AgentMatch software, provides information to home buyers and sellers on a nationwide basis by identifying real estate agents best suited to assist them in purchasing or selling properties in their local market.  AHRN searches the Internet for data on real estate listings, identifies, rates, and ranks real estate agents most suitable to represent potential buyers and sellers in proposed transactions, facilitates the introduction of the agents to its individual customers, and monitors its customers' satisfaction with the agents to whom they were introduced.  AHRN is compensated by receiving a percentage of a broker's commission if the broker accepts an AHRN client-referral and the

---

[2] The Motion to Strike and Motion for Leave to file a surreply are denied as moot in light of the Court's conclusion that the First Amended Counterclaims are dismissed for failure to state a claim.  The Motion for Leave to file second amended counterclaims and related Motion to Seal are denied as moot given the Court's determination that AHRN should be granted leave to file amended counterclaims and attempt to cure the deficiencies articulated herein.

referral results in a closed transaction.  Consumers in the residential real estate market have responded positively to the increased access to information that AHRN has provided, and AHRN has grown significantly in the last year in terms of its revenues, transactions referred, and full-time employees.

Counterclaim-Defendant MRIS provides what is known in the real estate industry as multiple listing services ("MLS").  MRIS facilitates real estate transactions in the mid-Atlantic region by operating and maintaining an automated database consisting of compiled property listings and related informational content (the "MRIS Database").  To use the database, real estate brokers and agents must execute a subscription agreement, under which they agree to upload their real estate listings to the database and upon payment to MRIS are granted access to all the listings in the database and the right to display those listings on their own websites via a licensed data feed.  Counterclaim-Defendant NAR is a trade organization which establishes and enforces policies and professional standards for its over one million individual member real estate brokers and their affiliated agents and sales associates, and 1,600 state and local member boards, which control approximately 80% of the roughly 1,000 MLSs in the United States.  NAR's members compete with one another in local brokerage referral services markets to represent consumers in real estate transactions.

AHRN also names as Counterclaim-Defendants Does #1–25, who are thought to be brokers and/or other MLSs and their principals.  AHRN intends to amend its counterclaims to add the true names and capacities of these Counterclaim-Defendants once they become known.  AHRN does not name Regional Multiple Listing Service of Minnesota, Inc. ("RMLS" or "Northstar") as a Counterclaim-Defendant at this time.  However, RMLS is the plaintiff in a similar action filed against AHRN in the District of Minnesota.  *See Regional Multiple Listing*

*Service of Minnesota, Inc. d/b/a NorthstarMLS v. American Home Realty Network, Inc.*, Case

No. 12cv965 (D. Minn.).

In broad terms, the thrust of AHRN's First Amended Counterclaims is that Counterclaim-

Defendants instigated a program to register and obtain sham compilation copyrights for MLS

listings, threatened to and actually enforced those copyrights against AHRN, refused to deal with

and refused to license MLS data to AHRN, made false and misleading statements related to their

copyrights and concerning AHRN, and passed anticompetitive MLS rules consistent with their

goal of driving AHRN and similar innovators out of the market.

A.     MRIS Guidance Paper and Copyright Program

In 2005, MRIS President and CEO David Charron, MRIS General Counsel Erik M. Feig,

and MRIS outside counsel J.T. Westermeier jointly wrote a two-part Guidance Paper issued in

several versions and titled in the 2006 version, "Strengthening the Foundation: The Real Estate

Listing Content Copyright FAQ and An Updated Program to Administer, Secure, and Enhance

the Value of Real Estate Listing Content."   The purpose of the Guidance Paper was to invite the

MLS industry to join MRIS's Copyright Program, the object of which was to defeat "the

emergence of several high profile initiatives proclaiming 'new' and 'improved' alternative

business models that they propose will dramatically change the real estate industry."

The authors heavily publicized the Guidance Paper, featuring it and distributing it at

various MLS industry conferences throughout 2005.  According to AHRN, the Guidance Paper

proposed the defeat of the alternative business models through subversion of the copyright

process by claiming the existence of and encouraging the enforcement of copyrights in

unregistered and uncopyrightable listing data consisting of facts assembled in compilations.  The

Guidance Paper urged the MLS industry to stop using the term "listing data" because the term

implies that the real estate information supplied by MLSs is merely factual and thus not copyrightable.  Instead, the Guidance Paper urged use of the term "listing content," noting that "[w]hile listing content may not, on the surface, have the degree of creativity we associate with a song or a story or other types of so-called 'creative' works, there should be little question that listing content is protectable by copyrights."

The MRIS Copyright Program, as outlined by the Guidance Paper, also urged "making each property listing a joint work owned by the broker and the MLS for copyright purposes. This joint work is created by merging each listing broker's and MLS's respective copyright contributions into a merged, unitary property listing with co-ownership of the respective copyrights.  Joint ownership is a key building block of the Program."  The Copyright Program also devised the "mashing" of non-copyrightable listing data from different sources after renaming it "content" in the MLS databases and urged MLSs to register the listing content under compilation copyright procedures for automated databases, thereby claiming coverage for both "the compilation and collection of content in the database . . . and to the jointly owned copyrighted content in each individual listing."

With respect to copyright registration, the Program devised a practical strategy which AHRN alleges was motivated by a desire to evade the Copyright Office's fee structure for individual copyright and published database copyright registrations:

> Given the number of listings in a typical MLS database and the number of updates occurring on a daily basis, as a practical matter registering the claims of copyright ownership in each individual listing with the U.S. Copyright Office is impractical and not cost effective.  What we contend is needed is a practical strategy that protects the copyrights in each individual property listing as well as the compilation and collection of property listings contained in the MLS database.

AHRN further alleges that the MLS industry's registration of databases as "unpublished" rather than "published" compilations saves the industry and deprives the Copyright Office of trillions

of dollars per year in registration fees due to the difference in fees between quarterly and daily registration. Similarly, AHRN alleges that foregoing registration of listing photographs in group registration copyrights and instead claiming the photographs as covered under the database registration saves the MLS industry and deprives the Copyright Office of hundreds of billions of dollars annually.

The MLS industry adopted the Copyright Program "under the auspices of, and with the encouragement and guidance of NAR." NAR held its annual meeting in Anaheim, California from November 11-14, 2011. "On information and belief," this meeting featured discussions of the perceived threat AHRN posed to the industry and what the industry could do to "shut down" AHRN. "[A]t a time yet unknown," NAR advised its members to follow MRIS's recommended "sham compilation copyright registration process." In its publication titled MLS Copyright Compilation Registration, NAR instructed its member MLSs to state in their compilation copyright applications that "the materials included in this compilation are preexisting materials" and to make it clear that these materials "were 'selected' and 'arranged,' in order to assure that the compilation receives copyright protection." The NAR publication also included "MLS Registration Tips," which provided instructions on compilation copyright registration.

B.  Cease-and-desist Letters and Related Communications Concerning AHRN

Beginning in November 2011, just before the Anaheim meeting, AHRN began to receive what would become, following the Anaheim meeting, "a torrent of cease-and-desist letters" from brokers and MLSs. Through 2012 AHRN received 32 letters, all substantially similar in form and content, and all alleging copyright infringement and threatening legal action. AHRN received eleven additional letters from brokers complaining about its referral program, and three letters involving complaints to government agencies regarding infringement or licensing

violations.  AHRN received a cease-and-desist letter from Northstar on November 15, 2011, the

day after the NAR Anaheim meeting ended, and another letter from MRIS on November 18,

2011.  AHRN also received a number of phone calls and e-mails from other MLSs and their

consultants that stated that they were in attendance or participated in the Anaheim meeting.

On December 22, 2011, AHRN was copied an on e-mail from a Northstar employee,

John Mosey, in which Mosey stated that MLSs across the country had "called in the full force

and fury of their respective legal advisors" and dropped C&Ds (cease-and-desist letters) "on the

head of the bad fellow," AHRN CEO Jonathan Cardella.  Mosey continued by saying:

> How do we connect the dots between all of the MLS's [sic] that have been abused
> so that we can act collectively, either in cost sharing and/or strategically by taking
> an action against Mr. Cardella that has the desired outcomes of:
> 1. Getting all of our listings off of his site[.]
> 2. Discovering where he has been getting the listings[.]
> 3. Throwing a world of hurt on both[.]
> 4. Sending a message that our copyrights are enforceable and we are serious about
> punishing anyone who doesn't take us seriously.

At the NAR Mid-Year meeting in Washington, D.C. in May 2012, the General Counsel of NAR

allegedly advised local MLSs to send cease-and-desist letters if their data was taken.

C.    AHRN's Offer to Negotiate Licenses

In response to the cease-and-desist letters, AHRN responded to each letter with an offer

to negotiate a license for the use of the broker's or MLS's website.  In most cases, AHRN's

overtures to negotiate were rebuffed, always in the same format and in essentially the same

language.  In instances in which agreements were reached or negotiations had commenced with

brokers over referral agreements and AHRN's use of listing information, the brokers repudiated

these agreements in January 2012.  AHRN alleges "upon information and belief" that this

repudiation was in response to pressure from MLSs.  Each repudiation letter from these brokers

stated in "remarkably similar language" that AHRN's overtures were brought to the broker's

attention, that the broker had no interest in entering into any agreements with Neighborcity.com or AHRN, and that any agreements purporting to bind the broker were void and of no legal effect.  AHRN has received nearly identical letters from brokers across the country intending to cease solicitations by AHRN and repudiating agreements with AHRN.

