IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC., Plaintiff, | |
| v. | |
| AMERICAN HOME REALTY NETWORK, INC., *et al.*, Defendants. | Civil Action No. 12-cv-00954-AW |
| and | |
| AMERICAN HOME REALTY NETWORK, INC., Counterclaim Plaintiff, | |
| v. | |
| METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC., *et al.*, Counterclaim Defendants. | |

**MEMORANDUM OPINION**

Pending before the Court are Counterclaim-Defendants Metropolitan Regional Information Systems, Inc. ("MRIS") and National Association of Realtors ("NAR")'s Motions to Dismiss the Second Amended Counterclaims of American Home Realty Network, Inc. ("AHRN"). The procedural background of this case has been covered in extensive detail in the Court's prior Memorandum Opinions, which are incorporated by reference herein. *See* Doc. Nos. 34, 64, 159, 184, and 186. On June 10, 2013, the Court granted-in-part and denied-in-part MRIS's Motion to Dismiss or Summarily Adjudicate AHRN's First Amended Counterclaims and granted-in-part and denied-in-part NAR's Motion to Dismiss AHRN's First Amended Counterclaims. Doc. Nos. 159-160. The Court dismissed Counts I, V, VI, and VII of the First

Amended Counterclaims with prejudice. The Court also dismissed Counts II, III, and IV—which alleged unfair competition under Maryland law and California law as well as violations of § 1 of the Sherman Act—without prejudice, and granted AHRN leave to file second amended counterclaims. Because the Court decided MRIS's Motion under Rule 12(b)(6), not Rule 56, it denied as moot AHRN's Motion to Strike the Charron Declaration and request for discovery.

AHRN timely filed its Second Amended Counterclaims on June 24, 2013. Doc. No. 167. MRIS and NAR moved to dismiss these claims with prejudice pursuant to Rule 12(b)(6). Doc. Nos. 181, 193. These Motions are now fully briefed and ripe for the Court's consideration. Based upon its careful review of the Second Amended Counterclaims and motion papers, the Court has determined that it must reconsider a determination from its June 10 Opinion and Order. Although the Court previously held that AHRN had failed to state a claim for fraud on the Copyright Office, it now recognizes that to grant MRIS's Motion to Dismiss, it would be required to rely on evidence outside the pleadings—specifically, the declaration of MRIS CEO David Charron that MRIS uses its own proprietary software, not CoreLogic, to arrange content on the MRIS Database. *See* Doc. No. 88-1 ¶ 14. As such, MRIS's Motion must be treated as one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d). Accordingly, the Court will reserve ruling on MRIS's Motion with respect to Count II (Maryland unfair competition) and Count IV (Sherman Act § 1) and will grant AHRN an opportunity, if it wishes, to conduct limited discovery on this issue. However, the Court will grant MRIS's Motion to Dismiss Count III (California unfair competition), as the Second Amended Counterclaims fail to cure the deficiencies identified in the Court's June 10 Opinion.

As for AHRN's claims against NAR, the Court has determined that the Second Amended Counterclaims are sufficient to survive NAR's Motion to Dismiss Counts II and IV. However,

AHRN has failed to state a claim against NAR under California law, and Count III will be dismissed with prejudice.

I.  **FACTUAL ALLEGATIONS IN SECOND AMENDED COUNTERCLAIMS**

As before, the crux of AHRN's claims is that MRIS, NAR, and unnamed Does engaged in a series of concerted, anti-competitive conduct, including the industry-wide adoption of a sham copyright registration and enforcement program and refusals to deal with AHRN. Many of the factual allegations from the Second Amended Counterclaims restate the allegations from the First Amended Counterclaims. These allegations were thoroughly documented in the Court's June 10, 2013 Opinion and will not be repeated here. However, the Court will briefly outline the new, relevant allegations from the Second Amended Counterclaims.

   A.  "Work for hire" representations in copyright registrations and related allegations

AHRN alleges that MRIS, NAR, and other MLSs, pursuant to their fraudulent Copyright Program, misrepresented in their applications to the United States Copyright Office that their copyrighted content constituted "works for hire." *Id.* ¶ 36. AHRN cites statements from the 2005 and 2006 versions of the Guidance Paper which urged MLSs to claim that the copyrighted works (i.e., photographs and text) in their electronic databases were works for hire by MLS employees. *Id.* ¶¶ 76-77. NAR allegedly conspired in the scheme when it urged MLSs to adopt the practice of making false work for hire statements to the Copyright Office in their compilation copyright applications. *Id.* ¶¶ 70, 78-79. Numerous MLSs followed suit throughout 2006 and 2007 by making such statements. *Id.* ¶ 79.

