IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC. | * * * |
| v. | * * |
| AMERICAN HOME REALTY NETWORK, INC. | * *   Civil No. AW 12-954 * |
| and | * * |
| NATIONAL ASSOCIATION OF REALTORS | * * |

## MEMORANDUM OPINION

Presently pending is a Motion for Relief from Contempt Damages filed by Defendant American Home Realty Network, Inc. (AHRN). ECF No. 230. AHRN seeks to satisfy the court's July 31, 2013 order requiring it to pay a $7,000 contempt award, ECF No. 185, by pursuing a self-designed payment plan. ECF No. 230 at 2. Plaintiff Metropolitan Regional Information Systems, Inc. (MRIS) contends that AHRN has not shown entitlement to relief from the payment order. ECF No. 240. The issues have been fully briefed and no hearing is necessary. *See* Local Rule 105.6. The court will deny AHRN's motion for relief.

**I.     Background.**

The background to this dispute has been previously documented. For purposes of this memorandum, the following is relevant. On November 13, 2012, the court issued a revised preliminary injunction enjoining AHRN from, *inter alia*, reproducing MRIS's copyrighted photographs. ECF No. 65. On January 17, 2013, MRIS filed a motion for contempt, seeking damages resulting from AHRN's alleged reproduction of MRIS photographs in violation of the preliminary injunction. ECF No. 92. On June 4, 2013, the court issued a Report and Recommendation which found that AHRN should pay MRIS a compensatory award of $7,000

for AHRN's unauthorized display of MRIS's copyrighted photographs for the period of November 30, 2012 through January 17, 2013. ECF No. 150. This report was adopted by the court on July 31, 2013. ECF No. 184, 185. The court subsequently set a deadline of October 23, 2013 for AHRN to make the $7,000 payment. ECF No. 223. On October 22, 2013, AHRN contacted MRIS, stating that AHRN did not have the resources to pay the contempt damages in full, and offering "a payment plan with $700 payable now and another $700 payable on the 23rd day of each of the next 9 months." ECF No. 240-2. MRIS refused to consent to this proposed payment plan.

**II.     Analysis.**

Because AHRN's contempt has already been established, ECF No. 185, the burden is on AHRN to show that it has a present inability to comply. *S.E.C. v. SBM Inv. Certificates, Inc.*, Civ. No. DKC 06-0866, 2012 WL 706999, at *10 (D. Md. Mar. 2, 2012). "The burden of establishing an inability-to-comply defense is difficult to sustain." *Id.* at *11. The moving party "must present evidence regarding [its] present inability to comply with the [contempt order], and [it] must make this showing 'categorically and in detail.'" *Id.* (citation omitted). "Conclusory assertions of financial inability, unsubstantiated by supporting documentation, are insufficient to satisfy this burden." *Id.* (citations omitted). "Rather, the [moving party] must show that [it] acted in good faith and took all reasonable efforts to comply with the court's order." *Id.* (citations omitted). Here, AHRN provides (1) a declaration from its general counsel, Christopher Miller; (2) a declaration from its CFO, Bruce Hall; (3) various redacted statements from its Wells Fargo bank account; and (4) a "Cash Flow Summary" submitted for *in camera* review.

Mr. Miller's declaration states that the Cash Flow Summary, which covers March 22, 2013 to November 4, 2013, "shows, among other items, that vital operating expenses such as

salaries, rent, and payments to critical vendors, exceeded the actual and/or anticipated income for each week during such time period." ECF No. 254-3 at 3.  Mr. Miller also states that on October 23, 2013, AHRN's bank balance was $1,048.23.  *Id.*  Notably, neither Mr. Miller's declaration nor the Cash Flow Summary provide any details regarding the substance of AHRN's "vital operating expenses" or "salaries, rent, and payments to critical vendors."  Nor does AHRN's bank account balance of $1,048.23 on October 23, 2013, establish that it was impossible for AHRN to pay $7,000 by that date.  AHRN was aware of this obligation on July 31, 2013, and AHRN's financial records show $18,952.07 in its bank account on October 16, 2013, one week prior to the payment deadline.  ECF No. 254-5.  AHRN cannot obtain relief by showing that it lacked the required resources at a particular moment in time.  AHRN must also justify directing its resources toward other obligations.

AHRN's CFO Hall attests that "[a]t no time since June 4, 2013 was AHRN's bank account balance sufficient to cover a payment of $7,000 for contempt . . . in addition to the mandatory operating expenses of the company, which include payroll, utilities, and rent," and that "the company has not been profitable over any monthly, quarterly or annual reporting period." ECF No. 254-4 at 3.  Such conclusory representations would, if accepted, indefinitely shield AHRN from complying with the court's order.  It is for this reason that a party seeking to show a present inability to pay must do so "categorically and in detail."

