IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| METROPOLITAN REGIONAL INFORMATION SYSTEMS, INC., et al. | : | |
| | : | |
| Plaintiff, and Counterclaim Defendants | : | |
| v. | : | Civil Action No. DKC 12-0954 |
| | : | |
| AMERICAN HOME REALTY NETWORK, INC. | : | |
| Defendant, and Counterclaimant | : | |
| | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this copyright infringement and antitrust case are: (1) a motion for summary judgment filed by Counterclaim Defendant the National Association of Realtors ("NAR") (ECF No. 410); and (2) three motions to seal filings in connection with the motion for summary judgment (ECF Nos. 412, 424, 430). The issues have been fully briefed and the court now rules, and no hearing is necessary. Local Rule 105.6. For the following reasons, NAR's motion for summary judgment will be granted. The three motions to seal will be denied without prejudice to renewal within fourteen (14) days.

I.   **Background**

The factual and procedural background of this action has been extensively documented in previous opinions, thus only a brief summary of those facts relevant to the instant motion for summary judgment is necessary. (*See* ECF Nos. 34, 64, 159, 180-1, 239, 351). The Metropolitan Regional Information Systems, Inc. ("MRIS") brought a copyright infringement action against American Home Realty Network, Inc. ("AHRN") and Jonathan J. Cardella, AHRN's Chief Executive Officer, on March 28, 2012.[1] (ECF No. 1). MRIS offers an online fee-based "multiple listing service" (MLS) to real estate brokers and agents. Subscribers upload their real estate listings to the MRIS Database and agree to assign to MRIS the copyrights in each photograph included in those listings.

AHRN is a "San Francisco real estate brokerage referral services and technology startup that provides information to home buyers and sellers, identifying the real estate agents best suited to assist them in purchasing or selling properties in their local market on a nationwide basis." (ECF No. 167 ¶ 6). AHRN takes listing data from online database compilers like MRIS and makes it directly available to consumers on its "real estate referral" website. Specifically, AHRN owns and operates

---

[1] The lawsuit was dismissed against Mr. Cardella for lack of personal jurisdiction.

www.neighborcity.com ("NeighborCity"), which connects potential
buyers with real estate agents based on the types of properties
in which a buyer is interested.  Jonathan Cardella declared:

> Although AHRN is a licensed real estate
> broker in the State of California, it does
> not actively engage in providing brokerage
> services for either the sale or purchase of
> any real property, and displays the property
> images and listing data for the sole purpose
> of attracting customers to use our
> AgentMatch services in order for AHRN to
> earn referral fees from third party
> recipient brokers.

(ECF No. 410-6 ¶ 9).  Mr. Cardella described the AgentMatch
service as follows:

> AHRN is compensated by matching and
> referring prospective customers from its
> website to local real estate agents and
> brokers most relevant to the property
> actively being viewed or searched on its
> website.  AHRN does this through its website
> where it provides AgentMatch[,] its patent
> pending technology, designed to measure and
> publish the relative performance of the
> majority of U.S. professional Realtors, with
> respect to their peers, and uses this
> information *to match interested customers*
> *with the most qualified agents available to*
> *assist them, at the time of their request*.
> AgentMatch does this specifically by using
> the property criteria for the property being
> viewed on its website, e.g. latitude,
> longitude, price, bedrooms, etc. and then
> matches that against its database of real
> estate agents and their relative performance
> history selling similar homes.

(*Id.* ¶ 4) (emphasis added).  If a consumer becomes interested in
a property displayed on NeighborCity and requests additional

information, AHRN seeks to arrange a referral of that customer
to a real estate agent. (ECF No. 411-3, at 9). If the referral
results in a closed transaction, AHRN seeks a thirty (30)
percent referral fee. (ECF No. 411-1, at 9, Cardella, depo).
MRIS claimed that AHRN had displayed on its website real estate
listings containing copyrighted photographs taken from the MRIS
Database.

After MRIS brought its complaint against AHRN for copyright
violations, AHRN brought counterclaims against MRIS, Does # 1-
25, and the National Association of Realtors ("NAR"), alleging,
*inter alia*, violations of the Sherman Act, 15 U.S.C. § 1 *et seq.*
Ralph Holmen, Associate General Counsel of the NAR, provided the
following description of NAR:

> NAR is the largest professional association
> in America, with over one million members
> who are involved in all aspects of the
> brokerage of residential and commercial real
> estate. NAR provides for its members a
> facility for professional development and
> exchange of information related to topics of
> interest to the real estate profession, such
> as the setting of ethical standards for real
> estate professionals, the efficient and
> lawful operation of a Multiple Listing
> Service ("MLS"), and the protection of MLS
> listing content.

(ECF No. 410-2 ¶ 2). In addition to NAR, there are 54 state and
territorial associations, as well as approximately 1,400 local
associations consisting of real estate professionals. (*Id.* ¶
4). NAR publishes a Handbook on Multiple Listing Policy, which

serves as a guide for member associations of realtors in their operation of MLSs. (*Id.* ¶ 6). The Handbook includes model rules, policies, and best practices established by NAR's Board of Directors. According to Mr. Holmen, MLSs choose whether to adopt NAR's model rules and policies. (*Id.*). MLSs that adopt and conform to all mandatory rules and policies are entitled to coverage under NAR's errors and omissions professional liability insurance policy. Additional facts will be presented in the analysis section below.

AHRN filed first amended counterclaims against MRIS and NAR, and they both moved to dismiss. After Judge Williams issued several opinions (ECF Nos. 159 & 239), and AHRN was granted leave to file second amended counterclaims (ECF No. 167),[2] counts I (Maryland unfair competition) and III (Sherman Act § 1) against MRIS and NAR remained the only counterclaims. The remaining counterclaims against MRIS were dismissed by memorandum opinion and order issued on March 10, 2014. (ECF Nos. 351, 352, 355). On September 12, 2014, MRIS and AHRN filed a proposed permanent injunction and final order, which reflects, *inter alia*, that MRIS and AHRN have agreed to dismiss with prejudice all pending claims between them. The permanent

---

[2] The second amended counterclaims asserted the following causes of action against MRIS and NAR: (1) unfair competition under Maryland law; (2) unfair competition under California law; and (3) violation of the Sherman Act § 1. (*See* ECF No. 167).

injunction and final order was entered on September 15, 2014. (ECF No. 420). Consequently, what remains in the case are two counterclaims against NAR: (1) unfair competition in violation of Maryland law (count I); and (2) violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (count III).