      D.     <u>Sham Litigation</u>

AHRN alleges "[o]n information and belief" that MRIS's lawsuit in this case and Northstar's lawsuit against AHRN "are the direct and concerted action discussed and sought by the concerted action at the Anaheim NAR Annual Meeting."  AHRN adds that these actions followed AHRN's roll-out of updated professional profile pages for real estate agents in March 2012.  AHRN alleges that Redfin and other companies that introduced similar real estate agent profile pages discontinued publication under pressure from MRIS and other MLSs within days of launch.  AHRN also alleges "[o]n information and belief" that NAR voted on Saturday, May 19, 2012, at the end of its Midyear Meeting in Washington, D.C., to fund the MRIS lawsuit and the Northstar lawsuit against AHRN in Minnesota.  According to AHRN, NAR "seeks to fund the litigations for its own financial gain."  In May 2012, the NAR Board allegedly approved $161,667 in legal assistance for seven cases, including the challenged misappropriation of MLS data by a third-party website.

      E.     <u>NAR Rules</u>

NAR promulgates rules which govern the conduct of MLSs and requires its member boards to adopt such rules, including those that prohibit or strongly discourage MLSs from licensing their listing databases to third parties like AHRN.  According to AHRN, these rules inhibit entities like AHRN from ranking or evaluating real estate agents, selling referrals, and using the MLS licensed data for unauthorized purposes.

For example, in November 2009, NAR revised its MLS Policy Statement to prevent brokers from using their MLSs' IDX data feeds "for any purpose other than display on their websites."  Furthermore, as of February 9, 2010, another NAR rule, addressed by NAR's Statement of MLS Policy 7.85, provided:

> Use of listings and listing information by MLSs for purposes other than the defined purposes of MLS requires participants' consent.  Such consent cannot be required as a condition of obtaining or maintaining MLS participatory rights.  MLSs may presume such consent provided that listing brokers are given adequate prior notice of any intended use unrelated to the defined purpose of MLS, and given the opportunity to affirmatively withhold consent for that use.

According to 7DS Associations, a frequent participant in real estate industry events, the primary motivation behind NAR's rules is to take back control of broker listings and prevent further loss of control over such listings.

F.    False and Misleading Statements

AHRN identifies the following allegedly false and misleading statements made by MRIS: (a) statements that the Guidance Paper's suggestions and MRIS Copyright Program are in accordance with the law; (b) statements that MRIS's compilation copyrights are valid, when in fact any copyright would be owned by CoreLogic; (c) statements that MRIS has valid copyrights in unregistered textual elements or photographs within the Database; (d) statements that MRIS acquires valid copyrights to photos and listings through a "click wrap" Terms of Use assignment when its members upload photos into the MRIS Database; (e) using false and misleading copyright notices on photos on MRIS's website and third party websites to which it syndicates the data; and (f) informing its members that uncopyrightable real estate listing information can be regarded as copyrightable merely by treating it as "content."   NAR is alleged to have republished or encouraged its members to republish these allegedly false and misleading statements.  Furthermore, NAR has itself referred to AHRN with terms such as "thief," "theft,"

"pirate," "pirating," and "piracy," and has encouraged others to do the same.  The website belonging to the Berkshire County Board of Realtors, an NAR member, accused NeighborCity of stealing listing data and called them "Data pirates of the year."

G.    Nature of MLS Databases

AHRN alleges "[o]n information and belief" that MRIS, Northstar, and other MLS listing databases are "based on third party-created software layouts in templates of fields and field descriptors into which brokers or their assistants insert individual numbers, words, and short phrases, individual unadorned facts they have obtained from prospective sellers of real estate." AHRN alleges that MRIS, Northstar, and "as much as half" of the real estate industry use the same MLS Matrix database software by CoreLogic, and that if any authorship is involved in the collection and arrangement of material in MLS listing databases, it would involve the creativity of CoreLogic, not the MLSs.  AHRN alleges "[o]n information and belief" that NAR has conducted insufficient due diligence on the merits of MRIS's copyright claims to fund the instant litigation, but that its payments represent an endorsement as to the merits of MRIS's claims.

* * * * *

Based on the foregoing, AHRN asserts the following causes of action in its First Amended Counterclaims: false advertising in violation of § 43(a) of the Lanham Act against MRIS and NAR (Count I); unfair competition against MRIS and NAR, in violation of Maryland law (Count II); unfair competition against all Counterclaim-Defendants, in violation of California law (Count III); violation of § 1 of the Sherman Act against all Counterclaim-Defendants (Count IV); violation of § 2 of the Sherman Act against MRIS (Count V); copyright misuse against MRIS (Count VI); and barratry against NAR (Count VII).

## II.      STANDARD OF REVIEW

The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the sufficiency of [the] complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  Except in certain specified cases, the complaint need only satisfy Rule 8(a) of the Federal Rules of Civil Procedure, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In resolving a motion to dismiss, the Court should proceed in two steps.  First, the Court should determine which allegations in the Complaint are factual allegations entitled to deference, and which are mere legal conclusions that receive no deference.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

In its determination, the Court must "accept the well-pleaded allegations of the complaint as true," *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and "must construe factual allegations in the light most favorable to the plaintiff," *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999).  The Court should not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), "legal conclusion[s] couched as . . . factual allegation[s]," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).  "Factual allegations must be

enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

## III.   ANALYSIS

As a threshold matter, MRIS and NAR argue that AHRN's counterclaims are barred by the law of the case doctrine.  "As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983).  "This rule of practice promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Cold Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (quotations omitted); *see also* 18B WRIGHT AND MILLER, FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed. 2010) ("Law-of-the-case principles . . . are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards.").  The doctrine applies to those questions actually decided and those decided by necessary implication, but it does not apply to questions which might have been decided but were not.  *Sejman v. Warner-Lambert Co., Inc.*, 845 F.2d 66, 69 (4th Cir. 1988).

The doctrine is a rule of discretion, not a jurisdictional requirement.  *Columbus-America Discovery Grp. v. Atl. Mut. Ins. Co.*, 203 F.3d 291, 304 (4th Cir. 2000).  Generally, where an appellate court's decision establishes the law of the case, it must be followed by the trial court in all subsequent proceedings in the same case.  *Sejman*, 845 F.2d at 69.  Interlocutory orders by the district court may also be considered the law of the case in subsequent proceedings.  *See Boyd v. Coventry Health Care Inc.*, 828 F. Supp. 2d 809, 814 (D. Md. 2011).  However, district courts retain the power to reconsider and modify their interlocutory orders at any time prior to final judgment when such reconsideration is warranted.  *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326

F.3d 505, 514 (4th Cir. 2003); *Hill v. Pitt & Greene Elec. Membership Corp.*, 161 F.3d 2

(Table), 1998 WL 482784, at *1 (4th Cir. Aug. 11, 1998); *see also Washington Gas Light Co. v.*

*Prince George's Cnty. Council*, 784 F. Supp. 2d 565, 571 n.2 (D. Md. 2011).

In general, a court's decisions at the preliminary injunction phase do not constitute law of

the case in further proceedings and do not limit or preclude the parties from litigating the merits.

*See, e.g.*, *Center for Biological Diversity v. Salazar*, 706 F.3d 1085, 1090 (9th Cir. 2013);

*Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012); *Grudzinski v. Staren*, 87 F. App'x 508,

512 (6th Cir. 2004); *Boit v. Gar-Tex Prods., Inc.*, 967 F.2d 671, 678 (1st Cir. 1992); *Goodheart*

*Clothing Co., Inc. v. Laura Goodman Enters., Inc.*, 962 F.2d 268, 274 (2d Cir. 1992).  The Ninth

Circuit explained that "[t]his is true for the reason that a preliminary injunction decision is just

that: preliminary."  *Salazar*, 706 F.3d at 1090; *see also Grudzinski*, 87 F. App'x at 512

("Findings made in the course of deciding whether to issue a preliminary injunction . . . generally

do not establish the law of the case, because preliminary injunctions require plaintiffs to satisfy a

lesser burden of proof than is required for a decision on the merits.").  For similar reasons, courts

have been loath to apply the doctrine where the prior holdings in the case were based on an

undeveloped factual record, or where the prior holdings were made on a different standard of

review.  *See, e.g.*, *McKenzie v. BellSouth Telecommc'ns., Inc.*, 219 F.3d 508, 513 (6th Cir. 2000);

*McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 142 (E.D.N.Y. 2009); *Davidson v.*

*Bartholome*, 460 F. Supp. 2d 436, 443 (S.D.N.Y. 2006).

The allegations underlying AHRN's First Amended Counterclaims are that

Counterclaim-Defendants engaged in a sham copyright registration program, made false and

misleading statements regarding the legality of the asserted copyrights, and enforced their sham

copyrights in sham litigation.  Counterclaim-Defendants essentially argue that the Court already

upheld the legality and validity of MRIS's copyrights, and therefore, AHRN's counterclaims should be dismissed pursuant to the law of the case doctrine.  In its August 24, 2012 Memorandum Opinion, the Court concluded that MRIS had a valid cause of action for infringement on the individual photographs in the MRIS Database.  Doc. No. 34 at 17. However, the Court's holding was made in the context of denying AHRN's Motion to Dismiss[3] and granting MRIS's Motion for a Preliminary Injunction.  The Court's conclusions that MRIS's infringement claims survived AHRN's Motion to Dismiss and that MRIS had established a likelihood of success did not foreclose the possibility that AHRN could prevail on the merits.[4] Given the preliminary nature of the August 24 and November 13 rulings, the Court rejects Counterclaim-Defendants' assertions that the law of the case bars AHRN's counterclaims.