AHRN alleges that the work for hire statements are false because MLS employees do not take the photographs of residential real estate properties listed in their databases and the MLSs do not specially commission photographers to take such photographs. *Id.* ¶ 80. AHRN further

3

alleges that the work for hire statements are false because the employees of MRIS and other MLSs do not author the text describing the real estate listed in the databases, nor do they specially commission others to author the text. *Id.* ¶ 81. Such representations allegedly concealed the fact that MRIS and other MLSs do not maintain records of the photographer, date of creation, and copyright assignment records and/or proof of ownership for the photographic images in the databases. *Id.* ¶¶ 36, 82-84. AHRN further maintains that the agent who uploads the listing photographs and text does not own the copyrights to those works, and that any recordkeeping on the part of MRIS and other MLSs with respect to the content in their databases is ineffective to transfer purported copyright in that content without a written assignment signed by the owner of the listed property. *Id.* ¶ 84. AHRN also alleges that MRIS does not own the text in the MRIS Database pursuant to Section 4.5 of its Subscriber License and Access Agreement. *Id.* ¶¶ 87, 119.

    B.    <u>NAR's "direct competition" with AHRN</u>

In March 2013, NAR entered the real estate agent evaluation and ranking market in "direct competition" with AHRN through pilot projects with Realtor associations in Illinois, Minnesota, California, Colorado, and Georgia. *Id.* ¶ 154. According to AHRN, the pilot projects are "further evidence of predation by the NAR-led conspiracy to drive AHRN out of the agent evaluation and ranking market." *Id.* NAR offers its rating service free of charge in return for an e-mail address of the customer. *Id.* ¶ 155. AHRN alleges that such service is evidence of "below cost, predatory pricing to drive AHRN out of the market." *Id.* AHRN also alleges that the rating service was announced by NAR General Counsel Laurene Janik, the same individual who spearheaded the sending of cease-and-desist letters to AHRN and who led the charge in urging members to repudiate already-entered referral agreements with AHRN or to refrain from

entering such agreements with AHRN. *Id.* ¶ 156. AHRN asserts that such a product rollout is "not the traditional role of general counsel." *Id.*

AHRN further claims that NAR's ratings service is "a ruse for NAR and its members to suppress legitimate evaluation and ranking of agents for the benefit of consumers." *Id.* ¶ 157. Whereas AHRN's evaluation and ranking is unbiased and algorithm-based, NAR's service depends upon the sending of customer satisfaction surveys to clients of participating brokerages. *Id.* Such an approach helps realtors "own the process" in an industry where real estate agent ratings are typically feared. *Id.*

C. Additional refusals to deal with AHRN

In the spring of 2013, with NAR now directly competing with AHRN in the market for real estate agent evaluations, NAR encouraged regional boards of realtors to prevent their member agents from entering referral agreements with AHRN, to breach or repudiate agreements already entered, and to demand that their names be stricken from AHRN's list of potential referral agents. *Id.* ¶ 112. AHRN cites numerous, specific examples of local realtors from across the country who refused to deal with AHRN at either the direction of their local MLSs or NAR itself. *Id.* ¶¶ 113-116. AHRN also cites what appears to be a related provision from the NAR MLS Handbook which allegedly requires NAR's members to notify NAR whenever they are confronted with requests or demands for access to the local multiple listing service:

> In states other than California, Georgia, Alabama, and Florida, whenever an association is confronted with a request or demand by an individual for access to the association's multiple listing service without membership in the association, member associations are advised that the association should immediately advise both the state association and the Member Policy Department of the National Association, and the recommended procedures will be provided to the member association with any other pertinent information or assistance. It is important that the state association and National Association be advised immediately if such request or demand for access to the association MLS as described is received.

5

*Id.* ¶ 117.