AHRN also attaches redacted Wells Fargo bank statements showing a transaction history from June 3, 2013 to July 30, 2013, and from October 8, 2013 to October 24, 2013.[1] ECF No. 254-5.  No explanation is provided as to why the August and September statements, which would be highly relevant to AHRN's ability to pay during those months, have not been provided.

---

[1] According to Mr. Hall, "AHRN's Wells Fargo bank account is the only financial resource or liquid asset account for AHRN." ECF No. 254-4 at 3.

In addition, the bank statements that have been provided reveal that AHRN, on most days, had more than $7,000 at the close of business, and much more than the $1,048.23 figure cited for October 23, 2013. Without a detailed explanation of what these transactions consist of, and how AHRN is prioritizing its expenses in relation to the court's contempt order, a representation that "the company has not been profitable," ECF No. 254-4, or that it has zero net profits, is meaningless. *See Advance Pharm., Inc. v. United States*, 391 F.3d 377, 400 (2d Cir. 2004) (quoting *United States v. Lizza Indus., Inc.*, 775 F.2d 492, 498-99 (2d Cir. 1985)) (noting that "the difference between gross and net profits is often so 'speculative' and so much a function of 'bookkeeping conjecture,' that 'using net profits as the measure for forfeiture could tip [certain] business decisions in favor of illegal conduct'").

Lastly, AHRN's "Cash Flow Summary," a sixty-six page document purporting to show daily financial transactions from March 22, 2013 to November 4, 2013,[2] does not explain or synthesize its entries in any way. Again, there is no useful explanation of how AHRN spent its gross revenue, and no attempt to tie the numbers on the Cash Flow Summary to the numbers on the bank statements, leaving the court with an unintelligible picture of AHRN's financial situation. The document is also silent as to the value of any of AHRN's non-liquid assets. It does not come close to justifying relief from the contempt order.

Other courts have similarly rejected unsupported assertions of inability to pay. For example, in *E.E.O.C. v. Local 638, Local 28 of Sheet Metal Workers' Int'l Ass'n*, 889 F. Supp. 642 (S.D.N.Y. 1995) *rev'd in part on other grounds and remanded sub nom. City of New York v. Local 28, Sheet Metal Workers' Int'l Ass'n*, 170 F.3d 279 (2d Cir. 1999), a labor union, fined for

---

[2] A typical line entry in the table consists of: (1) the client, whose identity has been redacted; (2) the date on which payment can be expected; (3) the expected amount of payment; (4) the method of delivery; (5) whether the payment has been received; (6) the actual amount of payment; (7) the category of person the payment was received from; and (8) additional comments.

violating a court order, contended that the fine would threaten its financial viability. The union submitted a certified public accountant's report purporting to show that the union's financial situation was "so precarious that it [could not] afford *any* additional expenses." *Id.* at 669 (emphasis in original). The court found that the report was "so general and relies on so many assumptions, however, that it constitutes a blanket denial of the union's ability to pay rather than a realistic analysis of the union's financial situation." Although the report claimed that the union had exercised "maximum cost cutting techniques," it failed to explain what these cost cutting techniques were or why more could not be taken. The court refused to base any relief on this report. *Id.*

In *Chao v. SOS Sec. Serv.*, 526 F. Supp. 2d 196 (D.P.R. 2007), defendants also argued that they were unable to comply with a contempt order's payment plan. *Id.* at 202-03. Defendants supported their position with evidence similar to that provided here: testimony from the company's owner and comptroller, an unaudited financial statement, and partial banks statements. *Id.* at 203. The court noted that the company, by its own admission, earned a profit of $120,000 in the previous year, yet "provided no explanation as to why those profits could not have been applied to satisfy the judgment . . . [n]or have defendants provided the court with sufficient, reliable evidence regarding the state of [the company's] finances in June 2006—when defendants discontinued making the required payments—or for the rest of that year." *Id.* In addition, although defendants claimed that their business dropped in 2006, they produced no reliable bank records "that would substantiate the amounts of money [the company] received or the amount that was paid for operating expenses." *Id.* In fact, although profits were supposedly decreasing in 2006, defendants' financial statement indicated that salaries paid to the company's fixed salary employees rose dramatically in 2006. *Id.*

The *Chao* court also concluded that the financial information provided for the first half of 2007 was insufficient:

> In particular, [the company] provided only selected pages from its bank statements corresponding to the months of January through June of 2007. The pages submitted document total monthly deposits ranging from approximately $101,000 to $137,000, and total monthly withdrawals ranging from approximately $110,000 to $143,000. Defendants, however, failed to provide complete copies of the bank statements and failed to provide cancelled checks which could have demonstrated who received the money that was withdrawn from the account. This omission is both telling and critical, since defendants have the heavy burden of proving financial inability to pay and the evidence to substantiate this claim is "peculiarly within the defendant's own knowledge" and control. *Hodgson* [*v. Hotard*, 436 F.2d 1110, 1115 (5th Cir. Fla. 1971)]. In this regard, *Hodgson* is instructive. There, the Fifth Circuit refused to credit the employer's testimony that he had no money or property to pay ordered minimum wages because that testimony was not substantiated by documentary evidence of how his assets had been disposed of.

*Id*. at 203. Thus, based on "sketchy and incomplete" evidence, *id.* at 202, defendants failed to demonstrate an inability to comply with the court's order. *Id.* at 204.

Here, AHRN's evidence is similarly deficient. AHRN has failed to document its total monthly deposits or withdrawals and failed to explain how its gross proceeds are dispersed among its various financial obligations.[3] A bald assertion that proceeds are used to cover "mandatory operating expenses of the company, which include payroll, utilities, and rent" is not sufficient. *See A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 279 F. Supp. 2d 341, 347-48 (S.D.N.Y. 2003) (concluding that "[s]elf-serving, conclusory statements with incomplete financial records do not show an inability to pay" and that, to obtain a "full and complete picture of [defendant's] financial situation," defendant's financial records should have been "submitted in an orderly fashion with a reasonable explanation and arguments based thereon"). Simply put, AHRN has failed to show an inability to pay the contempt award.

---

[3] There are other deficiencies in AHRN's Cash Flow Summary which are not addressed because the document was submitted *in camera*.

AHRN has similarly failed to show that it acted in good faith and took all reasonable efforts to comply with the court's order. AHRN asserts that it "has continuously sought funding, all of which was denied citing litigation against AHRN." ECF No. 254 at 6. According to Mr. Miller, AHRN missed out on several large investment opportunities. ECF No. 254-3 at 3. Aside from the fact that AHRN offers no information about these potential deals, failed investment attempts do not establish that all reasonable efforts to comply with the court's order were made. AHRN admits that it routinely receives commissions from real estate brokers, title companies and attorneys, ECF No. 254-4 at 3, and AHRN's Cash Flow Summary shows that one of these transactions alone may be worth more than $7,000. AHRN has not identified a single attempt to cut or reprioritize its current costs, instead simply assuming that all expenditures are justifiable notwithstanding the obligation to pay the contempt damages. Such conduct does not show that AHRN has expended all reasonable efforts to comply with the contempt order.

"The appropriate remedy for civil contempt is within the court's broad discretion." *In re GMC*, 61 F.3d 256, 259 (4th Cir. 1995) (citation omitted). So far, the court's payment orders have been ignored and additional sanctions are needed. To that end, the court concludes that MRIS should not be forced to incur additional expenses while AHRN stands in contempt of court and immune from litigation expenses.[4] Accordingly, the court will relieve MRIS from incurring further expenses associated with AHRN's discovery requests until AHRN pays its outstanding contempt damages.[5] *See Rousseau v. 3 Eagles Aviation, Inc.*, 130 Fed. Appx. 687,

---

[4] AHRN's "[c]urrent and past litigation expenses have been paid by Travelers Insurance Company." ECF No. 230-1 at 3. "However, Travelers has refused to pay the $7,000 in contempt damages." ECF No. 254-3 at 4.

[5] In addition to the $7,000 damage award owed to MRIS, the court also ordered AHRN to pay additional damages of $12,428.57, ECF No. 223, and $1,571.43, ECF No. 286, for continued violations of the preliminary injunction. Thus, AHRN currently owes $21,000.