NAR moved for summary judgment on September 5, 2014. (ECF No. 410. AHRN opposed the motion (ECF No. 422), and NAR replied (ECF No. 429). The parties also filed motions to seal filings in connection with the summary judgment motion. (ECF Nos. 412, 424, 430). On November 24, 2014, NAR filed a notice of supplemental authority, which, among other things, informed the court that a district court in Minnesota granted the motion for summary judgment on AHRN's antitrust counterclaim against the Regional Multiple Listing Service of Minnesota ("RMLS") (Case No. 12-0965, D.Minn.). (*See* ECF No. 432). As NAR acknowledges in the notice, however, the memorandum opinion granting summary judgment was filed under seal, and NAR indicates that it does not have it. It would be up to NAR to intervene in the case in Minnesota to try to attempt to access the sealed memorandum opinion and there is no indication that it has done so.[3]

---

[3] NAR filed a second notice of supplemental authority on February 17, 2015, stating that AHRN had appealed the summary judgment order to the United States Court of Appeals for the Eighth Circuit, but subsequently sought to dismiss the appeal. (ECF No. 433).

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).  Once a properly supported motion for summary judgment is filed, the nonmoving party is required to make a sufficient showing on an essential element of that party's claim as to which that party would have the burden of proof to avoid summary judgment.  *Celotex,* 477 U.S. at 322–23.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to judgment in its favor as a matter of law.  In *Anderson*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury

7

could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson,* 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778-79 (4th Cir. 1993) (*quoting Felty v. Graves-Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

## III. Analysis

### A.   NAR's Motion for Summary Judgment

Count III of the second amended counterclaims alleges a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Section 1 prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." "This provision has been interpreted to preclude only restraints that are 'unreasonably restrictive of competitive conditions.'" *Imaging Center, Inc. v. Western Maryland Health Systems, Inc.*, 158 F.App'x 413, 418 (4th Cir. 2005) (*quoting Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002)). To establish a violation of Section 1 of the Sherman Act, a plaintiff must prove two elements: (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade.[4] *Dickson v. Microsoft Corp.*, 309 F.3d 193, 202 (4th Cir. 2002).

The Fourth Circuit elaborated on the two elements in *Imaging Center, Inc.*, 158 F.App'x at 418:

> The first element requires a concerted action by two or more persons. *Laurel Sand & Gravel, Inc. v. CSX Transp., Inc.*, 924 F.2d 539, 542 (4th Cir. 1991). This element is satisfied even where "one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *Dickson*, 309 F.3d at 205 (*quoting MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 973 (7th

---

[4] As Judge Williams stated in his earlier opinion, "the viability of AHRN's unfair competition claim under Maryland law [] relies on the same set of facts as the Sherman Act § 1 claim" and the parties do not dispute this point. (ECF No. 239, at 12 n.7).

Cir. 1995)).   Trade-restraining concerted action may be inferred from conduct.  *Laurel Sand & Gravel*, 924 F.2d at 542.   However, when these actions could be consistent with either (1) independent conduct or a legitimate business purpose or (2) an illegal agreement, "proof must be offered that tends to exclude the first interpretation" in order to avoid summary judgment.  *Id.*  This is because "antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

The second element of any § 1 claim requires a showing that the restraint on competition is unreasonable.  *Cont'l Airlines*, 277 F.3d at 508.   In order to evaluate this second element, courts use one of three methods, depending on the restraint alleged: "(1) *per se* analysis for obviously anticompetitive restraints, (2) quick[-]look analysis, for those with some procompetitive justification, and (3) the full 'rule of reason,' for restraints whose net impact on competition is particularly difficult to determine."  *Id.* at 508-09.

The Supreme Court has long held that "certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as per se violations of § 1 of the Sherman Act." *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 290 (1985) (citing cases).  Group boycott cases to which the Supreme Court has applied this approach typically involve joint efforts to disadvantage competitors by "'either directly denying or persuading or

coercing suppliers or customers to deny relationships the competitors need in the competitive struggle.'"  *Id.* at 294 (*quoting* L. Sullivan, Law of Antitrust 261-62 (1977)).

The parties disagree about the appropriate standard of review in antitrust cases.  The Supreme Court of the United States has specified what a plaintiff must show to avoid summary judgment on a Sherman Act § 1 claim:

> To survive a motion for summary judgment . . . a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Respondents . . . must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

*Matsushita Elec. Indus. Co.*, 475 U.S. at 587-88.  Although the court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party, antitrust law "limits the range of permissible inferences from ambiguous evidence," such that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* at 588.  The *Matsushita* standard has been applied in cases alleging price-fixing and illegal restraints of trade such as the alleged agreement to boycott at issue here.  *See, e.g., In re Titanium Dioxide Antitrust Litigation*, 959 F.Supp.2d 799, 820 (D.Md.

2013) (applying *Matsushita* standard on summary judgment to allegations of price-fixing); *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436, 1999 WL 691840 (4th Cir. 1999) (unpublished table opinion) (applying *Matsushita* standard on summary judgment to group boycott allegations). "Although it is clear that the *Matsushita* standard governs whether granting summary judgment is proper, it is equally clear that the particular facts of each case determine how high a burden that standard imposes." *In Re Titanium Dioxide Antitrust Litigation*, 959 F.Supp.2d at 821. Judge Bennett's explanation of the appropriate standard of review in antitrust cases is instructive:[5]

> Plaintiffs alleging an implausible conspiracy face a high burden to show evidence that tends to exclude inferences of legitimate competitive behavior. By contrast, where plaintiffs allege a plausible conspiracy – one that makes economic sense – a lower "tends to exclude" standard applies. [] Accordingly, when a plausible conspiracy has been alleged, a plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct" to prevail at summary judgment. [] Especially relevant to this case, the United States Court of Appeals for the Second Circuit has held that where "a plaintiff relies on ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence;

---

[5] *In Re Titanium Dioxide Antitrust Litigation* did not involve allegations of group boycott, however, as is the case here.

it need not be the *sole* inference." [*In re
Publ'n Paper Antitrust Litig.*, 690 F.3d 51,
62 (2$^d$ Cir. 2012)] (emphasis in original).
When determining whether a jury could
reasonably infer that there was a
conspiracy, this Court must view the
totality of the evidence. *See* [*In re High
Fructose Corn Syrup Antitrust Litig.*, 295
F.3d 651, 655-56 (7th Cir. 2002)] (cautioning
against the supposition that "if no single
item of evidence presented by the plaintiff
points unequivocally to conspiracy, the
evidence as a whole cannot defeat summary
judgment.").