A.    Count I: Lanham Act § 43(a) (Against MRIS and NAR)

AHRN's First Amended Counterclaims allege that MRIS and NAR have violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  AHRN's claims appear to be based on section 43(a)'s false advertising provision, which prohibits the "use[] in commerce [of any] false or

---

[3] The fact that the Court considered AHRN's Motion under Rule 56 does not alter the Court's conclusion with respect to Counterclaim-Defendants' law of the case argument.  The Court merely concluded in its August 24 Opinion that AHRN was not entitled to judgment as a matter of law on MRIS's infringement claims, and whether AHRN's Motion was analyzed under Rule 12(b)(6) or Rule 56, it was made at a preliminary stage of the case without the benefit of discovery.

[4] Indeed, the language adopted by the Court in its August 24 Opinion demonstrates that its rulings were preliminary in nature and were made on a sparse record without the benefit of discovery.  For example, the Court noted that MRIS presented *credible*, not conclusive, evidence that it owned copyrights in the underlying photographs of the MRIS Database, and merely held that AHRN was not entitled to judgment as a matter of law on the grounds that MRIS did not individually register the photographs.  Doc. No. 34 at 17–18.  The Court also held that MRIS's identification of "photographs" and "text" as preexisting material in its Database registration *appeared* to be adequate under 17 U.S.C. § 409.  *Id.* at 20.  It was further noted that the TOU constituted *credible*, not conclusive, evidence that MRIS's users intended to assign the copyrights in photographs to MRIS, and that Defendants were not entitled to judgment as a matter of law on the grounds that the assignments of copyrights in the individual photographs were void.  *Id.* at 22–23.  Similarly, the Court held that the MRIS had a *credible*, not conclusive, claim that its subscribers intended to assign the copyrights to MRIS.  *Id.* at 23.  The Court relied in part on these conclusions in granting MRIS's Motion for Preliminary Injunction.  *Id.* at 24–25.  In concluding that MRIS demonstrated a *likelihood of success* on the merits, the Court further held that the MRIS Database exhibited the requisite originality for copyright protection.  *Id.* at 26.  The Court also held that "*[a]t this time*, AHRN has not presented credible evidence that MRIS is engaged in this litigation for any unlawful objective, as opposed to merely enforcing its copyrights." *Id.* at 29 (emphasis added).  The Court's November 13, 2012 Memorandum Opinion largely affirmed the substance of these rulings.

15

misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B); *see* Doc. No. 68 ¶ 120 (alleging false advertising).  To state a claim for false advertising under the Lanham Act, a party must establish that:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*PMB Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (quoting *Scotts Co. v. United Indus.*, 315 F.3d 264, 272 (4th Cir. 2002)).

The Supreme Court has explained that § 43(a) of the Lanham Act "does not have boundless application as a remedy for unfair trade practices, [and b]ecause of its inherently limited wording, § 43(a) can never be a federal codification of the overall law of unfair competition."  *Dastar Corp. v. Twentieth Century Fox Film Co.*, 539 U.S. 23, 29 (2003) (citations omitted) (internal quotations and alterations omitted).  The language of 15 U.S.C. § 1125(a)(1)(B) unequivocally limits liability to false or misleading statements made in "commercial advertising or promotion."  Although the Fourth Circuit has not defined the term, several district courts within this circuit have held that statements or representations constituting "commercial advertising or promotion" must be: "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry."

*Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med.*, 189 F. Supp. 2d 271, 275 (D. Md. 2001)

(adopting test from *Gordon & Breach Sci. Publishers, S.A. v. Am. Inst. of Physics*, 859 F. Supp.

1521, 1536 (S.D.N.Y. 1994) (internal alterations omitted)); *accord Design Res., Inc. v. Leather*

*Indus. of Am.*, No. 1:10CV157, 2012 WL 4580982, at *5–6 (M.D.N.C. Sept. 28, 2012) (noting

that several other circuits have adopted the *Gordon & Breach* test); *Huntingdon Life Scis., Inc. v.*

*Rokke*, 978 F. Supp. 662, 666 (E.D. Va. 1997).

Thus, the threshold issue for a Lanham Act violation is that the complaining party must

establish that the statements at issue constitute commercial speech. *See, e.g.*, *Porous Media*

*Corp. v. Pall Corp.*, 173 F.3d 1109, 1120 (8th Cir. 1999); *Neurotron, Inc.*, 189 F. Supp. 2d at

275. Generally, three factors govern whether speech is commercial: "(i) whether the

communication is an advertisement, (ii) whether it refers to a specific product or service, and (iii)

whether the speaker has an economic motivation for the speech." *Porous Media*, 173 F.3d at

1120 (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983)). The presence of

all three characteristics provides "strong support" for the conclusion that statements are

commercial speech. *Bolger*, 463 U.S. at 67.

For liability to arise under the false advertising provision, "the contested statement or

representation must be either false on its face or, although literally true, likely to mislead and to

confuse consumers given the merchandising context." *C.B. Fleet Co. v. SmithKline Beecham*

*Consumer Healthcare, L.P.*, 131 F.3d 430, 434 (4th Cir. 1997). Statements of opinion are

generally not actionable under § 43(a) of the Lanham Act. *See, e.g.*, *Osmose, Inc. v. Viance,*

*LLC*, 612 F.3d 1298, 1311 (11th Cir. 2010); *see also Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,

227 F.3d 489, 496 (5th Cir. 2000); *Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc.*, 202 F.

Supp. 2d 431, 435 (M.D.N.C. 2002). For a statement to be actionable, it must be a "specific and

measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 731 (9th Cir. 1999).

According to AHRN, MRIS's false and misleading statements include its statements (primarily those from the 2005 Guidance Paper) that the Copyright Program was lawful, that its compilation copyrights are valid, that it has valid copyrights in the underlying elements of the MRIS Database, and that it acquires valid copyrights to the underlying photographs through a "click wrap" Terms of Use (TOU) Agreement in which its subscribers assign copyrights of photographs when they upload them to the Database.  Doc. No. 68 ¶ 111.  AHRN also claims that MRIS's copyright notices on photographs in the MRIS Database constitute false and misleading statements, and that it was false and misleading to promote the idea that listing information could be regarded as copyrightable by treating it as "content." *Id.*  AHRN alleges that NAR (1) republished MRIS's allegedly false and misleading statements that it held valid copyrights in the MRIS Database and underlying elements thereof, *id.* ¶¶ 111–12; (2) published "MLS Registration Tips," which provided instructions to MLSs as to how to obtain copyright protection for their databases, *id.* ¶ 69; and (3) has accused AHRN of "stealing" information and referred to AHRN as a "thief" and "pirate," and has encouraged others to make similar accusations, *id.* ¶ 112.  With respect to the last allegation, AHRN alleges:

> NAR has republished or encouraged its members to republish MRIS's false and misleading statements on its web site.  In presentations to NAR's MLS members and their broker members, and based on NAR's endorsement of MRIS's false and misleading statements, NAR has itself, and encouraged others to, refer to AHRN as "stealing" information, as a "thief" or of "theft," as a "pirate," "pirating" or of "piracy."  E.g., NAR-member, Berkshire County Board of Realtors' website accused Neighbor City of "taken [sic] our MLS listing data without license, authorization or agreement (we call that stolen in these parts) and are rating agents. . . . Termed: Data pirates of the year."

*Id.*

For multiple reasons, AHRN has failed to state a plausible Lanham Act violation against either Counterclaim-Defendant.  First, any statements made by MRIS and NAR regarding the copyrightability of MLS listing data were nonverifiable legal opinions that are not actionable under the Lanham Act.  Several courts have recognized that such opinions cannot form the basis of a Lanham Act claim.  For example, in *Dial A Car, Inc. v. Transportation, Inc.*, 884 F. Supp. 584 (D.D.C. 1995), *aff'd* 82 F.3d 484 (D.C. Cir. 1996), the plaintiff claimed that defendants falsely represented in discussions with taxicab customers and clients that defendants' cars could lawfully be used to provide the same services provided by plaintiff.  *Id.* at 591–92.  Defendants claimed that their statements were merely expressions of opinion regarding the legality of their services, and that the accuracy of their representations had yet to be made by an administrative agency in the District of Columbia.  *Id.* at 592.  The Court agreed with the defendants and dismissed the claim, holding that "[a]t this point, all that can be said is that defendants were expressing an opinion on an inconclusive question of law and were not making representations of verifiable or hard definable facts."  *Id.* at 592 (internal quotations omitted) (citations omitted); *see also, e.g.*, *Coastal*, 173 F.3d at 731 ("Absent a clear and unambiguous ruling from a court or agency of competent jurisdiction, statements by laypersons that purport to interpret the meaning of a statute or regulation are opinion statements, and not statements of fact."); *General Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1356–57 (S.D. Fla. 2002) (dismissing § 43(a) claim based on defendants' statements that plaintiff's marks would lose trademark protection, holding that "speculative legal analysis does not give rise to Lanham Act liability unless it can be shown to be false").  The Guidance Paper and related statements connected to the MRIS Copyright Program merely opined that MLSs' listing databases could obtain copyright

protection and outlined a strategy whereby MLSs could register for protection with the Copyright Office.  Such statements were clearly expressions of legal opinion, and AHRN has failed to explain how these statements could be verified as false statements of fact.[5]