    D.    <u>New allegations of anti-competitive effects</u>

AHRN alleges that viewed as a whole, Counterclaim-Defendants' conduct was intended to and did have anti-competitive effects on AHRN and on consumers in the market for real estate brokerage referral services. *Id.* ¶ 170. In addition to the anti-competitive effects already identified in the First Amended Counterclaims, AHRN now alleges that Counterclaim-Defendants' conduct has resulted in the following anti-competitive effects: suppressing technological innovation, reducing competition on price and quality, restricting efficient cooperation among brokers, making express or tacit collusion more likely, and raising barriers to entry. *Id.* ¶¶ 170-71. AHRN alleges that "[i]f NAR, MRIS and Doe Defendants hadn't restricted innovative brokerages such as Redfin, AHRN, and others from competing in MLS Service Area[s], these brokerages would have provided customers of real-estate brokerage services with competitive options and, in the process, placed downward pressure on the prices charged by defendants, who offer traditional methods of providing real-estate-brokerage services." *Id.* ¶ 172. According to AHRN, "NAR is making the real estate market less efficient by depriving the consumer of the ability to select the most qualified agents for their Deal, thereby driving up brokerage services costs and reducing the return for consumers and market liquidity." *Id.* ¶ 201.

## II.    STANDARD OF REVIEW

The purpose of a motion to dismiss under Rule 12(b)(6) is "to test the sufficiency of [the] complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). Except in certain specified cases, the complaint need only satisfy Rule 8(a) of the Federal Rules of Civil Procedure, which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff must plead "enough facts to state a claim

to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In resolving a motion to dismiss, the Court should proceed in two steps. First, the Court should determine which allegations in the Complaint are factual allegations entitled to deference, and which are mere legal conclusions that receive no deference. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

In its determination, the Court must "accept the well-pleaded allegations of the complaint as true," *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and "must construe factual allegations in the light most favorable to the plaintiff," *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). The Court should not, however, accept unsupported legal allegations, *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), "legal conclusion[s] couched as . . . factual allegation[s]," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555.

## III. CLAIMS AGAINST MRIS

In its June 10 Opinion and Order, the Court held that MRIS was entitled to *Noerr-Pennington* immunity from AHRN's antitrust claims "to the extent they are based on the filing of this litigation and the incidents of that litigation." Doc. No. 159 at 28. The Court rejected AHRN's argument that MRIS was not entitled to immunity on the grounds that they committed

7

fraud on the Copyright Office in registering their compilation copyrights. Specifically, the Court ruled that none of the alleged misrepresentations identified by AHRN set forth a plausible claim of fraud on the Copyright Office. *Id.* at 26-27. With respect to the remaining factual allegations against MRIS—in particular, its alleged refusals to deal with AHRN—the Court concluded that AHRN had failed to plead the time, place and contours of any agreement in restraint of trade on the part of MRIS, and had not plausibly alleged that competition in general was harmed as a result of MRIS's conduct. *Id.* at 30-36.

In an attempt to state a claim that MRIS committed fraud on the Copyright Office, AHRN now asserts in its Second Amended Counterclaims that MRIS's work for hire designations in its compilation copyright applications were false because, *inter alia*, MRIS employees do not take the photographs of the properties or author the text in the MRIS Database and MRIS did not specially commission individuals to take the photographs or author the text. Doc. No. 167 ¶¶ 76-77, 80-81. AHRN further asserts that MRIS's work for hire representations concealed the fact that MRIS lacks records establishing its ownership of the photographic images in the database. *Id.* ¶¶ 82-84.[1]

AHRN made virtually identical arguments in support of its June 6, 2013 Motion to Vacate the preliminary injunction. Doc. No. 155. The Court summarily rejected these arguments in a July 31, 2013 Memorandum Opinion and Order, reasoning as follows:

> AHRN appears to misapprehend that MRIS's copyright registrations, including the "work made for hire" designation, apply to the MRIS Database *as a whole*. Indeed, collective works such as the MRIS Database may be works made for hire. *See* Compendium II of Copyright Office Practices § 308.02 ("The collective work

---

[1] AHRN also asserts that the purpose of MRIS's false work for hire statements "is to obviate the requirement to list photographers and authors" on its copyright registrations. Doc. No. 167 ¶ 82. This argument has already been rejected by this Court and by the Fourth Circuit Court of Appeals. Doc. No. 34 at 19-21; Doc. No. 180-1 at 19-20. AHRN also appears to assert that MRIS committed fraud on the Copyright Office because it does not own copyright in the text of the compiled real estate listings. Doc. No. 167 ¶¶ 84, 87, 119. However, as noted by the Fourth Circuit, "[t]he copyright in individual component works need not be owned by the author of the collective work." Doc. No. 180-1 at 12 (citing 17 U.S.C. § 201(c)).