This ruling impacts the current dispute over the scope of AHRN's proposed search terms. *See* ECF Nos. 220,

690 (5th Cir. 2005) (concluding that "[a]n award of attorney's fees is an appropriate sanction where a party incurs additional expenses as a result of the other party's noncompliance" with a court order); *Abbott v. Suntrust Mortgage, Inc.*, Civ. No. 08-665, 2009 WL 971267, at *6 (E.D. Va. Apr. 8, 2009) (instituting a nonmonetary sanction against plaintiffs preventing them from filing any pleading of any kind with the court "until they show proof that they have paid to [Defendant] the $1,000.00 monetary sanction imposed"); *Buford v. Vang*, Civ. No. AWI-SMS 01-6496, 2006 WL 2652220, at *13 (E.D. Cal. Sept. 15, 2006) *report and recommendation adopted sub nom.*, 2007 WL 749700 (E.D. Cal. Mar. 1, 2007) (after plaintiff disobeyed a court order and repeatedly re-hashed the same arguments, the magistrate judge considered several sanctions, "including relieving defendant of the obligation to respond to any outstanding discovery," but ultimately decided that dismissal with prejudice was the most appropriate sanction); *Kee v. R-G Crown Bank*, 656 F. Supp. 2d 1348, 1354 (D. Utah 2009) (warning plaintiff that he will be held in contempt if he violated the court's injunction, "with potential sanctions including fines, paying Defendants' attorneys' fees and costs, and imprisonment"); *Collins v. TIAA-CREF*, Civ. No. 06-304 C, 2007 U.S. Dist. LEXIS 66021, at *10 (W.D.N.C. Sept. 5, 2007) (warning plaintiff that further failure to "comply fully with any of the Court's Orders . . . will likely result in the imposition of sanctions" and that "[s]anctions can include the offending party being required to pay the opposing party's costs, including reasonable attorney's fees in their entirety . . . .").

MRIS asks the court to hold AHRN's CEO, Jonathan Cardella, personally liable for the

---

245, 259. MRIS objects to AHRN's proposed search terms primarily because of relevance, burden and cost, but also because of concerns that some files might contain confidential and sensitive business information. ECF No. 259. If AHRN seeks to pursue discovery of MRIS's electronically stored information while in contempt, AHRN may use its proposed search term list, but must advance all associated costs and fees, including fees associated with a review for privileged and confidential information. If AHRN satisfies the contempt orders, the court will rule on the merits of the search term dispute and allocate costs and fees accordingly.

$7,000, citing *Chicago Truck Drivers v. Bhd. Labor Leasing*, 207 F.3d 500 (8th Cir. 2000).

AHRN responds, correctly, that under the precedent set forth in *Chicago Truck Drivers*, the court cannot hold Mr. Cardella personally liable for the $7,000 payment: the fact that a corporate officer "may be subject to the court's contempt power for failing to direct his corporations to comply with the payment orders does not mean that [the officer] can now be held personally liable for the underlying withdrawal payments themselves." *Id.* at 507-08. As for MRIS's contention that the court can hold Mr. Cardella in contempt, the court notes that no motion for contempt has been directed at Mr. Cardella personally. ECF No. 92.

MRIS also asks the court to impose a constructive trust on AHRN's assets, including its domain name and servers. The constructive trust doctrine allows proceeds derived from wrongdoing to be held in trust for the victims of the wrongdoing. *FTC v. AmeriDebt, Inc.*, 373 F. Supp. 2d 558, 565 (D. Md. 2005). "The constructive trust plaintiff who proves his claim . . . wins an *in personam* order that requires the defendant to transfer legal rights and title of specific property or intangibles to the plaintiff." *Goldstein v. F.D.I.C.*, Civ. No. ELH 11-1604, 2012 WL 1819284, at *12 (D. Md. May 16, 2012) (citations omitted).

> The remedy is applied by operation of law where property has been acquired by fraud, misrepresentation, or other improper method, or where the circumstances render it inequitable for the party holding the title to retain it. Nevertheless, the Court of Appeals has explicitly provided that the remedy is not to be used as a means of attempting to right every wrong. Thus, in the ordinary case, there must be clear and convincing evidence not only of wrongdoing, but also of the circumstances which render it inequitable for the [possessor] of the [property] to retain the beneficial interest. . . . [In most cases] it is enough that the conscience of a court of equity would be traumatized if the legal title holder were allowed to deprive the beneficial owner of that which in good conscience belongs to the beneficial owner.

*Robinette v. Hunsecker*, 212 Md. App. 76, 118-19 (2013). Here, the court has imposed an intermediate level of sanctions and there is no showing that a constructive trust over AHRN's

assets is necessary at this time.  If AHRN continues to violate the contempt order, then the court may consider additional options.

Finally, MRIS's motion for leave to file a sur-reply, ECF No. 257, is denied as moot because it is unnecessary to this decision.

### III.     Conclusion.

AHRN's motion for relief is denied.  MRIS is relieved from incurring further expenses associated with AHRN's discovery requests until such time as AHRN pays all outstanding contempt damages.

Date: December 20, 2013                              /s/
                                         JILLYN K. SCHULZE
                                         United States Magistrate Judge