*In re Titanium Dioxide Antitrust Litig.*, 959 F.Supp.2d at 821.

## 1.   Concerted Action

The Fourth Circuit explained in *North Carolina State Bd. of
Dental Examiners v. F.T.C.*, 717 F.3d 359, 372 (4th Cir. 2013):

> [T]o be concerted action, the parties must
> have "a conscious commitment to a common
> scheme designed to achieve an unlawful
> objective." *Monsanto Co. v. Spray-Rite
> Service Corp.*, 465 U.S. 752, 768 (1984). We
> have indicated there must be "something
> more" than independent action, such as "a
> unity of purpose or a common design and
> understanding, or a meeting of the minds."
> *Parkway Gallery Furniture, Inc. v.
> Kittinger/Pennsylvania House Group, Inc.*,
> 878 F.2d 801, 805-06 (4th Cir. 1989).
> Concerted action may be proven by "direct or
> circumstantial evidence." *Monsanto*, 645
> U.S. at 768.

A party may demonstrate an agreement by direct evidence or
circumstantial evidence, or a combination of the two. *West Penn
Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99-100 (3$^d$ Cir.
2010); *Merck-Medco Managed Care, LLC,* 1999 WL 691840, at *5;

13

*Laurel Sand & Gravel, Inc.*, 924 F.2d at 542 (noting that when there is no direct evidence of antitrust activity, "[a]n agreement to restrain trade may be inferred from other conduct.").

AHRN argues that together with brokers and agents around the country, NAR engaged in a group boycott in violation of Section 1 of the Sherman Act.  As will be seen, none of the evidence – even when viewed in the aggregate – support group boycott or concerted action.

###### a.   Litigation-Related Activity

First, in support of its group boycott theory, AHRN references litigation-related activity purportedly spearheaded by NAR, including a multitude of cease and desist letters that it received from MLSs around the country beginning in November 2011 around the time of the Anaheim meeting when NAR purportedly first became aware of AHRN and NeighborCity.  (ECF No. 422, at 12; *see also* ECF Nos. 422-2 through 422-18, cease and desist letters).  The gist of the letters is that AHRN has been reproducing and distributing copyrighted works relating to real estate listings on its website, NeighborCity.com, without authorization; the letters request that AHRN immediately remove copyrighted information from its website or risk legal action. AHRN cites multiple email exchanges between Laurie Janik and MLSs and their legal counsel regarding an appropriate course of

action against AHRN. (*See* ECF No. 422, at 10-11; ECF Nos. 423-4 through 423-8; ECF No. 422-33, at 5, email from John Mosey of Northstar MLS, ("[Y]es it is Laurie [Janik] he refers to. I spoke with her last week and she is very interested in having the NAR take a lead role in a filing again [AHRN.]"). AHRN states:

> Janik was also in constant communication with MLSs and their legal counsel about AHRN. [] As she coordinated the litigation Janik took steps to prevent the coordinated actions from appearing to be an illegal group boycott. [] Additionally, NAR not only orchestrated this agreed upon litigation plan against AHRN, it funded it. [] NAR contributed $35,000.00 to the legal action brought by Northstar MLS in Minnesota.

(ECF No. 422, at 10-11). Ms. Janik provided deposition testimony to explain the rationale for NAR providing funding to support a lawsuit against AHRN in January 2012:[6]

> Q: How was that decision made, to make an initial commitment of $35,000?
>
> A: Well, that decision, actually, was a little irregular. The decision was made by my boss. I recommended it to him to use some funds that were left over from an industry settlement of a patent infringement case that involved patent licenses and the Association received more money than we needed to spend for the patent license for the industry because payments were received

---

[6] Laurene Janik testified that although NAR allocated certain funds to support the lawsuit instituted by MRIS, the funds were *not* actually paid from NAR to MRIS. (ECF No. 410-4, at 11). She did not know why MRIS did not accept the funds.

late.   And,  in  my  view,  those  payments  had
come  in  from  MLSs,  and  NAR  shouldn't  just
put  it  to  the  bottom  line;  that  the  money
came   from   MLSs,   it   was   related   to   MLS
issues,  and,  therefore,  it  should  be  used  on
[]  some  industry-wide  issue  that  affected
MLSs.

And   at   this   point   in   time,   I   had
concluded  that  []  the  NeighborCity  concern
was   an   industry-wide   issue   that   affected
MLSs,  and  it  would  be  a  good  place  to  use
the  excess  funds  that  had  been  paid  by  the
MLSs  in  the  CIVIX  case.   So  I  went  to  Dale
Stinton,  suggested  this  use  of  those  funds
to  him,  and  he  approved  it.

(ECF No. 422-1, at 11-12).

NAR  asserts  that  "the  Court  has  already  held  that  activity

relating  to  incidents  of  litigation  such  as  cease  and  desist

letters  [is]  immune  from  liability."   (ECF  No.  411,  at  37).    In

the  June  10,  2013  opinion  adjudicating  NAR's  and  MRIS's  motions

to  dismiss  the  first  amended  counterclaims  filed  by  AHRN,  Judge

Williams  held  that  "Counterclaim-*Defendants*  are  []  entitled  to

*Noerr-Pennington*  immunity  from  AHRN's  §  1  claims  to  the  extent

they  are  based  on  the  filing  of  this  litigation  and  the

incidents  of  that  litigation."[7]   (ECF  No.  159,  at  28)  (emphasis

---

[7]   Judge  Williams  later  reconsidered  the  June  10,  2013
opinion  insofar  as  it  dismissed  the  claims  for  violations  of
Section  1  of  the  Sherman  Act  and  unfair  competition  under
Maryland  law  as  to  *MRIS*  because  he  had  to  rely  on  materials
outside  the  four  corners  of  the  complaint  in  determining  the
application  of  *Noerr-Pennington*  immunity.   (*See*  ECF  No.  239,  at
2).    Summary  judgment  was  granted  on  both  counterclaims  as  to
MRIS  by  memorandum  opinion  and  order  issued  on  March  10,  2014.
(ECF  Nos.  351,  352,  355).

added).   Later in the opinion, Judge Williams specified: "[i]t
is not sufficient to allege that Counterclaim-Defendants agreed
to enforce their copyrights against AHRN; MRIS and NAR are
immunized from such a claim for the reasons discussed above."
(*Id.* at 30).   AHRN argues that *Noerr-Pennington* immunity
protects parties from litigation based on *their* petitioning the
court for redress, and that the court's prior ruling that AHRN
could not assert antitrust claims against *MRIS* for having
instituted this lawsuit is inapplicable to NAR, who did *not*
institute a copyright infringement lawsuit.   (ECF No. 422, at
24).   AHRN contends that "[h]ad AHRN's claims against NAR rested
on incidents of litigation *by NAR against AHRN* in an attempt to
petition the government, then the Court no doubt would have
stated that NAR was due *Noerr-Pennington* immunity."   (*Id.*)
(emphasis added).