Second, AHRN's false advertising claims against MRIS and NAR must be dismissed because none of the allegedly false or misleading statements were made in "commercial advertising or promotion."  15 U.S.C. § 1125(a)(1)(B).  AHRN relies largely on the fact that MRIS promoted, published and republished its Guidance Paper and other statements connected to its Copyright Program in industry journals and at industry conferences across the country. Doc. No. 68 ¶ 57.  However, statements in the Guidance Paper were allegedly directed to MLSs and focused on the copyrightability of MLS content.  AHRN's allegations fail to suggest that the Guidance Paper is a commercial advertisement that promoted MRIS as a multiple listing service, or that it was likely to influence anyone's purchasing decisions.  *See, e.g.*, *PMB Prods., LLC*, 639 F.3d at 120; *see also Porous Media Corp.*, 173 F.3d at 1120 (noting that statements most likely to constitute commercial speech refer to specific goods or services); *Neurotron*, 189 F. Supp. 2d at 275 (noting that alleged statements must be made for the purpose of influencing consumers to buy particular goods or services).  To the extent AHRN relies on any statements MRIS allegedly

---

[5] Even if the Court accepted that the truth or falsity of these statements could be verified, the only logical conclusion it could reach is that the statements asserting the copyrightability of MLS compilations were *true*.  Indeed, the record reveals that the Copyright Office routinely grants MLSs copyright protection in their compilations, and federal courts have routinely found at both the preliminary injunction stage and on the merits that MLS compilations are entitled to copyright protection.  *See, e.g.*, *Montgomery Cnty. Ass'n of Realtors v. Realty Photo Master Corp.*, 878 F. Supp. 804, 809-10 (D. Md. 1995) (granting summary judgment to MLS), *aff'd* 91 F.3d 132 (Table) (4th Cir. 1996); *Supermarket of Homes, Inc. v. San Fernando Valley Bd. of Realtors*, 786 F.2d 1400, 1408-09 (9th Cir. 1986) (granting summary judgment to MLS); *Regional Multiple Listing Serv. of Minn. v. Am. Home Realty Network, Inc.*, 2012 WL 4470286, at *8-9 (D. Minn. Sept. 27, 2012) (granting preliminary injunction to MLS); Doc. No. 81-2, *Realtor Ass'n of Greater Ft. Lauderdale, Inc. v. Prop. Am. Corp.*, Case No. 99-6141 (S.D. Fla. Mar. 20, 2000) (finding that MLS had established likelihood of success on infringement claim, but denying preliminary injunction where it failed to show irreparable harm); Doc. No. 81-3, *Real Data, Inc. v. Houston Ass'n of Realtors, Inc.*, Case No. H-94-0947 (S.D. Tex. Apr. 28, 1995) (finding on motion for summary judgment that MLS held valid compilation copyright, but denying motion for summary judgment and injunctive relief based on disputed factual issues regarding infringement).

made to the Copyright Office, *see* Doc. No. 68 ¶ 18, there is no basis to conclude that such statements constituted commercial advertising or promotion.[6]

With respect to NAR, AHRN alleges in conclusory fashion that "NAR has republished or encouraged its members to republish MRIS's false and misleading statements on its web site." Doc. No. 68 ¶ 112.   AHRN's allegations fail to identify which statements were republished and the nature and context of the alleged republication.   To the extent AHRN relies on the statements from the Guidance Paper and statements related to the Copyright Program, it has failed to state a claim for the reasons discussed above.   AHRN's Lanham Act claim against NAR also relies on the basis of NAR's alleged "Registration Tips," which recommended how MLSs should apply and register their copyrights with the U.S. Copyright Office  *Id.* ¶ 69.   AHRN has failed to specify what is false or misleading in the "Registration Tips" publication, much less allege that the statements were made in an advertisement or for the purpose of promoting a particular good or service.   Furthermore, like the statements in the Guidance Paper, the statements in the "Registration Tips" are nonactionable legal opinions.

Finally, AHRN's allegations regarding Counterclaim-Defendants' disparaging statements are also insufficient to state a claim for false advertising under the Lanham Act.   AHRN identifies a single disparaging statement made about NeighborCity.com by an NAR member, Berkshire County Board of Realtors.   Aside from conclusory assertions of conspiracy and agreement, AHRN's pleadings fail to connect this particular statement to MRIS, NAR, or the other allegations underlying the First Amended Counterclaims.   Furthermore, even if the Court accepted that this particular statement or any of the other alleged statements accusing AHRN of

---

[6] It is not clear whether AHRN's Lanham Act claim was also based upon MRIS's statements that its database was "unpublished."   These statements do not give rise to liability for false advertising, however, because they were not false.   *See infra*, Part III.B.1.   Furthermore, statements made to the Copyright Office do not constitute commercial advertising or promotion.

"theft" or "piracy" could be attributed to MRIS or NAR, AHRN has not demonstrated that any of them occurred in the context of commercial advertising or promotion.[7]

Although a court "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), leave to amend is properly denied and a claim dismissed with prejudice where further amendment would be futile, where the deficiencies in the complaint are fundamental, or where the party has failed to cure the deficiencies despite repeated opportunities. *See, e.g.*, *Forman v. Davis*, 371 U.S. 178, 182 (noting that reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment"); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 630 (4th Cir. 2008) (holding that district court did not abuse discretion in denying motion for leave where amendment was futile in light of complaint's "fundamental deficiencies"); *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (affirming district court's determination that further amendment would be futile where proposed complaint did not state a claim under Rule 12(b)(6) and lacked sufficient particularity under Rule 9(b)).  As discussed above, the crux of AHRN's Lanham Act claims is based on Counterclaim-Defendants' allegedly false statements relating to the copyrightability of MLS listing data.  Further amendment in this case would be futile, as no set of facts would make these allegedly false statements actionable under the Lanham Act.  Furthermore, there is nothing in the new allegations presented in AHRN's proposed Second Amended Counterclaim, Doc. No. 133-1, that would alter the Court's analysis.  Accordingly, the Court will dismiss AHRN's Lanham Act claims with prejudice.

---

[7] The Court further notes that even well-pleaded allegations based on Counterclaim-Defendants' accusations of infringement would likely not give rise to a cause of action.  For the reasons discussed herein, such allegations would constitute nonactionable legal opinions.

B.     Count IV: Sherman Act § 1 (Against All Defendants)

AHRN's allegations that Counterclaim-Defendants have conspired to engage in sham

litigation, or efforts incident to that litigation, such as the sending of cease-and-desist letters,

form a substantial basis of its Sherman Act claims.  *See* Doc. No. 68 ¶¶ 3, 14, 58, 62, 70–74, 101,

109, 139-40, and 143.  As a preliminary matter, MRIS and NAR contend that they are immune

from antitrust liability based on *Noerr-Pennington* immunity.

1.     *Noerr-Pennington* antitrust immunity

"Those who petition government for redress are generally immune from antitrust

liability."  *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56

(1993).  In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, the Supreme

Court held that the Sherman Act "does not prohibit  . . . persons from associating together in an

attempt to persuade the legislature or the executive to take particular action with respect to a law

that would produce a restraint or monopoly."  365 U.S. 127, 136 (1961); *accord United Mine

Works of Am. v. Pennington*, 381 U.S. 657, 669 (1965).  However, *Noerr* "withheld immunity

from 'sham' activities because 'application of the Sherman Act would be justified' when

petitioning activity, 'ostensibly directed toward influencing governmental action, is a mere sham

to cover . . . an attempt to interfere directly with the business relationships of a competitor.'"

*Prof'l Real Estate*, 508 U.S. at 56 (quoting *Noerr*, 365 U.S. at 144).  The Supreme Court

subsequently extended *Noerr-Pennington* immunity to "the approach of citizens or groups of

them . . . to administrative agencies . . . and to courts."  *Cal. Motor Transp. Co. v. Trucking

Unlimited*, 404 U.S. 508, 510 (1972) (noting that the right of access to the judiciary "is indeed

but one aspect of the right to petition").  Accordingly, litigation, "including good faith litigation

to protect a valid copyright, . . . falls within the protection of the *Noerr-Pennington* doctrine."

*Primetime 24 Joint Venture v. Nat'l Broad. Co., Inc.*, 219 F.3d 92, 100 (2d Cir. 2000).  In recent years, courts have extended *Noerr-Pennington* "to encompass concerted efforts incident to litigation," including prelitigation threat letters and settlement offers.  *Id.* (listing cases).

In *Professional Real Estate Investors, Inc.*, the Supreme Court held that "an objectively reasonable effort to litigate cannot be a sham regardless of subjective intent."  508 U.S. at 57. "Whether applying *Noerr* as an antitrust doctrine or invoking it in other contexts, we have repeatedly reaffirmed that evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham."  *Id.* at 59 (citing cases).  The Court went on to outline a two-part definition of "sham litigation":

> [T]he lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail.  Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.

*Id.* at 60–61 (emphasis added).