> as a whole is often a work made for hire, and in such cases, the author is the
> employer or other person for whom the work was prepared. See 17 U.S.C.
> 201(b)."). The Court cannot equate MRIS's designation of its Database as a work
> made for hire as an attestation that its employees or agents shot the photographs
> within the MRIS Database. Accordingly, the Court discerns no inconsistency
> between MRIS's representations to the Copyright Office and the evidence it has
> presented to this Court regarding its ownership of copyrights in the photographs.

Doc. No. 186 at 3. The Court also rejected AHRN's argument that MRIS's interrogatory responses constitute an admission that it lacks evidence of its ownership of copyrights to the photographs in the MRIS Database:

> Despite AHRN's assertions to the contrary, the Court cannot read MRIS's
> interrogatory response as an admission that it does not own valid copyrights in the
> underlying photographs of the MRIS Database. Furthermore, none of the cases
> cited by AHRN support the conclusion that to show a likelihood of success on the
> merits, MRIS was required to produce a chain of title for each underlying
> photograph in the MRIS Database. In conclusion, AHRN has failed to present
> evidence that would disturb the Court's previous determinations.

*Id.* at 4-5. For the same reasons, AHRN's allegations relating to MRIS's work for hire representations do not state a plausible claim for fraud on the Copyright Office.

The work for hire allegations are the only new, substantive factual allegations against MRIS in the Second Amended Counterclaims.[2] However, the Court deems it necessary to reconsider one aspect of its June 10 Opinion and Order. As it did in the First Amended Counterclaims, AHRN continues to allege that MRIS committed fraud on the Copyright Office by failing to disclose in its copyright registrations that CoreLogic, not MRIS, is actually responsible for the selection and coordination of content in the MRIS Database. Doc. No. 167 ¶¶ 127, 132-37, 176. The Court previously determined that this allegation appeared to be "a

---

[2] The remaining new allegations in the Second Amended Counterclaims—including refusals to deal, restrictive rules, and direct competition with AHRN—are directed to NAR's conduct, and have no connection to MRIS. As with the First Amended Counterclaims, AHRN's allegations against MRIS are focused upon MRIS's writing of the Guidance Paper and promotion of its copyright registration program. Although AHRN refers to MRIS as NAR's co-conspirator in its briefs, it has failed to set forth a plausible claim of an illicit agreement between MRIS and NAR. Allegations that MRIS attended industry meetings with NAR, that NAR expressed agreement with MRIS's Guidance Paper and its legal opinions, and that NAR sought to fund MRIS's lawsuit do not warrant deeming MRIS a co-conspirator. Conclusory allegations of MRIS's role in a conspiracy fare no better.

reiteration of AHRN's *legal* argument that the MRIS Database does not exhibit sufficient originality to warrant copyright protection," and that AHRN "failed to allege with sufficient particularity that MRIS committed fraud on the Copyright Office by making material, *factual* misrepresentations regarding its selection, coordination, and arrangement of its database." Doc. No. 159 at 26-27 (emphasis in original). The Court's prior determination constitutes clear error, however.[3] AHRN's allegations regarding CoreLogic cannot be viewed simply as another attempt to argue that the MRIS Database is not entitled to copyright protection under *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340 (1991). Rather, AHRN alleges that even accepting that the MRIS Database is sufficiently original to warrant copyright protection, the copyright would belong to CoreLogic, not MRIS. *E.g.*, Doc. No. 167 ¶¶ 135, 176. Such factual allegations are sufficiently particular to withstand scrutiny on a Motion to Dismiss, even under the standards of Rule 9(b). Accepting AHRN's allegations as true, MRIS's representation that it was responsible for the selection and coordination of content in its database would be materially inaccurate, as the Copyright Office would not have granted copyright protection to MRIS had it known that another entity was responsible for arranging the database. AHRN would therefore have a plausible claim that MRIS's copyright litigation and enforcement efforts were a sham, and as a result, MRIS would not be entitled to *Noerr-Pennington* immunity.[4]