The Fourth Circuit rejected a similar argument to the one
AHRN lodges here in *Balt. Scrap Corp. v. David J. Joseph Co.*,
237 F.3d 394, 400 (4th Cir. 2001).   Plaintiff in that case argued
that "*Noerr-Pennington* protects litigants only, not third
parties who covertly funded the lawsuit."   *Id.*   The Fourth
Circuit remarked that "*PRE* is not so restrictive as to protect
only the litigant from later antitrust liability."[8]   *See also*

---

[8]   In *Professional Real Estate Investors, Inc. v. Columbia
Pictures Indus.*, 508 U.S. 49, 60 (1993) ("PRE"), the Supreme

*Hosp. Building Co. v. Rex Hospital*, 691 F.2d 678 (4th Cir. 1982)

(non-litigants who caused a government entity to file litigation

entitled to jury charge of *Noerr-Pennington* immunity).   The

Fourth Circuit further reasoned:

> Indeed, non-parties often provide aid to
> litigants, whether through financial
> backing, legal assistance, amicus briefs, or
> moral support.   The fact that an amicus
> brief, for example, might be filed by a non-
> party with some anti-competitive aim does
> not strip from the amicus its *Noerr-
> Pennington* right to petition the courts.
> The realities often are that litigation
> cannot be entirely financed out of the
> pocket of the party bringing suit.   And the
> costs of supporting a party's right of
> access to public bodies need not entail the
> defense of a collateral antitrust suit.   To
> hold that only parties who have standing in
> their own right to receive the protection of
> *Noerr-Pennington* immunity is to artificially
> restrict that doctrine by penalizing even
> the lawful support of objectively
> meritorious actions. . . .   *Accordingly,
> because the litigation was not objectively
> baseless, and because the source of funding
> this lawsuit in no way affected the
> legitimacy of the claims advanced, the
> district court correctly held that the
> lawsuit was not sham litigation.*

*Balt. Scrap Corp.*, 237 F.3d at 401 (emphasis added).

Here, too, any support received by MRIS from NAR to

institute the lawsuit against AHRN to protect copyrighted

materials in no way affected the legitimacy of the copyright

claims.   In any event, regardless of the applicability of *Noerr-*

---

Court of the United States fashioned a two-part sham-litigation
test as an exception to *Noerr-Pennington* immunity.

*Pennington* immunity to NAR, AHRN's reliance on any litigation-related activity by NAR to support the group boycott theory is misplaced.   There is nothing unlawful about NAR supporting MLSs in considering legal action against AHRN, who it believed was unlawfully misappropriating information related to real estate listing on its own website without a license authorizing access to such information.   As NAR argues, "[t]hat NAR communicated with representatives of MLSs about AHRN has never been in dispute.   That fact does not, however, create a triable issue as to whether NAR orchestrated a conspiracy to boycott AHRN." (ECF No. 411, at 35); *see, e.g., Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 227 (4th Cir. 2004) ("At most, the MCAP meeting shows contact between two independent economic actors, but 'mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence [of] an anticompetitive conspiracy.'" (*quoting Cooper v. Forsyth County Hosp. Authority, Inc.*, 789 F.2d 278, 281 (4th Cir. 1986))).[9]

---

[9]   AHRN contends that "[t]he letters pouring into AHRN's office in the wake of the November 2011 NAR annual meetings is evidence of NAR's discouraging local associations, boards, brokers and agents from dealing with AHRN." (ECF No. 422, at 25).   NAR provides evidence, however, that even *before* the Anaheim meeting in November 2011 when NAR purportedly became aware of AHRN's website, an attorney representing an MLS in Wisconsin, and *not* NAR, sent an email to a group of MLSs (and their attorneys) informing them about the operations of NeighborCity:

b.   **Direct Evidence**

AHRN argues that it has raised a genuine dispute of material fact as to direct evidence of a group boycott, relying on a single conversation between Paulette Carroll, a broker, and a representative of NeighborCity.  "Direct evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'"  *Trigon Healthcare, Inc.*, 367 F.3d at 226.  Direct evidence in the § 1 antitrust context is "explicit and requires no inferences to establish the proposition or conclusion being asserted."  *Id.*  The "direct evidence" AHRN

---

> It appears that there is a website (neighborcity.com) which is displaying some of the copyrighted data of my client.  A[] quick check of this site reveals that they are not limited to Wisconsin but also display some but not all other areas (Chicago [49,000 listings], Minneapolis [5000 listings], Detroit [726 listings], Denver [10877 listings]) in which I would strongly suspect they do not have consent to do so.
>
> My clients in Wisconsin are proceeding with the proper ways to protect ourselves and hold them accountable, but the people involved make me suspect that this is not a fly-by-night operation.  Accordingly, I would like to know if any of you have had any contact or interaction with either neighborcity.com or the company American Home Realty Network, Inc. or it[s] CEO Jonathan Cardella.

(ECF No. 410-27, at 2; *see also* ECF No. 410-21 (Aug. 27, 2010 cease and desist letter); 410-22 (Mar. 22, 2011 cease and desist letter).

offers to show group boycott is by no measure a "smoking gun" and is ambiguous at best. Specifically, AHRN relies on the following exchange between Ms. Carroll and Alex Gilbert, an AHRN representative, as direct evidence:

> Alex Gilbert: . . .  I was actually reaching out because I wanted to discuss a broker-to-broker referral with you.
>
> Paulette Carroll: Yeah.  Um, you know what? I've been advised not to take any from Neighborhood City.
>
> Alex Gilbert: Oh really?  And, and why is that?
>
> Paulette Carroll: *Because of the lawsuit that's going on with Neighborhood City.*
>
> Alex Gilbert: Ok.  And who was it that had advised you not to take out referrals?
>
> Paulette Carroll: Just out of our – *out of our office.*
>
> Alex Gilbert: Out of – OK.  Like the national association?
>
> Paulette Carroll: Yeah.  Mmmhmmm.
>
> Alex Gilbert: Oh.  Alright.  That's very strange.  Have they sent off and mailed to you or something like that?
>
> Paulette Carroll: No.  It's brought up in our team meeting every week.
>
> Alex Gilbert: Oh – every week, really?
>
> Paulette Carroll: Because of the lawsuit.
>
> . . .