In this case, not only did the Court deny AHRN's Motion to Dismiss, but it also granted MRIS a preliminary injunction.  The lawsuit therefore cannot be deemed "objectively baseless." *See, e.g.*, *Omni Res. Dev. Corp. v. Conoco, Inc.*, 739 F.2d 1412, 1414 (9th Cir. 1984) ("[T]he suit cannot not be characterized as baseless at all; for although we do not know the outcome, at least to the point of a preliminary injunction the state court plaintiffs were successful.").  AHRN contends, however, that Counterclaim-Defendants are not entitled to *Noerr-Pennington* immunity because they committed fraud on the U.S. Copyright Office in registering their copyrights.

The Copyright Act provides, in relevant part:

A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless—

(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

(B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1).  "[T]he fraudulent procurement of a copyright by means of knowing and willful misrepresentations to the Copyright Office may strip a copyright holder of its exemption from the antitrust laws." *Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F. Supp. 639, 647 (S.D.N.Y. 1992) (internal quotations and alterations omitted) (citation omitted).  A claim alleging fraud on the Copyright Office is only available where the registrant is alleged to have made false representations of *fact* with the requisite intend to defraud.  *See, e.g.*, *id.* at 643–44 (entertaining fraud claim where plaintiff was alleged to have applied for copyright registration in its own name for designs originated by others and "willfully" omitted in its applications reference to any work from which its designs were copied or originated); *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 1:CV-09-1685, 2011 WL 1883815, at *4 (M.D. Pa. May 17, 2011) (holding that counterclaimant adequately alleged that plaintiff deliberately and intentionally withheld material prior art in connection with the prosecution of the patent-in-suit where the complaint specifically described individuals with knowledge of prior art, that the plaintiff withheld the prior art, and that its objective was to deceive the Patent and Trademark Office); *Nabi Biopharms. v. Roxane Labs., Inc.*, No. 2:05-CV-889, 2007 WL 894473, at *5–6 (S.D. Ohio Mar. 21, 2007) (denying motion to dismiss counterclaim where it alleged that the applicant failed to disclose to the PTO "a variety of facts" concerning its prior art and sales, was aware of the relevance of the information, and failed to disclose it).  As with all allegations

25

of fraud, claims of fraud on the Copyright Office must be pled with particularity pursuant to the

requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  *See, e.g., Robinson v.*

*Fountainhead Title Grp. Corp.*, 447 F. Supp. 2d 478, 490 (D. Md. 2006); *see also Yurman*

*Design, Inc. v. Chaindom Enters., Inc.*, No. 99 Civ. 9307 (JFK), 2002 WL 31358991, at *1-3

(S.D.N.Y. Sept. 30, 2002) (requiring claims of fraud on the Copyright Office to be pled with

particularity); *Spectrum Creations, Inc. v. Catalina Lighting, Inc.*, No. SA-00-CA-875-F, 2001

WL 1910566, at *10 (W.D. Tex. Aug. 1, 2001) (same).

The basis for MRIS's alleged fraud on the Copyright Office is its (1) failure to inform the

Copyright Office of the Guidance Paper Program; (2) failure to disclose the generic selection,

coordination, and arrangement through the Database software for which it claims copyright

protection; (3) failure to disclose mandated arrangement of the MRIS Database for compliance

with real estate industry standard communication protocols; and (4) failure to disclose the

publication of real estate listings from the ostensibly unpublished database.  Doc. No. 89-1 at 30–

31; Doc. No. 93 at 24.  The first basis of alleged fraud—that MRIS failed to disclose the

existence of the Guidance Paper—is nowhere in AHRN's First Amended Counterclaims.  AHRN

also fails to demonstrate that the alleged omission was made knowingly and how the omission

made MRIS's copyright applications materially inaccurate.  The second basis of alleged fraud—

that MRIS failed to disclose that its selection, coordination, and arrangement was "generic"—

appears to be a reiteration of AHRN's *legal* argument that the MRIS Database does not exhibit

sufficient originality to warrant copyright protection.  *See* Doc. No. 68 ¶¶ 58, 89, 91, 94; *see also*

Doc. No. 25, Defendants' Opposition to MRIS's Motion for Preliminary Injunction.  AHRN has

failed to allege with sufficient particularity that MRIS committed fraud on the Copyright Office

by knowingly making material, *factual* misrepresentations regarding its selection, coordination,

and arrangement of its database.  As for the third basis of alleged fraud, AHRN has simply failed

to identify or describe the real estate industry's "standard communication protocols" in its briefs

or in its First Amended Counterclaims.

AHRN's fourth basis for alleged fraud on the Copyright Office—that MRIS failed to

disclose publication of real estate listings from the ostensibly unpublished database—appears

grounded in its allegation that Counterclaim-Defendants misrepresented in their applications

with the Copyright Office "that their compilation copyrights covering their databases are

'unpublished,' when in fact their databases are published through wide dissemination to

subscribers and licensees for purposes including display to public."  *Id.* ¶ 18.  However, the

Court finds no basis to conclude that MRIS acted improperly in registering the MRIS Database

as an "unpublished" work.  Both "published" and "unpublished" works may obtain copyright

protection.  17 U.S.C. § 104(a)–(b).  "Publication" is defined in the Copyright Act as "the

distribution of copies of a work to the public by sale or other transfer of ownership, or by rental,

lease, or lending."  *Id.* § 101.  The legislative history and reports of the 1976 Copyright Act

"define 'to the public' as distribution to persons under no explicit or implicit restrictions with

respect to disclosure of the contents."  United States Copyright Office, Circular 1, at 4, *available

at* http://www.copyright.gov/circs/circ01.pdf.  MRIS does not distribute its database "to the

public"; indeed, the MRIS Database is only made available to subscribers under restrictive

licensing terms.  *See* Doc. No. 29-1, MRIS Subscriber License and Access Agreement.

Furthermore, the MRIS Database is not distributed by rental, lease, or lending.  MRIS properly

registered its database as an "unpublished" work, and as such, this representation does not form a

plausible basis for a claim of fraud on the Copyright Office.

For the foregoing reasons, the First Amended Counterclaims do not set forth a plausible claim of fraud on the Copyright Office.  Counterclaim-Defendants are therefore entitled to *Noerr-Pennington* immunity from AHRN's § 1 claims to the extent they are based on the filing of this litigation and the incidents of that litigation.

2.     Other bases for § 1 claims

AHRN asserts that it has stated a § 1 claim against MRIS and NAR even without considering the litigation.  Doc. No. 89-1 at 30.  Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ."  15 U.S.C. § 1.  To establish a § 1 violation, "a plaintiff must prove, and therefore plead, '(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint on trade.'"  *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 284 (4th Cir. 2012) (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002)).

With respect to the first element, stating a § 1 claim "requires a complaint with enough factual matter (taken as true) to suggest than an agreement was made.  Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556.  The Court in *Twombly* elaborated on what is required to plead an agreement for § 1 purposes:

> [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

*Id.* at 556–57.

28

As to the second element, a § 1 plaintiff "must prove the existence of '*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Dickson*, 309 F.3d at 202–03 (emphasis in original). AHRN does not appear to dispute that its § 1 claims will be assessed by the rule of reason. The Fourth Circuit noted in *Sea Pines*, a case involving § 1 claims against MLS members, that

> Because trade associations may be protective of consumer interests and not just inimical to them, the cooperative actions of MLS members are not per se unreasonable. As the district court properly noted, the restraints at issue should be evaluated at the merits stage according to the rule of reason, traditionally applied to joint venture cooperation that has possible procompetitive justifications.

679 F.3d at 290 (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) and *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010)).

In rule of reason analysis, "the reasonableness of a restraint [on trade] is evaluated based on its impact on competition as a whole within the relevant market." *Dickson*, 309 F.3d at 206 (quoting *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 708 (4th Cir. 1991)). "This evaluation requires a showing of 'anticompetitive effect' resulting from the agreement in restraint of trade." *Dickson*, 309 F.3d at 206. To have anticompetitive effect, conduct "must harm the competitive *process* and thereby harm consumers. . . . [H]arm to one or many competitors will not suffice." *Id.* (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)). Accordingly, allegations that an antitrust defendant sought to harm plaintiff's business in particular are not sufficient to state a §1 claim. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 255 (1993) ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."); *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (noting that antitrust laws were passed "for protection

of *competition*, not *competitors*") (emphasis added).  Furthermore, conclusory allegations that an alleged agreement produced anticompetitive effects will not suffice.  *Dickson*, 309 F.3d at 212–13 (affirming dismissal of § 1 claim where complaint's assertions of anticompetitive effects were conclusory).

AHRN primarily relies on the writing and promotion of the MRIS Guidance Paper and copyright registration program, refusals to deal, restrictive NAR rules, and industry meetings as the basis for its § 1 claims against both MRIS and NAR.  The Court concludes that AHRN's First Amended Counterclaims do not adequately plead the existence of either element of a § 1 claim.  First, AHRN fails to plead the time, place and contours of any anticompetitive agreement. It is not sufficient to allege that Counterclaim-Defendants agreed to enforce their copyrights against AHRN; MRIS and NAR are immunized from such a claim for the reasons discussed above.   Second, AHRN has not plausibly alleged that competition in general was harmed as a result of Counterclaim-Defendants' conduct.