---

[3] Rule 54(b) of the Federal Rules of Civil Procedure provides that any order or decision "that adjudicates fewer than all the claims of the rights and liabilities of fewer than all the parties . . . may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). Courts in this district generally have identified the following grounds for reconsideration of an interlocutory order: "(1) there has been an intervening change in controlling law; (2) there is additional evidence that was not previously available; or (3) the prior decision was based on clear error or would work manifest injustice." *Coulibaly v. JP Morgan Chase Bank, N.A.*, No. DKC 10-3517, 2013 WL 3507096, at *1 (D. Md. July 10, 2013) (quoting *Akeva L.L.C. v. Adidas Am., Inc.*, 385 F. Supp. 2d 559, 565-66 (M.D.N.C. 2005)).

[4] The Court is persuaded in part by the District of Minnesota's conclusion in *Regional Multiple Listing Service of Minnesota, Inc. v. American Home Realty Network, Inc.*, --- F. Supp. 2d ----, 2013 WL 3367132 (D. Minn. July 5, 2013). As in this case, the plaintiff MLS—Regional Multiple Listing Service of Minnesota ("RMLS")—sued

In order to dismiss AHRN's claim that MRIS committed fraud on the Copyright Office, the Court would be required to rely on evidence outside the pleadings—specifically, the declaration of MRIS CEO David Charron, who averred: "MRIS does not use CoreLogic for the MRIS Database. Instead, MRIS has developed and owns its own proprietary database system called 'Cornerstone.' MRIS's Cornerstone system is protected by U.S. Patent Nos. 7346519 and 7881948." Doc. No. 88-1 ¶ 14. Rule 12(d) of the Federal Rules of Civil Procedure provides:

> If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. *All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.*

Fed. R. Civ. P. 12(d) (emphasis added).

Based on the foregoing, MRIS's Motion to Dismiss the Second Amended Counterclaims must be treated as a motion for summary judgment under Rule 56. MRIS did not expressly move for summary judgment on the Second Amended Counterclaims, nor was AHRN otherwise

---

AHRN for copyright infringement of its online database and obtained a preliminary injunction from the district court. AHRN filed a Sherman Act § 1 counterclaim against the plaintiff and RMLS moved to dismiss, arguing that it was entitled to *Noerr-Pennington* immunity. AHRN alleged, *inter alia*, that RMLS did not own the copyrights in the database because the data was arranged based upon the creative efforts of a different company. *Id.* at *5. The district court relied in part on this allegation in denying RMLS's motion to dismiss: "AHRN alleges that, in the instant action, RMLS has asserted a copyright over the manner in which the facts and data are compiled in NorthstarMLS, even though the RMLS database is built on software RMLS did not design and does not own. . . . These allegations, if true, could show that RMLS's threats and pursuit of litigation against AHRN were in fact a sham." *Id.* at *12.

It must be emphasized, however, that the Minnesota case differs from the instant action in multiple respects. First, as discussed herein, MRIS has presented evidence that it uses its own proprietary software, not CoreLogic, to arrange the database. It is therefore appropriate to defer ruling on MRIS's motion and permit limited discovery on the issue. If AHRN fails to present a genuine issue of material fact, MRIS's copyright litigation and enforcement efforts would be immunized from antitrust suit. Second, aside from the copyright litigation and enforcement efforts, there are significant differences between the factual allegations raised against RMLS and those raised against MRIS. For example, the Minnesota court relied upon the e-mail sent by RMLS employee John Mosey in which he called for MLSs to take collective action against AHRN. *Id.* at *14. While the e-mail might implicate RMLS, there is no inference to be drawn that implicates MRIS in any way. The Minnesota court also relied on AHRN's allegation that third-party syndicators informed it that they would not extend a license to AHRN, which raised the specter of concerted action by MLSs to prevent dealing with companies that did not comply with their business model. *Id.* Such allegations are absent in AHRN's Second Amended Counterclaims. In sum, the Court discerns no grounds to reconsider its previous ruling that AHRN's allegations regarding Counterclaim-Defendants' refusals to deal failed to state a claim against MRIS. Furthermore, as discussed herein, AHRN's new allegations are directed to NAR, not MRIS.