Alex Gilbert: So, is the broker the one who's kind [of] been in contact with the national association and now they're just telling him not to work with us?

Paulette Carroll: I'm not sure what the – *I'm not sure what the connection is.*

Alex Gilbert: Gotcha, but they just kind [of] passed down the message?

Paulette Carroll: Yup.  Mmmhmmm.
. . .

Alex Gilbert: . . .  I'm not fully apprised of what the whole lawsuit entails, but I've actually never heard anybody been advised by the national association to not take referrals from us.

Paulette Carroll: Yeah.  Yeah.  So, I don't know.  I mean, it's our option.  It's our option in the end.

Alex Gilbert: Uh-huh.

Paulette Carroll: It is our option, but they've put it out there, definitely.

Alex Gilbert: Gotcha.  And . . .

Paulette Carroll: With the lawsuit, it's conflict of interest or whatever, you know.

(ECF No. 423-13, at 2-3) (emphases added).

The above phone conversation that AHRN relies on as direct evidence of concerted action falls far short of the standard that it be "explicit and require no inferences." *See Golden Bridge Technology, Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) ("Direct evidence explicitly refers to an understanding between the alleged conspirators, while

circumstantial evidence requires additional inferences in order to support a conspiracy claim."). Nowhere in the call does Ms. Carroll identify an explicit agreement orchestrated by NAR to encourage brokers and/or agents not to deal with AHRN. Indeed, as NAR argues, the NeighborCity representative – and not Ms. Carroll – mentioned the national association – and Ms. Carroll stated that they were advised ou*t of their office* not to take referrals from AHRN. (*See* ECF No. 429, at 14). Indeed, when asked whether the national association was in contact with the broker and advised it not to work with AHRN, Ms. Carroll stated that she was "not sure what the connection is." She also stated that *the broker* had the option not to take referrals from AHRN considering the copyright infringement lawsuit. *See, e.g., Golden Bridge Technology, Inc.*, 547 F.3d at 272 ("Viewing the evidence favorably to GBT, the emails do reveal a common dislike for CPCH among some of the Appellees and other companies. However, common dislike is not the same as an explicit understanding to conspire, so we accordingly review GBT's claim under the stricter standard required for circumstantial evidence."); *cf. Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 410 (5th Cir. 2007) (finding that email communications show conspiracy because they contain direct evidence stating that the parties entered into a "gentlemen's agreement" not to deal with another company).

Moreover, Ms. Carroll gave deposition testimony stating that NAR never advised her not to accept referrals from AHRN. Specifically, she stated that her husband, a real estate agent and business partner, advised her to stop working with NeighborCity. (ECF No. 410-51, at 3). She stated: "We felt it was not in our best interest to work with Neighborhood City because of a potential lawsuit. We decided that we did not want to jeopardize our career, our license or be involved in any type of legal matter." (*Id.*). Ms. Carroll stated during her deposition that she has "never had contact with NAR at any level," only with NAR's lawyers in the instant litigation. (*Id.* at 4). Ms. Carroll explained the phone call with the AHRN representative:

> A: The phone call was very off the cuff. I was busy, I wasn't expecting to have a lengthy phone call with anybody from Neighborhood City. I have -- I've answered the questions as well as I could, many of them. If you listen to the recording you can hear the little bit of chaos going on in the background. I was in an office situation. And had they asked me for a time to have a conversation with them, if it was an appropriate time if I had time for them, I would have gone to my office where it was a closed door, and I did not do that because I did not realize where this was going. *I have never had any conversation from NAR, I've never had any e-mails, phone calls, other than a monthly newsletter, which I never read.*
>
> Q: And you indicated that the only discussion you had at these team meetings

about NeighborCity was after that one
meeting?

A: The *only discussion that I have ever had
about Neighboorhood City with the other
agents was after the team meeting.*

Q: That one time?

A: One time.

(ECF No. 410-51, at 5) (emphases added). Consistent with her
deposition testimony, Ms. Carroll submitted a declaration
stating that "[n]o one in my brokerage has ever told me that
[NAR] advised the brokerage not to do business with AHRN. I was
never instructed by NAR, NorthstarMLS, or my broker that I was
not to enter into referral agreements with AHRN. The decision
not to accept additional referrals from AHRN was entirely my own
and based on my disapproval of AHRN's use of agent listings
without permission." (ECF No. 410-52 ¶ 4).

Based on the foregoing, the telephone recording on which
AHRN relies as direct evidence of concerted action is ambiguous,
relies on inferences of a conspiracy orchestrated by NAR, and
does not establish direct evidence of a group boycott. *See,
e.g., Hyland v. HomeServices of America, Inc.*, 771 F.3d 310, 319
(6th Cir. 2014) ("Like the district court, we view Jerry
McMahan's statements at the hearing as ambiguous at best and
they therefore do not establish direct evidence of a
conspiracy.").

### c.   Circumstantial Evidence

AHRN also relies on circumstantial evidence to show concerted action.   To show concerted action, AHRN asserts that "NAR has encouraged regional boards of realtors to step up their efforts (1) to keep their member agents from entering into referral agreements with AHRN; [(2)] to breach or repudiate referral agreements agents have entered with AHRN; and (3) to pressure agents into demanding that their names be stricken from AHRN's list of potential referral agents."   (ECF No. 167 ¶ 112). AHRN also cites an excerpt from the NAR Handbook and the Realtor Excellence Program developed by NAR as further establishing a plausible inference of a group boycott.   As will be seen, none of the circumstantial evidence purporting to show concerted action establishes a plausible conspiracy and does not tend to exclude the possibility that MLSs acted independently in deciding not to deal with AHRN, motivated by their desire not to associate with a company embroiled in litigation for copyright infringement and whose business model was unappealing.

AHRN contends that it received formulaic letters from brokers repudiating previous agreements and requesting not be contacted by AHRN, purportedly at the behest of NAR.   For instance, one such letter stated:

> It has come to my attention that American Home Realty Network, Inc. d/b/a NeighborCity ("NeighborCity") has been soliciting or may

> intend in the future to solicit agents of
> Champion Realty, Inc. to ask them to execute
> referral agreements that purport to bind
> Champion Realty, Inc.   Please be advised
> that Champion Realty, Inc. has no interest
> in entering into any referral or other
> agreements with NeighborCity, and Champion
> Realty, Inc. has not authorized any of its
> agents to execute any such agreement with
> NeighborCity on its behalf.