AHRN relies to a great extent on NAR's annual meeting in Anaheim in November 2011, which allegedly "featured discussions of the perceived threat AHRN poses to the industry and what the industry could do to shut down AHRN."  Doc. No. 68 ¶ 69.  Although MRIS acknowledges that it had representatives at the meeting, Doc. No. 76-1 at 18, the Court cannot infer that any agreement was reach merely because an industry meeting was held.   The Court will not equate mere "discussions" with the consummation of an anticompetitive agreement, particularly where the claimant fails to outline the specific contours of the alleged agreement.[8] *See, e.g.*, *Loren Data Corp. v. GXS, Inc.*, No. DKC 10-3474, 2011 WL 3511003, at *5 (D. Md. Aug. 9, 2011) (dismissing § 1 claim where the complaint did not identify the parties with whom

---

[8] Even if the Court accepted that an agreement was reached at this meeting, it is only alleged that the agreement was directed to harming AHRN, not competition in general.

defendant allegedly agreed, the time or place at which such agreement was reached, or the specific contours of the agreement).  Indeed, AHRN's difficulty in pinning down the time, place and contours of an agreement is reflected in other allegations in the First Amended Counterclaims.  For example, AHRN claims that the "conspiracy" among Counterclaim-Defendants actually had its origins "much earlier" than the November 2011 Anaheim meeting and "dates at least to 2005," when MRIS issued the Guidance Paper.  Doc. No. 68 ¶ 139; *see also* Doc. No. 89-1 at 37 (calling the Guidance Paper the "genesis" for concerted action, sham copyrights and sham litigation).  AHRN's claim that the Guidance Paper evidences agreement makes little sense considering that its publication *predated* AHRN's existence by approximately two years and the Anaheim meeting by approximately five years.  *See* Doc. No. 68 ¶ 6 (indicating that AHRN was founded five years ago).  Furthermore, AHRN alleges that it began receiving cease-and-desist letters *before* the Anaheim meeting.  *Id.* ¶ 70.

In further misplaced reliance on the MRIS Guidance Paper and Copyright Program, AHRN alleges that the "MLS industry adopted the Program under the auspices of, and with the encouragement and guidance of NAR."  *Id.* ¶ 67.  AHRN relies largely on a September 27, 2010 NAR meeting in Chicago, where points of discussion included:

> MLS' [sic] debate the merits of consolidation, revenue streams, *data ownership and their 'true role'* ● Real estate brokers struggle to survive on narrow margins ● Realtors struggle to earn U.S. median income ● *Everybody wants realty data for free* ● Innovators want no barriers to innovation ● Thought leaders want their views adopted ● New business models and technologies continue to disrupt (Freemium) ● RETS is not all it could be[.]

*Id.* (emphasis added).  AHRN alleges that this coded discussion represented "a clear signal to drive disruptive innovators out of business with the 'true role' of the MLS copyright Program."

*Id.* ¶ 68.  While this "clear signal" may be apparent to AHRN, it is not apparent to the Court, and the Court "will not accept as true any unwarranted inferences or unreasonable conclusions."

*Daniels v. Arcade, L.P.*, 477 F. App'x 125, 128 (4th Cir. 2012). Indeed, AHRN does not identify

who was at the September 2010 meeting, and the points of discussion include no mention of

MRIS, the Guidance Paper, or copyright registration. There is no reasonable inference to be

drawn from the 2010 meeting that NAR, MRIS, or any other entity reached an agreement.

AHRN also emphasizes a December 2011 e-mail from a Northstar employee, John

Mosey, in which Mosey called for the MLSs to take collective action against AHRN. *Id.* ¶ 73.

The Mosey e-mail makes no mention of MRIS or NAR, does not evidence their involvement in

drafting the e-mail, and is otherwise not probative of Counterclaim-Defendants' participation in

any alleged agreement. Furthermore, when read in context, the collective action referred to in

the Mosey e-mail concerns litigation and related activities, including the sending of cease-and-

desist letters and other copyright enforcement efforts. *Id.* The Court acknowledges that the e-

mail reflects some level of animus against AHRN and its CEO, Jonathan Cardella, but as

discussed above, Counterclaim-Defendants are shielded from antitrust immunity under the

*Noerr-Pennington* doctrine. *Prof'l Real Estate*, 508 U.S. at 60 ("Only if challenged litigation is

objectively meritless may a court examine the litigant's subjective motivation.").

AHRN further alleges that the cease-and-desist letters and refusal and repudiation letters

related to broker or agent referrals were "coordinated by discussions and agreements among

NAR, MLSs and brokers." Doc. No. 68 ¶ 83. These vague allegations fail to specify the

contours of the agreement and when the agreement was reached.[9] *See Loren*, 2011 WL 3511003,

at *5. However, even if the Court could infer an agreement based upon the receipt of the letters

as well as the timing of the November 2011 meeting, the Mosey e-mail, and the initiation of

---

[9] AHRN's allegation that NAR's General Counsel Lauri Janik advised MLSs to send cease-and-desist letters does not support the plausibility of its claim that an agreement was reached. *See* Doc. No. 68 ¶ 85. Janik's communication does not mention MRIS and is alleged to have occurred in May or June 2012, approximately six months *after* AHRN received the "torrent" of cease-and-desist letters. *Id.* ¶¶ 70, 85.

lawsuits, the First Amended Counterclaims fail to allege that any such agreement produced anticompetitive effects generally.  AHRN repeatedly alleges that Counterclaim-Defendants intended to drive AHRN out of business, or that the effect of Counterclaim-Defendants' alleged agreement was to make it hard for AHRN to compete effectively.  *See, e.g.*, Doc. No. 68 ¶ 20 (lawsuits are an attempt "to drive AHRN out of business and eliminate AHRN as a competitor"); *id.* ¶ 109 (Counterclaim-Defendants' coordinated action "was intended to and did have anti-competitive effects on AHRN").  Such allegations are insufficient to state a § 1 claim, as AHRN must allege that Counterclaim-Defendants' concerted action affected competition in general.  To the extent the First Amended Counterclaims contain such allegations, they are largely conclusory.  *See, e.g.*, *id.* ¶ 110 ("Defendants' activities, and the violations alleged in this First Amended Counterclaim, affect home buyers and sellers located throughout the United States."); *id.* ¶ 146 ("The anti-competitive acts of the Conspiracy have directly harmed competition . . . .").  Where AHRN does identify specific anticompetitive effects, including the elimination of price competition and price maintenance on brokerage referral services and the impeding and blocking of market entry by AHRN and other innovative businesses, *see id.* ¶ 109, it fails to explain the connection between such anticompetitive effects and the conduct complained of—Counterclaim-Defendants' copyright registration and enforcement efforts.

AHRN also relies upon certain rules promulgated by NAR, including rules (1) preventing brokers from using their MLSs' IDX data feeds for any purpose other than display on their websites and (2) requiring participant consent for use by the MLS of listings or listing information for any purposes other than the defined purposes of the MLS.  *Id.* ¶¶ 102–03.  As an initial matter, the First Amended Counterclaims fail to sufficiently allege that any agreement was

reached in connection with the NAR rules.[10]  Instead, AHRN baldly asserts that the NAR rules

"adopt the anticompetitive premise and goals of the MRIS Guidance Paper's 'Program.'"  *Id.*

¶ 102.  This is not a case like *Sea Pines*, which addressed complaints alleging anticompetitive

rules passed by real estate brokerages serving together as board members on MLSs.  679 F.3d at

282-83.  There, the content of the rules constituted the factual matter "establishing a plausible

claim of conspiracy between the MLS board members," and "the concerted conduct [was] not a

matter of inference or dispute."  *Id.* at 289-90.  In this case, however, the mere existence of NAR

rules as alleged in the First Amended Counterclaims lends no support to the existence of an

agreement.

But even if the Court accepted that the NAR rules evidenced agreement or were part of

some larger cooperative scheme, AHRN's allegations of anticompetitive effects are still

insufficient under *Sea Pines*.  Plaintiffs in *Sea Pines* challenged MLS rules which

> prohibited members from offering alternative contractual terms and operating a
> "fee-for-service" business model, which would have allowed a seller who found
> a buyer on his own to avoid payment of a commission to the brokerage. Other
> rules operated to restrict lower-priced and consumer-friendly internet
> competition by excluding brokerages without a physical office in the MLS area
> and brokerages that did not primarily do business in the MLS service area or
> hold a South Carolina real-estate license as their primary license. Member-
> brokerages were required to reside within the MLS service area and operate their
> offices only during hours deemed reasonable by the MLS.

*Id.* at 291.  Plaintiffs alleged that these rules resulted in the following anticompetitive effects:

> (1) raised entry barriers for potential competitors by imposing burdensome
> prerequisites for membership; (2) provided a means of identifying potentially
> aggressive competitors so defendants could exclude them from [MLS]
> membership; (3) stabilized the price of real-estate-brokerage services through the

---

[10] AHRN cites a 2008 consent decree between the NAR and the Department of Justice.  Doc. No. 68 ¶ 44.  AHRN claims that the consent decree provides factual evidence to support its claims that NAR acts in concert with its member MLSs.  Doc. No. 93 at 22.  AHRN fails to draw any specific connection between the 2008 consent decree and any of the alleged concerted action in this case, however.  Furthermore, by its terms, the consent decree does not constitute "any evidence against, or any admission by, any party regarding any issue of fact or law."  *United States v. Nat'l Ass'n of Realtors*, No. 05-C-5140, 2008 WL 5411637, at *1 (N.D. Ill. Nov. 18, 2008).