on notice that the Court would treat MRIS's Motion to Dismiss under Rule 56.[5] Accordingly, AHRN is entitled to limited discovery and an opportunity to present supplemental evidence to the Court in an effort to present a genuine issue of material fact on the CoreLogic issue, if it so chooses.[6] The Court will defer ruling on MRIS's motion as to Counts II and IV until such discovery is complete or until AHRN communicates that it will not oppose the motion for summary judgment.[7] At this point, the Court offers no opinion as to what specific discovery will be necessary to properly address the CoreLogic issue.[8] Given the narrowness of the issue in dispute, however, the Court anticipates that discovery will be limited and will set a deadline of forty-five days for its completion. The Court is mindful of the high costs of federal antitrust litigation, and the Court's order should not be interpreted by AHRN as a license to engage in broad, burdensome discovery requests at this juncture of the proceedings. *See, e.g.*, *Twombly*, 550 U.S. at 558 ("The costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no likelihood that the plaintiffs can construct a claim from the events related in the complaint.").

Although the Court will defer ruling on Counts II and IV, MRIS's Motion to Dismiss will be granted as to Count III. As discussed in the Court's June 10 Opinion, California's unfair competition law (UCL) does not apply to nonresidents where the allegedly wrongful conduct

---

[5] MRIS asserts that the Charron declaration is "part of the record" and should be considered by the Court because it denied AHRN's Motion to Strike the declaration. Doc. No. 209 at 19. The Court cannot conclude, however, that AHRN was on notice that the Court would convert the pending Motion to one for summary judgment.

[6] MRIS previously moved to dismiss or, in the alternative, summarily adjudicate AHRN's First Amended Counterclaims. The Court dismissed the claims under Rule 12(b)(6), and therefore did not address AHRN's arguments that it the Court should defer granting MRIS's Motion prior to discovery.

[7] As noted in the Court's June 10 Opinion, the viability of AHRN's unfair competition claim under Maryland law (Count II) relies on the same set of facts as the Sherman Act § 1 claim (Count IV). Doc. No. 159 at 37.

[8] In prior briefing on this issue, AHRN argued that the portion of the Charron declaration regarding CoreLogic lacked foundation. Doc. No. 83-1 at 5. AHRN also suggested that it would need time to conduct depositions of Charron and a 30(b)(6) MRIS corporate representative knowledgeable about MRIS's Database configuration, including the CoreLogic Matrix, Cornerstone, and Keystone programs, and possibly third-parties. *Id.* at 19. Furthermore, counsel for AHRN stated in his previously filed Rule 56(d) affidavit that AHRN sought discovery from various software developers, communications between MRIS and those developers, and the deposition of Michael Belak. Doc. No. 94-1 at 5-6.

occurred outside California. *See, e.g.*, *Norwest Mortg., Inc. v. Superior Court*, 72 Cal. App. 4th 214, 222 (Cal. Ct. App. 1999) (holding that UCL was not applicable to claims of non-residents injured by conduct occurring outside California); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (same). The Court ruled that AHRN had failed to state a claim under the UCL because it failed to identify wrongful conduct that occurred in California and the harm AHRN suffered there. Doc. No. 159 at 38-39. AHRN has failed to cure these deficiencies in its Second Amended Counterclaims.

Accordingly, MRIS's Motion to Dismiss will be granted-in-part, and Count III will be dismissed with prejudice. The Court will treat MRIS's Motion as one for summary judgment with respect to Counts II and IV, and will defer ruling on the motion in accordance with the accompanying Order.

## IV. CLAIMS AGAINST NAR

Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. To establish a § 1 violation, "a plaintiff must prove, and therefore plead, '(1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint on trade.'" *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 284 (4th Cir. 2012) (quoting *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002)). In its June 10 Opinion and Order, the Court concluded that AHRN had failed to plead the existence of either element of a Sherman Act § 1 claim. Specifically, the Court determined that AHRN had failed to outline the time, place, and contours of any anticompetitive agreement. Doc. No. 159 at 30-34. The Court also determined that AHRN had not plausibly alleged that competition in general was harmed and had failed to

plead an economically plausible connection between NAR's conduct and harm to competition. *Id.* at 30, 34-35.