> Accordingly, to the extent any agent
> has executed an agreement with NeighborCity
> that purports to bind Champion Realty, Inc.,
> that agreement is void and of no legal
> effect.   Alternatively, Champion Realty,
> Inc. hereby terminates any such agreement.

(ECF No. 422-22, at 2; *see also* ECF Nos. 422-23 through 422-25).

AHRN essentially asks the court to infer concerted action at

NAR's direction from, among other things, the fact that it

received a plethora of similar correspondence from real estate

professionals around the country either repudiating referral

agreements or refusing to accept referrals from AHRN.   AHRN does

not present sufficient evidence, however, to show "that the

inference of conspiracy is reasonable" in light of NAR's

competing inference of independent action.   *Matsushita*, 475 U.S.

at 588.   Moreover, parallel behavior alone is not enough to

prove a conspiracy.   *See Theatre Enterprises v. Paramount Film

Distributing Corp.*, 346 U.S. 537, 541 (1954) ("[T]his Court has

never held that proof of parallel business behavior conclusively

establishes agreement or, phrased differently, that such

behavior itself constitutes a Sherman Act offense.").   NAR has

produced evidence that agents and brokers acted independently in refusing to deal with AHRN and for a variety of reasons. *See, e.g., Golden Bridge Technology, Inc.*, 547 F.3d at 271 ("Independent parallel conduct, or even conduct among competitors that is consciously parallel, does not alone establish the contract, combination, or conspiracy required by § 1"); *Twombly*, 550 U.S. at 554 ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently.").

Specifically, NAR provides declarations from MLS representatives stating that they have not entered into any kind of agreement with any other MLS or NAR or any other party not to deal with AHRN and NAR has not instructed or encouraged them not to deal with or license data to AHRN. (*See* ECF Nos. 410-53 through 410-65). One such MLS representative declares that he "reached out directly *and only to AHRN* when [he] learned that NeighborCity was displaying FMLS listing content without authorization." (ECF No. 410-54 ¶ 8) (emphasis added). The declarations reflect that MLSs and other real estate professionals decided not to deal with AHRN for a multitude of independent reasons, including the fact that AHRN voluntarily relinquished its membership in MLSs around the country, yet continued to display MLS data on the NeighborCity website.

(*See, e.g.,* ECF No. 410-56 ¶ 3 ("Around the beginning of 2011,
CREN continued an audit of all IDX feeds and determined that
AHRN was still displaying CREN listings, even though it was no
longer a member.  I continued to monitor the site and discovered
th[at] AHRN was continuing to post new CREN listings even though
CREN was no longer sending AHRN an IDX feed."); *see also* ECF No.
411-19 ("I have no desire to work with neighborhood city.  As
long as you[']r[e] stealing data from MLS[s] around the
country[,] I have no intention of paying you for a referral, why
should I?  You don't pay my MLS [] that brings you the leads in
the first place.   Remove me from your mailing list
immediately.")).  Many real estate professionals chose not to
deal with AHRN because they found the terms of the proposed
referral agreement unacceptable.  (*See* ECF No. 410-64 ¶ 6 ("On
February 28, 2012, I sent Mr. Miller an email, declining AHRN's
proposal for a custom license, as we found the terms proposed by
AHRN to be unacceptable, particularly given the broad rights to
use MLSLI's data that the proposed license would grant AHRN.");
ECF No. 411-22, at 2 ("After reviewing your agreement (which is
not available until you agree to accept it), I have many issues
with the terms and will not allow my agents to participate.");
ECF No. 411-23, at 2 ("Please remove me from your referral list.
I was not able to read the terms and conditions before I signed
up.  I don't agree with them."); ECF No. 411-24 ("I do not pay

29

ANYONE 30% and the property is sold!  I am in business to make money not support you!") (emphasis in original)).  Other MLSs found the information on the NeighborCity website misleading or inaccurate and refused to deal with AHRN for that reason.  (*See* ECF No. 411-26, at 2 ("Remove all profiles from agents affiliated to Huntley Estates.  The one you have of me specifically is GROSSLY incorrect! . . . Your site is deceitful to say the least."); ECF No. 411-27 ("I have some huge concerns over the misrepresentation, lies, and slander I've seen regarding your profile you have set up for me on neighborcity."); ECF No. 411-28 ("Your website is very out of date.  You have people listed as being with my firm who are not even licensed anymore.")); *see also* ECF Nos. 411-29 through 411-31).

AHRN also references a purported conversation between a real estate agent and an AHRN representative as also evidencing a conspiracy when examined in conjunction with the other evidence cited.  Specifically, AHRN relies on notes taken by an AHRN employee, Shannon Burns, which purport to reflect a telephone exchange with Kent Meister, a real estate agent from Minnesota.  Her notes indicate:

> Kent Meister, an agent with Keller Williams Classic Realty in Minnesota called NeighborCity on Friday afternoon, May 3rd, 2013 asking to speak with Devon, one of the Company's Client Advocates, regarding a

> referral invitation sent to him on May 2nd for Joseph & Mimi Toto.  Shannon at NeighborCity answered the call[] and Mr. Meister asked, "I'm just curious, are you guys aware of the local lawsuit against you?"  Further, he said "We've been *contacted by our Board about it*, so word of caution, you're peppering our agents with these emails and I'm sure they're getting logged and will be used in a court of law against you."  He asked to be removed from our system until the lawsuits are resolved. He says there are "many people in the area who are going to use this all against you." I asked if he had a question I could help him with and he said no and the conversation ended.

(ECF No. 422-27, at 2) (emphasis added).  Even assuming this transcription purporting to show what Mr. Meister expressed on the call were admissible, all this transcription indicates is that a real estate agent did not want to be contacted by AHRN until the lawsuits were resolved and that *some Board* contacted his firm about AHRN's lawsuit and/or persistent communications regarding referrals.  Whether the reference to *the Board* means NAR also is ambiguous, and the court cannot extrapolate as much from the above transcription.  Even assuming NAR contacted Mr. Meister or his agency about AHRN, there is nothing unlawful about sharing information regarding the lawsuit against AHRN. *See, e.g., Cooper*, 789 F.2d at 281 ("Indeed, the federal courts consistently have recognized that mere contacts and communications, or the mere opportunity to conspire, among antitrust defendants is insufficient evidence from which to

31

infer an anticompetitive conspiracy."); *see also Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 295 n.30 (5th Cir. 1988) (noting that "a trade association is not by its nature a 'walking conspiracy[,]' its every denial of some benefit amounting to an unreasonable restraint of trade" and that the mere exchange of information, or even consciously parallel action, is insufficient to establish a conspiracy under § 1).