> prospect of price controls; (4) deterred the emergence of Internet-based
> brokerages; (5) stabilized the price of, and reduced customer options for, real-
> estate-brokerage services by dictating the services that all brokerages in the
> [MLS] Service Area had to provide; and (6) discouraged entry of potential
> competitors who raised funds through public ownership.

*Id.* at 290.  The court concluded that the allegations were sufficient where "the alleged

anticompetitive effects are economically plausible in light of the MLS restrictions recounted in

the complaint."  *Id.* at 291.

AHRN alleges that the NAR rules in question "were designed to make it more difficult

for MLSs to share listing data with third parties."  Doc. No. 68 ¶ 102.  As an initial matter,

although NAR rules may make it more difficult for AHRN obtain access to the third party listing

data, the Sherman Act does not guarantee AHRN the benefit of more effective competition.  *See,*

*e.g.*, *Clorox Co. v. Sterling Winthrop, Inc.*, 117 F.3d 50, 59 (2d Cir. 1997) ("The antitrust laws do

not guarantee competitors the right to compete free of encumbrances . . . so long as competition

as a whole is not significantly affected."); *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 972

(10th Cir. 1994) ("[I]f [plaintiff's] goal is to compete *more effectively* in [the] market, we do not

believe this objective constitutes the proverbial sparrow the Sherman Act protects.").  More

importantly, however, the First Amended Counterclaims' allegations of anticompetitive effects

are conclusory, and AHRN has failed to specify an economically plausible connection between

the NAR rules it identifies and harm to competition generally.  *See, e.g.*, *Keller v. Greater*

*Augusta Ass'n of Realtors, Inc.*, 760 F. Supp. 2d 1373, 1389 (S.D. Ga. 2011) (dismissing § 1

claim where the allegations of anticompetitive conduct consisted of legal conclusions and the

complaint did not factually allege how the challenged NAR rule affected the relevant market, as

opposed to merely harming plaintiff individually).

To summarize, MRIS and NAR's litigation and related activities are immunized from antitrust liability.  With respect to the other factual allegations in the First Amended Counterclaims, AHRN has failed to outline the contours of an agreement and has failed to explain how Counterclaim-Defendants' alleged conduct affected competition generally. Accordingly, the Court will dismiss the § 1 claims in the First Amended Counterclaims.  In light of the deficiencies identified herein, the Court has serious reservations about AHRN's ability to set forth a cognizable Sherman Act claim against either Counterclaim-Defendant.  However, AHRN set forth in its proposed Second Amended Counterclaims some allegations which may be relevant to its § 1 claims, including its claim for fraud on the Copyright Office.  *See* Doc. No. 133-1.  Accordingly, in the interest of justice, the Court will grant AHRN leave to file amended counterclaims and attempt to cure the deficiencies outlined above.

C.      Count II: Maryland Unfair Competition (Against MRIS and NAR)

The law of unfair competition in Maryland is laid upon the premise that no one "is justified in damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort." *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943)).  "What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception." *Elecs. Store, Inc. v. Cellco P'ship*, 732 A.2d 980, 991 (Md. Ct. Spec. App. 1999) (quoting *Balt. Bedding Corp.*, 34 A.2d at 342).  The rules relating to liability for unfair competition "developed largely from the rule which imposes liability upon one who diverts custom from another to himself by fraudulent misrepresentation." *Cellco*, 732 A.2d at 991 (quoting *Edmondson Vill. Theater, Inc. v. Einbinder*, 116 A.2d 377, 379 (Md. 1955)).  Although

allegations of fraud and deception commonly underlie claims of unfair competition, the presence

of misleading or deceptive conduct is not a necessary element of every unfair competition claim.

*See, e.g.*, *Mascaro v. Snelling & Snelling of Balt., Inc.*, 243 A.2d 1, 10 (Md. 1968) ("As the law

[of unfair competition] developed, proof of fraudulent deception was no longer essential for

relief."); *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, No. SKG-11-2016, 2012 WL

5920864, at *12 ("Maryland courts' description of the tort is not so narrowly drawn.").

AHRN alleges in its First Amended Counterclaims that NAR and MRIS's "false

statements, group boycott, and litigation activities constitute unfair competition," and that their

unfair competition includes "fraud, deceit, and trickery."  Doc. No. 68 ¶¶ 126–27.  The unfair

competition claims rely on the same set of facts relied upon in the Lanham Act and Sherman Act

§ 1 claims, and for similar reasons, the Court will dismiss them.  The Court discerns nothing

unfair in Counterclaim-Defendants' statements regarding the copyrightability of MLS listing

data, particularly where they simply expressed legal opinions and the Copyright Office

ultimately granted the applications.  The Court also discerns nothing unfair in MRIS or NAR's

litigation or related activities with respect to MLS compilation copyrights, especially given that

AHRN has not pled with particularity a basis for a claim of fraud on the Copyright Office.

Furthermore, AHRN's reliance on MRIS's or other MLSs' refusals to grant licenses to AHRN

cannot form the basis of an unfair competition claim, as copyright holders generally have the

authority to exclude others from using their copyrighted work.  *See, e.g.*, *Stewart v. Abend*, 495

U.S. 207, 229 (1990) ("[A] copyright owner has the capacity arbitrarily to license one who seeks

to exploit the work."); *Océ N. Am., Inc. v. MCS Servs., Inc.*, 795 F. Supp. 2d 337, 344 (D. Md.

2011) (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1187 (1st Cir.

1994)) ("[W]hile exclusionary conduct can include a monopolist's unilateral refusal to license a

copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers.").  The deficiencies underlying AHRN's unfair competition claim are similar to those underlying its Sherman Act § 1 claims.  Accordingly, the dismissal of the unfair competition claims will be without prejudice, and AHRN will be permitted an opportunity to file amended counterclaims which cure the deficiencies identified herein.

        D.      Count III: California Unfair Competition (Against All Defendants)

The California Business and Professions Code prohibits unfair competition, which includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  CAL. BUS. & PROF. CODE § 17200.  This cause of action largely mirrors a claim for unfair competition under Maryland law.  For the reasons discussed above, the First Amended Counterclaims fail to state a plausible claim for violation of California's unfair competition law (UCL).

AHRN's California claim contains an additional defect.  Courts have held that the California UCL does not apply to nonresidents where the allegedly wrongful conduct occurred outside California.  *See, e.g.*, *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. Ct. App. 1999) (holding that UCL was not applicable to claims of non-residents injured by conduct occurring outside California); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (same).  "However, extraterritorial application of the UCL is not barred where the alleged wrongful conduct occurred in California."  *Parkinson*, 258 F.R.D. at 598.  The only conduct alleged to have occurred in California was NAR's November 2011 meeting in Anaheim, and MRIS's presentation of the Guidance Paper in San Francisco and Sacramento in 2005.  Doc. No. 68 ¶¶ 57, 69.  AHRN's reliance on the 2005 presentation of the Guidance Paper is illogical,

as such presentation predated AHRN's existence by approximately two years.  The factual

allegations surrounding the 2011 Anaheim meeting are also insufficient to state a claim for the

same reasons discussed in the context of AHRN's Sherman Act § 1 claim.  *See supra* Part

III.B.2.  Furthermore, AHRN has failed to sufficiently plead the harm it suffered in California.

The Court cannot infer that AHRN suffered harm from MRIS and NAR's conduct merely

because its principal place of business is in the state.  Accordingly, the dismissal of the

California claim will be without prejudice, and AHRN may file second amended counterclaims

and attempt to cure the deficiencies identified herein.

     E.     <u>Count V: Sherman Act § 2 (Against MRIS)</u>

     In support of its monopolization claim under section 2 of the Sherman Act, AHRN

alleges, in relevant part:

> At least by 2005, MRIS and its large broker subscribers had an intent and scheme
> to monopolize the market for real estate brokerage referral services in the MRIS
> service area of Maryland, Virginia, Washington, D.C. and parts of Pennsylvania,
> Delaware and West Virginia.  MRIS has market power through its dominant
> shares of 100% of the MLS services to its member brokers and its member
> brokers' dominant share of 85% of listed properties—as measured by dollar
> volume of closed transactions—in MRIS's service area.  The property listing
> information in MRIS's Database is an essential facility controlled by MRIS and
> required by brokers operating in MRIS's service area to effectively serve their
> clients and to complete with other brokers. . . . MRIS has engaged in exclusionary
> conduct for itself, MRIS and other Defendants through MRIS's dissemination,
> promotion, and implementation of MRIS's Guidance Paper's "Program" and its
> rules governing its member brokers, its litigation against AHRN and its refusal to
> deal with AHRN, and others.  MRIS has effectively denied the essential facility to
> AHRN and other innovative brokers who compete with MRIS's broker
> subscribers.  MRIS can effectively provide the essential facility to AHRN and
> other innovative brokers by relaxing its stranglehold on property listing data and
> ceasing its anticompetitive conduct against AHRN and other innovative brokers.

Doc. No. 68 ¶¶ 148–50.