Reading the new allegations in conjunction with the original allegations against NAR, the Court finds that AHRN has nudged its claims across the line from conceivable to plausible, *Twombly*, 550 U.S. at 570, and the Second Amended Counterclaims are therefore sufficient to survive NAR's Motion to Dismiss. AHRN now alleges that in March 2013, NAR entered the real estate agent evaluation and ranking market by establishing pilot projects across the nation. Doc. No. 167 ¶¶ 154-157. Although NAR's methodology differs from that of AHRN and its website, it is offering the same type of agent evaluation services as AHRN.[9] *Id.*

Following its entry into the agent evaluation and ranking market, NAR "encouraged regional boards of realtors to step up their efforts (1) to keep their member agents from entering into referral agreements with AHRN; [(2)] to breach or repudiate referral agreements agents have entered with AHRN; and (3) to pressure agents into demanding that their names be stricken from AHRN's list of potential referral agents." *Id.* ¶ 112. AHRN offers several specific examples. On May 2, 2013, a Minot, North Dakota agent responded to an offer of referral by AHRN by telling it that his brokerage had been advised by its MLS not to accept AHRN referrals. *Id.* ¶ 113. The same day, a Coon Rapids, Minnesota agent informed an AHRN customer service representative that he wanted his name removed from the AHRN referral list after receiving a warning from his local board of realtors. *Id.* ¶ 114. On or about May 30, 2013, an Upper St. Clair, Pennsylvania agent advised an AHRN customer service representative that she was

---

[9] The Court does not rely on AHRN's allegations of predatory pricing. NAR correctly points out that predatory pricing allegations typically support a monopolization claim under § 2 of the Sherman Act. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 222-27 (1993). The Court dismissed AHRN's § 2 claims with prejudice, and AHRN has not requested reconsideration of that Order or otherwise requested leave to file a new § 2 claim. However, AHRN's allegations regarding NAR's entry into the market support its argument that NAR was a party to an anticompetitive agreement.

informed by her brokerage's legal department that she was prohibited from entering a referral agreement because it would give AHRN access to the brokerage's proprietary information. *Id.* ¶ 115. Around the same time, a Clear Lake, Minnesota realtor refused a referral from AHRN and advised AHRN that NAR had advised her brokerage not to work with AHRN. *Id.* ¶ 116.[10]

AHRN also cites a provision from the NAR MLS Handbook which allegedly requires NAR's MLS and broker members to immediately notify NAR whenever they are "confronted with a request or demand by an individual for access to the association's multiple listing service without membership in the association." *Id.* ¶ 117.[11] AHRN further alleges that NAR's entry into the agent evaluation and ranking market was announced by NAR's General Counsel, Laurene Janik—the same individual who allegedly led the efforts in 2011, 2012, and 2013 to urge NAR members to send cease-and-desist letters to AHRN and to fund lawsuits against AHRN. *Id.* ¶¶ 97, 111, 156. The allegations regarding NAR's entry into the agent evaluation and ranking market, the concrete steps taken by NAR and its members in refusing to deal with AHRN, and the NAR Handbook notice provision—read in conjunction with the original allegations from the First Amended Counterclaims including, *inter alia*, the November 2011

---

[10] NAR argues that AHRN's allegations that it "encouraged" local boards of realtors to take action with respect to AHRN are insufficient to establish an actionable agreement under the Sherman Act. *See, e.g.*, *Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 706 (4th Cir. 1991) ("Simply making a peer review recommendation does not prove the existence of a conspiracy. There must be something more such as a conscious commitment by the medical staff to *coerce* the hospital into accepting its recommendation."); *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397 (7th Cir. 1989) ("There can be no restraint of trade without a restraint."); *Kreuzer v. Am. Acad. of Periodontology*, 735 F.2d 1479, 1488-90 (D.C. Cir. 1984) (holding that abstract contacts and hypothetical requirements were insufficient to prove a conspiracy). However, none of the cases cited by NAR were decided on a motion to dismiss. *E.g.*, *Kreuzer*, 735 F.2d at 1489 (determining that no conspiracy existed "after substantial discovery"). Furthermore, given NAR's alleged role in the national real estate market as a trade association which establishes and enforces professional standards for brokers and agents throughout the country, Doc. No. 167 ¶¶ 14-15, it is plausible that its directives to local boards and members could be considered coercive restraints, not merely abstract or hypothetical advice.

[11] NAR urges the Court to consider the Handbook provision as merely advisory, and not as a "rule" that evidences any sort of unlawful agreement. Doc. No. 193-1 at 21. However, the Handbook provision—particularly the directive, "It is important that [NAR] be advised immediately if such request or demand for access to the association MLS as described is received"—could plausibly be read as imposing a mandatory requirement. *See* Doc. No. 167 ¶ 117.