Any reliance by AHRN on excerpts from the NAR handbook to show group boycott also is misplaced. The portion of the NAR handbook relied upon by AHRN states:

> In states other than California, Georgia, Alabama, and Florida, whenever an association is confronted with a request or demand by an individual for access to the association's multiple listing service without membership in the association, membership associations are advised that the association should immediately advise both the state association and the Member Policy Department of the National Association, and the recommended procedures will be provided to the member association with any other pertinent information or assistance. It is important that the state association and National Association be advised immediately if such request or demand for access to the association MLS as described is received.

(ECF NO. 167 ¶ 117; ECF No. 423-3, at 19, NAR Handbook). As NAR argues, this provision "addresses only demands by someone who is not an MLS participant for direct access to the MLS data. It has nothing to do with whether an MLS may license data to third-

parties, like AHRN, who are not members of the MLS." (ECF No. 411, at 31). Thus, this excerpt from the NAR Handbook, even when considered in conjunction with all of the other evidence that AHRN offers, does not establish a common scheme designed to achieve an unlawful objective. Indeed, it is uncontested that AHRN voluntarily surrendered its participation in various MLSs for financial reasons, losing the right to obtain MLS data. (*See* ECF No. 410-11, at 3, Cardella depo.).

Finally, AHRN contends that "[t]he course of discovery has produced evidence that suggests that NAR created a program, named the Realtor Excellence Program (REP), to compete directly with AHRN. Given the identical purpose of the two agent rating systems, a reasonable jury could find that the creation of REP was designed to push AHRN out of the market in furtherance of the NAR led boycott." (ECF No. 422, at 37). Through its AgentMatch software system, AHRN offers performance metrics, rankings, and statistics regarding real estate agents to match consumers to the "best agent" for their needs. (*See* ECF No. 422-31, at 4-15, Cardella depo). AHRN's evidence purporting to show that the Realtor Excellence Program, a pilot program, was created by NAR as part of the group boycott to compete with AHRN's AgentMatch program is ephemeral. AHRN relies primarily on an email from Gregg Larson, the CEO of Clareity Consulting,

33

in which he summarized his communications with Jonathan
Cardella, CEO of AHRN, and referenced the AgentMatch program:

> NeighhborCity is "going for it" – making the
> case that anyone should be allowed to
> display the listing data and their agent
> performance rankings *and unique consumer*
> *matching will have great value to buyers and*
> *sellers (I think this is his jewel* –
> Realtor.com might want to look into it –
> maybe license or buy it?  I can explain more
> about how it works – it's the best I've
> heard of so far).

(ECF No. 423-4, at 3) (emphasis added).  Nothing about this
correspondence suggests that NAR created the Realtor Excellence
Program to compete with AHRN; if anything, the email shows that
Gregg Larson thought that licensing or buying AgentMatch was
worth considering.

Laurene Janik provided the following deposition testimony
regarding how the Realtor Excellence Program came into
existence:

> A: [] Mr. Romito, if I recall correctly,
> called me in Chicago shortly after the
> Anaheim meeting because he became aware of
> the NAR strategic plan, which was
> [ap]proved, I believe, at that meeting and
> talked about increasing the professionalism
> of agents.   He contacted me immediately
> after the meeting to talk about ways that .
> . . NAR could perhaps, *use his program* to
> help achieve that objective.
>
> Q: And what was his program?
>
> A: His program is a survey.  It originally
> started out 12, 13 years ago where a broker,
> brokerage would send out – or QSC [Quality

34

Service Certification] would send out a
paper survey to a home buyer or a home
seller, whoever the brokerage represented in
a particular transaction; the consumer would
complete that paper survey; send it to QSC;
QSC, then, would share the results of those
surveys with the broker.  And the survey
told the broker how well their agent
performed in that particular transaction,
how satisfied the consumer was with the
services provided by that broker's agent in
that transaction.

It has since been put online, provided
there's an e-mail address provided to QSC so
that QSC can e-mail the customer
satisfaction survey to the buyer or the
seller, whoever it was, or both, if the
brokerage represented both in the
transaction; the buyers and sellers complete
the survey; it goes back to QSC; and, then,
QSC shares those results with the brokers.

Q: Prior to 2011, November of 2011, had you
had any discussions with Mr. Romito or is
this the first time you had –

A: Oh, no.  I've known Larry.  Larry started
this company, it says, 13 years ago. . . .
*And Larry made me familiar with his QSC
certification when he created it*. . . .  So,
he had all of that bundled together.  He
was, at least at this point in his
conversation with me, willing to unbundle it
and make a deal.  So if the cost had come
down, it was something that I was interested
in.  Because, based on his statistics, it
showed agent behavior modification; it
showed increase in client satisfaction on
the buy and the sell side, a jump in highly
satisfied consumers; and a decrease in
highly dissatisfied consumers, which, to me,
meant a decrease in litigation against our
members and a bump in professionalism, both
areas that I was responsible for as general
counsel.

(ECF No. 410-4, at 13) (emphases added).   This deposition testimony suggests that the idea for REP as a pilot program had nothing to do with AHRN.   Indeed, Ms. Janik further testified that in her mind, there was "[n]o connection whatsoever" between the implementation of REP and the communications she was having with various individuals regarding NeighborCity.   (*Id.* at 16). She stated that NeighborCity did not come up in any of her discussions with representatives of associations or brokers or agents when discussing REP.

AHRN argues in its opposition that "REP was designed to replicate the features of AgentMatch, but was marketed through NAR and as a way for members of NAR to protect their reputation."   (ECF No. 422, at 38).   AHRN provides no evidentiary support for this assertion, which is wholly speculative.   Aside from the single email from Gregg Larson discussed above, AHRN has not identified anything else on the record establishing that NAR created REP as part of the group boycott to compete directly with AgentMatch.   AHRN cites emails between Ms. Janik and others showing regular communications about REP, but the emails show that NAR was taking certain steps to roll out this pilot program, not that it was designed to compete with AgentMatch.   (*See* ECF Nos. 422-28 through 422-30); *see, e.g., Matsushita*, 475 U.S. at 588 ("[C]onduct as consistent with permissible competition as with illegal conspiracy does

36

not, standing alone, support an inference of antitrust conspiracy." (*citing Monsanto*, 465 U.S. at 764)). Indeed, in one such email, Ms. Janik informs the group of a meeting time to discuss the quality service certification program and references Larry Romito, whom she credited in her deposition as having developed the program which became of interest to NAR. (*See* ECF No. 423-16); *see, e.g., Merck-Medco*, 1999 WL 691840, at *15 ("We must avoid the danger of an inevitable competition chilling result that would occur should a low quantum of proof be required before a party may harness the power of the Sherman Antitrust Act against facially, legitimate, procompetitive business practices.").