     To prevail on a monopolization claim under Section 2 of the Sherman Act, 15 U.S.C. § 2,

a plaintiff must establish "possession of monopoly power in a relevant market, willful acquisition

or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990). "To run afoul of Section 2, a defendant must be guilty of illegal conduct 'to foreclose competition, to gain a competitive advantage, or to destroy competition.'" *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 441 (4th Cir. 2011) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 480 (1992)). "Proof of a relevant market is the threshold for a Sherman Act § 2 claim. The plaintiff must establish the geographic and product market that was monopolized." *Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493 (4th Cir. 1986). "In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956) (internal quotations omitted). The Supreme Court has further defined "market power" as the "ability to alter the interaction of supply and demand in the market" or the "ability to raise prices above those that would be charged in a competitive market." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109, 109 n.38 (1984). For an antitrust plaintiff to prevail on an essential facilities claim, it must establish the following four elements: "(1) control of the essential facility by a monopolist; (2) a competitor's inability practically or reasonably to duplicate the essential facility; (3) the denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility to competitors." *Advanced Health-Care*, 910 F.2d at 150 (quoting *MCI Comm'ns v. AT & T*, 708 F.3d 1081, 1132–33 (7th Cir. 1983)).

Even if MRIS was not immunized from antitrust claims, *see supra* Part III.B.1, AHRN's § 2 claim is fundamentally deficient for two primary reasons.  First, AHRN has failed to plead the boundaries of the relevant market and that MRIS has monopoly power within that market. AHRN alleges that the relevant market in this case is the market for real estate brokerage referral services in the geographic areas in which MRIS operates.  However, MRIS does not provide or compete in the market for such referral services; rather, it is a multiple listing service.  AHRN does not offer multiple listing services, and as such, it fails to state a plausible claim for monopolization against MRIS.

Second, AHRN has also failed to state a § 2 claim based on the essential facilities doctrine.  For the reasons discussed above, AHRN does not and cannot allege that it is a competitor of MRIS in any relevant market, as AHRN offers brokerage referral services while MRIS offers multiple listing services.  Furthermore, AHRN cannot allege that it is unable to practically or reasonably duplicate the property listing data in the MRIS Database.  Indeed, its President has offered sworn testimony that the data displayed on NeighborCity.com comes from multiple sources that are not the MRIS Database, including from brokers and agents, public records, foreclosure data providers, FSBO aggregators, school data websites, map websites, and other third parties.  *See* Vahabzadeh Dec., Doc. No. 24-3 ¶ 12; *see also* Cardella Dec., Doc. No. 54-1 ¶ 8 (acknowledging that AHRN has obtained access to property listings by way of permission from many of MRIS's brokers and agents).  AHRN cannot now assert in its First Amended Counterclaims that these other sources and methods are inadequate and that the MRIS Database is an essential facility.

In its opposition, AHRN relies on a April 2007 Joint Report by the Federal Trade Commission and U.S. Department of Justice, "Competition in the Real Estate Brokerage referral

services Industry," which allegedly states that "MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS and brokers must have access to their local multiple listing service (MLS) to compete effectively."  Doc. No. 68 ¶ 52.  Again, AHRN cannot allege based on this provision or otherwise that it (as opposed to brokers and agents) is a competitor of MRIS, as they offer distinct services.  Furthermore, AHRN made no attempt to explain the inconsistency between the Vahabzadeh declaration and other prior representations in this litigation and its current claim that the MRIS Database is an essential facility.  Because amendment would be futile, the Court will dismiss AHRN's § 2 claim with prejudice.

      F.     Count VI: Copyright Misuse (Against MRIS)

      The Fourth Circuit has recognized that copyright misuse is a valid *defense* to an action for copyright infringement.  *Lasercomb Am., Inc. v. Reynolds*, 911 F.2d 970, 977 (4th Cir. 1990).  However, virtually every court that has addressed the issue has held that copyright misuse is only a defense, not a basis for affirmative relief.  *See, e.g.*, *Interscope Records v. Kimmel*, No. 3:07-cv-0108, 2007 WL 1756383, at *5 (N.D.N.Y. June 18, 2007; *Arista Records, Inc. v. Flea World, Inc.*, 356 F. Supp. 2d 411, 428 (D.N.J. 2005); *Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1198 n.4 (N.D. Cal. 2004); *Broad. Music, Inc. v. Hearst/ABC Viacom Entm't Servs.*, 746 F. Supp. 320, 328 (S.D.N.Y. 1990).  AHRN cites caselaw from the Ninth Circuit which indicates that a claim of copyright misuse may form the basis for a declaratory judgment action.  *See, e.g.*, *Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 520–21 (9th Cir. 1997); *Oldcaste Precast, Inc. v. Granite Precasting & Concrete, Inc.*, 2011 WL 813759, at *9–10 (W.D. Wash. Mar. 2, 2011).  However, these facts do not apply to AHRN's First Amended

Counterclaims. Because there is no freestanding, independent cause of action for copyright misuse, Count VI of AHRN's First Amended Counterclaims will be dismissed with prejudice.

G.    Count VII: Barratry (Against NAR)

Under Maryland law, "a person may not, for personal gain, solicit another person to sue or to retain a lawyer to represent the other person in a lawsuit." MD. CODE, BUS. OCC. & PROF. § 10-604(b)(1). Any person in violation of the prohibition on barratry "is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $1,000 or imprisonment not exceeding one year or both." *Id.* § 10-606(c).

By its own terms, section 10-604 expressly provides for the criminal prosecution of violators, but does not declare a private cause of action. *Son v. Margolias, Mallios, Davis, Rider & Tomar*, 689 A.2d 645, 653 n.11 (Md. Ct. Spec. App. 1997), *rev'd on other grounds*, 709 A.2d 112 (Md. 1998). Reported cases that have examined the Maryland barratry statute have typically involved a party's attempt to invalidate a contract as being against public policy due to unlawful barratry. *See, e.g.*, *Son v. Margolias, Mallios, Davis, Rider & Tomar*, 709 A.2d 112, 119 (Md. 1998); *Schackow v. Medical-Legal Consulting Serv., Inc.*, 416 A.2d 1303, 1312 (Md. Ct. Spec. App. 1980); *see also Accrued Fin. Servs. v. Prime Retail, Inc.*, 298 F.3d 291, 296-300 (4th Cir. 2002). However, AHRN cites to no cases, and the Court is not aware of any, holding that Maryland's criminal barratry statute creates a private cause of action in tort. In fact, most courts that have examined that issue in other jurisdictions have concluded that a private cause of action for barratry cannot be implied from a criminal statute. *See, e.g.*, *DaimlerChrysler Corp. v. Kirkhart*, 561 S.E.2d 276, 283 (N.C. Ct. App. 2002); *Pelletier v. Zweifel*, 921 F.2d 1465, 1512–13 (11th Cir. 1991); *Galinski v. Kessler*, 480 N.E.2d 1176, 1179 (Ill. App. Ct. 1985); *Moiel v. Sandlin*, 571 S.W.2d 567, 571 (Tex. Civ. App. 1978). The Court finds no basis to conclude that

the Maryland criminal barratry statute creates a private right of action, and therefore, AHRN's claim must be dismissed with prejudice on that basis alone.

Even if the Court accepted that such a private cause of action existed under Maryland law, AHRN has plainly failed to plead the required elements of barratry. The key elements to the statutory offense are "officious meddling" and "personal gain." *Accrued Fin. Servs.*, 298 F.3d at 299 (quoting *Son*, 709 A.2d at 121). In this case, AHRN's amended pleadings fail to allege that NAR engaged in "officious meddling" in this lawsuit. Indeed, the only specific allegation of financial support is that on May 19, 2012, NAR approved funding of MRIS's lawsuit against AHRN. Doc. No. 68 ¶¶ 81, 84. However, MRIS's lawsuit against AHRN was filed nearly two months *before* the alleged financial support. It therefore does not follow from these allegations that NAR engaged in "officious meddling."

Furthermore, AHRN's First Amended Counterclaims are devoid of any specific factual allegations that NAR *solicited* MRIS to sue AHRN prior to the initiation of this suit. AHRN's allegation that NAR "featured discussions" concerning AHRN's threat to the industry at its November 2011 annual meeting, *id.* ¶ 69, does not satisfy the "officious meddling" element, much less the statutory requirement that the alleged barrator engage in solicitation, *see* MD. CODE, BUS. OCC. & PROF. § 10-604(b)(1). Other allegations cited by AHRN, including its receipt of cease-and-desist letters from MRIS and other MLSs, do not contain any claims that NAR instigated the cease-and-desist process or otherwise engaged in solicitation within the meaning of the Maryland barratry statute. *See* Doc. No. 68 ¶¶ 72–73.[11] For these reasons, Count VII of AHRNs' First Amended Counterclaims will be dismissed with prejudice.

---

[11] Although AHRN alleges that NAR's General Counsel advised MLSs to send cease-and-desist letters, she did not do so until May or June 2012, several months *after* MRIS sent a cease-and-desist letter and initiated this lawsuit. Doc. No. 68 ¶ 85.

IV.     **CONCLUSION**

For the foregoing reasons, MRIS's Motion to Dismiss or Summarily Adjudicate will be

GRANTED-IN-PART, and NAR's Motion to Dismiss will be GRANTED-IN-PART.  AHRN's

Motion to Strike the Charron Declaration, MRIS's Motion for Leave to file a surreply, AHRN's

Motion for Leave to file second amended counterclaims, and AHRN's Motion to Seal will all be

DENIED as moot.  Counts I, V, VI, and VII will be dismissed with prejudice.  Counts II, III, and

IV will be dismissed without prejudice, and AHRN will be granted fourteen days to file second

amended counterclaims that cure the deficiencies identified herein.  A separate Order follows.


    June 10, 2013                                                  /s/
        Date                                        Alexander Williams, Jr.
                                                    United States District Judge