NAR annual meeting, AHRN's receipt of virtually identical refusal and repudiation letters from brokers nationwide, and the Janik-led cease-and-desist efforts and NAR-funding of lawsuits against AHRN, *see id.* ¶¶ 90-95, 97, 103-10, 123, 166-67—give rise to the plausible inference that NAR was a party to an anticompetitive agreement.[12]

Moreover, AHRN's Second Amended Counterclaims sufficiently plead the existence of anti-competitive harm as a result of NAR's conduct. For example, it is economically plausible that the alleged NAR-led boycott of AHRN—including the refusal to accept referrals from AHRN, the breaching of referral agreements already entered with AHRN, and demands that agents' names be stricken from AHRN's materials—would have the effect of depriving consumers of the ability to select the most qualified real estate agents for their transactions, thereby making the market less efficient and driving up the costs of brokerage services. Doc. No. 167 ¶¶ 108, 171-172, 201. AHRN also emphasizes the advantages of its own agent evaluation and ranking services in comparison to the pilot projects offered by NAR. Whereas AHRN's services are allegedly unbiased and algorithm-based, NAR's are dependent upon the sending of customer satisfaction surveys to clients of participating brokerages. *Id.* ¶ 157. AHRN further alleges that the Chief Operating Officer of the company assisting NAR with its ratings services has publicly acknowledged that there is a fear of ratings in the industry, and that NAR wants to help realtors "own the process." *Id.* Such allegations indicate that the consumers of real estate evaluation, ranking, and referral services would be deprived of valuable resources as a result of an NAR-led boycott.

---

[12] "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Phillips v. Crown Cent. Petro. Corp.*, 602 F.2d 616, 625 (4th Cir. 1979) (quoting *Cont'l Ore Co. v. Union Carbide*, 370 U.S. 690, 699 (1962)); *see also Milliken & Co. v. CNA Holdings, Inc.*, No. 3:08-CV-578, 2011 WL 3444013, at *10 (M.D.N.C. Aug. 8, 2011) ("Defendants' invitation to parse and dismember and Amended Complaint . . . is contrary to the Supreme Court's admonition.") (citations and internal quotations omitted).

AHRN also alleges that NAR engaged in similar efforts to persuade its members to avoid relationships with other similarly situated companies, such as Redfin. *Id.* ¶¶ 118, 170. Based on advice from NAR, member MLSs have successfully pressured Redfin and other innovative brokers to discontinue their own real estate agent profile pages under threat of lawsuit. *Id.* ¶¶ 96-97, 170. The termination of such services would plausibly reduce competition in the market, lower the quality of real estate agent evaluation services, and suppress the incentive to innovate and provide better services. Therefore, AHRN's allegations of anticompetitive harm are not limited merely to AHRN's ability to compete, which was the primary deficiency of the First Amended Counterclaims.

Based on the foregoing, AHRN's Sherman Act § 1 and Maryland unfair competition claims are sufficiently pled and survive NAR's Motion to Dismiss. However, the Second Amended Counterclaims do not add any new, particularized allegations of wrongful conduct on the part of NAR in California or harm suffered by AHRN in California. Accordingly, NAR's Motion will be granted in part, and Count III against NAR will be dismissed.

## V. CONCLUSION

AHRN's claims against MRIS continue to be premised upon MRIS's promotion of its copyright registration and enforcement program. Although the Court previously ruled that MRIS is entitled to *Noerr-Pennington* immunity on AHRN's antitrust claims, it will hold in abeyance MRIS's Motion to Dismiss the Sherman Act § 1 and Maryland unfair competition claims to allow AHRN an opportunity to obtain discovery on whether MRIS uses CoreLogic to arrange its database.

With respect to NAR's Motion to Dismiss, AHRN has set forth particularized allegations regarding NAR's conduct that, taken as a whole, have nudged its claims across the line from

conceivable to plausible. Accordingly, NAR's Motion to Dismiss the Sherman Act § 1 and Maryland unfair competition claims will be denied.

Finally, MRIS and NAR's Motions will be granted on Count III, and AHRN's California UCL claim will be dismissed with prejudice.

A separate Order follows.

  November 1, 2013                                                         /s/
      Date                                                        Alexander Williams, Jr.
                                                                           United States District Judge