Based on the foregoing, all of the evidence viewed together does not create a reasonable inference of concerted action and group boycott. Thus, judgment will be entered in favor of NAR on the only two remaining counterclaims for violation of Section 1 of the Sherman Act and unfair competition under Maryland law.[10]

### B. Motions to Seal

The parties filed three motions to seal concerning their filings related to the motion for summary judgment. (*See* ECF Nos. 412, 424, 430). The motions are insufficient and will be

---

[10] AHRN also relies on the "group boycott" theory to show an unreasonable restraint of trade by way of a "per se" violation of Section 1 of the Sherman Act. For the reasons explained above, it has not established a group boycott, thus its antitrust claim cannot survive summary judgment.

denied without prejudice to the filing of properly supported motions.

The Fourth Circuit recently reminded us that:

> It is well settled that the public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n. 17, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 597, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *Media Gen. Operations, Inc. v. Buchanan*, 417 F.3d 424, 428 (4th Cir. 2005). The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny. *Va. Dep't of State Police v. Wash. Post*, 386 F.3d 567, 575 (4th Cir. 2004). "The distinction between the rights of access afforded by the common law and the First Amendment is significant, because the common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment." *In re United States for an Order Pursuant to 18 U.S.C. Section 2703*, 707 F.3d 283, 290 (4th Cir. 2013) (*quoting Va. Dep't of State Police*, 386 F.3d at 575) (internal quotation marks omitted). The common-law presumptive right of access extends to all judicial documents and records, and the presumption can be rebutted only by showing that "countervailing interests heavily outweigh the public interests in access." *Rushford [v. New Yorker]*, 846 F.2d [249,] 253 [4th Cir. 1988]. By contrast, the First Amendment secures a right of access "only to particular judicial records and documents," *Stone [v. Univ. of Md. Med. Sys. Corp.]*, 855 F.2d [178,] 180 [4th Cir. 1988], and, when it applies, access may be restricted only if closure is "necessitated by a compelling government interest" and the denial of

> access is "narrowly tailored to serve that
> interest," *In re Wash. Post Co.*, 807 F.2d
> 383, 390 (4th Cir. 1986) (*quoting Press-
> Enter. Co. v. Superior Court*, 464 U.S. 501,
> 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)
> (internal quotation marks omitted)).

*Doe v. Public Citizen*, 749 F.3d 246, 265-66 (4th Cir. 2014). In addition, Local Rule 105.11 requires the party seeking sealing to include "(a) proposed reasons supported by specific factual representations to justify the sealing and (b) an explanation why alternatives to sealing would not provide sufficient protection."

The parties in this case were advised at least once before that "[t]he burden is on the party seeking confidential treatment to justify it" and that the party seeking to seal documents must justify the motion, provide redacted portions of documents that can be filed if that is possible, and consider alternatives to sealing. (*See* ECF No. 355, at 41, March 10, 2014 memorandum opinion). Nevertheless, the motions to seal contain only boilerplate recitations, citing the Protective Order and the "attorney's eyes only" designations on the applicable documents. The submissions indicate that the parties seek to seal in their entirety their memoranda in connection with the motion for summary judgment and multiple exhibits. The parties have made no attempt to redact portions of the filings as opposed to sealing the documents in their entirety. *See*

*Visual Mining, Inc. v. Ziegler*, No. PWG 12-3227, 2014 WL 690905, at *5 (D.Md. Feb. 21, 2014) (denying motion to seal when the only justification was that the documents are "confidential" under a court-approved Protective Order); *Under Armour, Inc. v. Body Armor Nutrition, LLC*, No. JKB-12-1283, 2013 WL 5375444, at *9 (D.Md. Aug. 23, 2013) (denying motions to seal where "[t]he parties . . . provided only the barest support for the motions, usually relying on the protective order issued in th[e] case" and failed to "provide 'specific factual representations' to justify their argument"); *Butler v. DirectSAT USA, LLC*, 876 F.Supp.2d 560, 577 n.18 (D.Md. 2012) ("In their motion to seal, Plaintiffs state only that they seek to seal the exhibits pursuant to the confidentiality order, an explanation insufficient to satisfy the 'specific factual representations' that Local Rule 105.11 requires."). Indeed, it is not at all clear why all of the memoranda and many exhibits should be sealed in their entirety from the public.

For its part, NAR states it does not necessarily agree with all of the documents it has submitted for sealing, but has moved to seal nonetheless because of *AHRN's* confidentiality designations. (*See* ECF No. 412, at 4). In response to AHRN's motion to seal - which also erroneously relies exclusively on the confidentiality and "attorney's eyes only" designations as justifications for sealing - NAR states that it agrees with

AHRN's motion only insofar as it seals to keep sealed Exhibits PP, QQ, and RR (ECF Nos. 422-28 through 422-30).   Citing ECF No. 405, NAR submits that "[t]he Court already has determined that Exhibits PP, QQ, and RR contain confidential information that support sealing, having previously granted NAR's motion to seal those documents."   (ECF No. 425, at 2).   ECF No. 405 is a paperless order approving a motion to seal, but it is not clear at all why Exhibits PP, QQ, and RR need to be sealed in their entirety.   Based on the foregoing, the parties may resubmit their motions to seal, justifying any sealing or proposed redactions.   In the meantime, the summary judgment submissions will remain temporarily under seal.   If the parties do not timely renew their motions, the sealed filings will be unsealed.

Finally, the court will not undertake to determine whether any portion of this Memorandum Opinion will be filed under seal. Accordingly, the Memorandum Opinion will be filed under seal temporarily, and the parties are directed to review it and request *jointly* within fourteen (14) days from this memorandum opinion any necessary redactions that should be made before it is released to the public docket.

## IV.  Conclusion

For the foregoing reasons, NAR's motion for summary judgment will be granted.  The three motions to seal will be denied.

A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge